DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
LAUREN E. KAPSKY (SBN 321395)
lkapsky@durietangri.com
ERIC G. MESSINGER (SBN 320298)
emessinger@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
NOVELLA YVETTE COLEMAN (SBN 281632)
ncoleman@aclunc.org
MICAELA DAVIS (SBN 282195)
mdavis@aclunc.org
ABRE' LEANN CONNER (SBN 306024)
aconner@aclunc.org
CHRISTINE P. SUN (SBN 218701)
csun@aclunc.org
JAMIE L. CROOK (SBN 245757)
jcrook@aclunc.org
39 Drumm St
San Francisco, CA 94111
Telephone:    415-621-2493
Facsimile:    415-255-8437

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
CRIMINAL LAW REFORM PROJECT
EZEKIEL R. EDWARDS (*pro hac vice* pending)
eedwards@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone:   212-549-2610
Facsimile:   212-549-2651

Attorneys for Plaintiffs
Tiffany Cross, Shalonda Adams, Crystal Anthony, Arron Lee Mathews,
Acacia McNeal, and Darlene Francine Rouse

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIFFANY CROSS, SHALONDA ADAMS, CRYSTAL ANTHONY, ARRON LEE MATHEWS, ACACIA MCNEAL, and DARLENE FRANCINE ROUSE. | Case No. 3:18-cv-06097 |
| Plaintiffs, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CITY AND COUNTY OF SAN FRANCISCO, DARREN NOCETTI, in his individual capacity, JASON CHERNISS, in his individual capacity, AND JOHN DOES 1 THROUGH 50, in their individual capacities. | |
| Defendants. | |

Plaintiffs Tiffany Cross, Shalonda Adams, Crystal Anthony, Arron Lee Mathews, Acacia McNeal, and Darlene Francine Rouse (collectively, "Plaintiffs") for their complaint against Defendants City and County of San Francisco, San Francisco Police Department Sergeant Darren Nocetti ("Sergeant Nocetti"), San Francisco Police Department Captain Jason Cherniss ("Captain Cherniss"), and John Does 1 through 50 (collectively, "Defendants") allege as follows:

## NATURE OF ACTION

1.    Our Constitution promises all persons, regardless of their race, the equal protection of the laws.  When peace officers selectively enforce criminal laws against members of one race, because of their race, they break that promise.  And, in so doing, they violate the laws they have sworn to uphold.

2.    Discriminatory enforcement of criminal laws against Black people was one of the central evils addressed by the framers of the Fourteenth Amendment.  But while courts have long recognized that the Fourteenth Amendment's Equal Protection Clause prohibits selective enforcement of criminal laws based on race, law enforcement officers of the City and County of San Francisco have repeatedly violated the rights that Clause safeguards, singling out Black people for enforcement.

3.    In one of San Francisco's most diverse neighborhoods, the Tenderloin District, drug sales are commonplace.  In 2013 and 2014, the U.S. Drug Enforcement Administration ("DEA") and the United States Attorney's Office for the Northern District of California ("USAO") partnered with the San Francisco Police Department ("Police Department" or "Department") on a joint operation (the "Operation") to enforce certain drug laws in the Tenderloin.  Police Department officers decided which individuals to target for buy-walks and surveillance in the Operation.  Those officers targeted 37 people for federal prosecution for selling small amounts of drugs.  Yet despite Police Department officers knowing, at the time, that people of many different races engage in drug sales in the Tenderloin, all 37 people those officers targeted were Black.

4.    The arrests took place in two waves.  By the time of the second wave, the scale and precision of the racially discriminatory enforcement became even starker.  Those arrested in the first wave, facing federal sentences, pleaded guilty.  Half of the individuals arrested in the second wave pleaded guilty as well.  Twelve of the remaining criminal defendants—including the Plaintiffs in this civil action—sought discovery, seeking to prove that law enforcement officers had impermissibly

targeted them because of their race.  The District Court granted their motion for discovery, finding there was "substantial evidence suggestive of racially selective enforcement by the [Police Department]."  In response, before a full accounting of the Police Department's involvement could emerge, the USAO dropped all charges against the remaining 12 criminal defendants.

5.      Neither the Police Department nor the federal prosecutors provided any meaningful explanation for why these defendants had been targeted for arrest and prosecution over others similarly situated, or what compelled the sudden dismissals of the charges against them.  In opposing the defendants' motion for discovery, the federal prosecutor never proffered as evidence any statement from a member of the Police Department to justify the targeting decisions that had been made.

6.      The Police Department whose officers committed these overt constitutional violations against Plaintiffs and other Black arrestees has a long history of racially discriminatory law enforcement. Reports dating back to at least 2002 by the ACLU of Northern California, the Hayward Burns Justice Institute, the U.S. Department of Justice, a Blue Ribbon panel convened by the San Francisco District Attorney's Office, and others have documented the Department's alarming racial disparities in traffic stops and searches; arrest rates for all offenses, including drug offenses; and the disproportionate use of force on Black people.

7.      In recent years, police officers in the Department have exchanged text messages with other officers containing egregious racial epithets and racially inflammatory language, without adequate discipline from the Department.

8.      Even the former Police Department Chief, current District Attorney George Gascon, has publicly concluded that there are "a substantial number of people within [the Department] that are racist" and that "[t]here's a culture that has allowed those people to thrive and survive and even promote within that environment."

9.      Yet the Department has refused to implement reforms to begin responding to its long history of racially biased policing or to counteract a culture that tolerates racism by some officers and fails to discipline adequately officers whom the Department knows have demonstrated racial bias.  This indifference to overwhelming evidence of racially biased policing and racist attitudes by some officers, and a refusal to discipline adequately officers for racially biased policing or implement training and

protocols to eradicate racial disparities in enforcement, caused the selective enforcement of drug laws against the exclusively Black people who were arrested in the two waves of the Operation.

10.     Defendants' choices in targeting people in the Operation were motivated by race, in violation of well-established constitutional law under the Equal Protection Clause and the requirements of Title VI of the Civil Rights Act of 1964, *codified at* 42 U.S.C. § 2000d *et seq.*

11.     Plaintiffs therefore bring this action for damages pursuant to 42 U.S.C. § 1983, the Equal Protection Clause, and for damages under Title VI to protect against racially motivated law enforcement and to obtain relief for the injuries they suffered as a result of Defendants' unlawful actions.

12.     Those injuries include the loss of important constitutional and civil rights; substantial emotional distress, anxiety, worry, and humiliation; interference with intimate family relationships; and out-of-pocket costs, including lost wages, lost job opportunities, and costs incurred to comply with onerous pretrial terms and conditions that were imposed as a consequence of Plaintiffs being targeted for law enforcement and referral for federal prosecution on the basis of their race.

## THE PARTIES

### Plaintiffs

13.     Plaintiff Tiffany Cross is a Black woman and a resident of the State of California.  During some of the events giving rise to this suit, Ms. Cross resided in the jurisdiction of the Northern District of California.

14.     Plaintiff Shalonda Adams is a Black woman and a resident of the State of California.  At all times relevant to the events giving rise to this suit, Ms. Adams resided in the jurisdiction of the Northern District of California.

15.     Plaintiff Crystal Anthony is a Black woman and a resident of the State of California.  At all times relevant to the events giving rise to this suit, Ms. Anthony resided in the jurisdiction of the Northern District of California.

16.     Plaintiff Arron Lee Mathews is a Black man and a resident of the State of California.  At all times relevant to the events giving rise to this suit, Mr. Mathews resided in the jurisdiction of the Northern District of California.

17.     Plaintiff Acacia McNeal is a Black woman and a resident of the State of California.  At all

times relevant to the events giving rise to this suit, Ms. McNeal resided in the jurisdiction of the Northern District of California.

18.     Plaintiff Darlene Francine Rouse is a Black woman and a resident of the State of California.  At all times relevant to the events giving rise to this suit, Ms. Rouse resided in the jurisdiction of the Northern District of California.

**Defendants**

19.     Defendant City and County of San Francisco is an entity established pursuant to Article XI, § 6, of the California Constitution.

20.     The Police Department is a sub-department of the City and County of San Francisco. Defendant City and County of San Francisco has jurisdictional control over and funds the Police Department.

21.     At all times relevant to this case, the City and County of San Francisco's programs and activities received federal financial assistance, including yearly grants from the U.S. Department of Justice's Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program.  Defendant City and County of San Francisco has allocated funds from the annual Byrne JAG Program grants, along with other federal funding, to its Police Department for activities including drug law enforcement.

22.     As a recipient of federal funds, the City and County of San Francisco is responsible for ensuring that the programs or activities to which it distributes those funds, including programs administered or carried out by the Police Department, comply with federal law, including the prohibition against racial discrimination by the programs and activities that receive that federal funding.  Its Police Department is likewise responsible for ensuring that it does not discriminate based on race in its use of the Byrne JAG Program funds (and any other federal funds) that Defendant City and County allocates to it.

23.     The Police Department constitutes one of two law enforcement arms of the City and County of San Francisco, along with the San Francisco Sheriff's Department.  At all times relevant to this case, the Police Department had responsibility for law enforcement within the Tenderloin District ("the Tenderloin").

24.     Defendant Darren Nocetti is a resident of the State of California.  At all times relevant to

this suit, he was an officer or sergeant in the Police Department.  Sergeant Nocetti participated in the cases brought against at least 29 of the 37 defendants in the Operation, including the cases brought against Plaintiffs Anthony, Cross, McNeal, and Rouse.  All actions taken by Sergeant Nocetti described herein were taken while acting in the course and scope of his employment, and under color of state law.

25.     Defendant Jason Cherniss was the Captain of the Tenderloin Station, a police district in San Francisco, from 2013–15, during the two waves of investigations that gave rise to this suit.  The Tenderloin Station is the smallest of 10 district station areas that together cover the City and County of San Francisco.  Captain Cherniss was responsible for supervising the conduct of Police Department officers at issue in this suit, including during the arrests of Plaintiffs.

26.     Defendant John Doe 1, an as-yet-unidentified officer[1] in the Police Department, was captured on video during a surveillance operation against one of the targets.  In the video, he is seen choosing not to engage in an undercover buy with an Asian-American person involved in drug activity in favor of engaging with and arresting a Black person involved in drug activity.  Officer Doe 1 participated in an unknown number of cases in the Operation.  All actions taken by John Doe 1 described herein were taken while acting in the course and scope of his employment, and under color of state law.

27.     Defendant John Doe 2, an as-yet-unidentified officer of the Police Department, was recorded on video during a surveillance operation against one of the targets expressing racial animus toward Black persons.  Defendant John Doe 3 was recorded on video during a surveillance operation against one of the targets directing Officer Doe 2 not to give voice to his views while being recorded. Officer Doe 2 participated in the cases brought against at least 18 of the 37 defendants in the Operation, including the cases brought against one or more of the Plaintiffs.  Officer Doe 3 participated in the cases brought against at least 11 of the 37 defendants in the operation, including the cases brought against one or more of the Plaintiffs. All actions taken by Officers Doe 2 and Doe 3 described herein were taken while acting in the course and scope of their employment, and under color of state law.

28.     Defendant John Does 4–33 are individual Police Department officers who participated in the decision to target Plaintiffs for arrest and prosecution on the basis of race.  Each of these Defendants

---

[1] The term "officer" is used generically herein to refer to members of the Police Department.

1    was involved in the Operation, and all actions taken by these Defendants described herein were taken

2    while acting in the course and scope of their employment, and under color of state law.

3        29.    Members of the Police Department who participated in the Operation included Officers

4    Anthony Assaretto, B. Conway, R. Crosby, K. Cuadro, John Cunnie, Ariana Daggett, Murray Daggs,

5    Britt Elmore, D. Goff, M. Guttierez, Micah Hope, Tom Lee, Matt Lopez, Ken MacDonald, Joseph

6    Marte, Z. McAuliffe, Brian Michaud, Irene Michaud, Moody (first name unknown), C. O'Brien, Joseph

7    Obidi, Adrian Payne, James Puccinelli, Brenton Reeder, Dan Rosaia, A. Scafani, Daniel Solorzano, J.

8    Wood, and Sergeants Matt Dudley, Frank Hagan, Hinds (first name unknown), Ron Liberta, Joe

9    McCloskey, and Shaughn Ryan.  Officers Elmore, Daggs, Reeder, MacDonald, and Lee were involved in

10   20 or more of the buy-walks that led to arrest and federal prosecution.

11       30.    As of the filing of this Complaint, despite diligent efforts, Plaintiffs have been unable to

12   uncover which specific officers selected them as targets in the Operation.  Because Plaintiffs do not yet

13   have information sufficient to ascribe responsibility for targeting and enforcement decisions to any non-

14   supervisory officers, Plaintiffs therefore herein rely on "John Doe" designations because the culpability

15   of certain individuals is at present unknown.  Plaintiffs intend to use information obtained in discovery to

16   amend these designations.

17       31.    Defendants John Doe 34–50 are members of the Police Department who had supervisory

18   authority over the officers who targeted Plaintiffs for arrest and prosecution on the basis of race.

19   Plaintiffs do not yet have information sufficient to ascribe supervisory authority to any individual

20   member within this group.  All actions taken by John Doe Defendants 34–50 described herein were taken

21   while acting in the course and scope of their employment, and under color of state law.

22                              **JURISDICTION AND VENUE**

23       32.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under

24   the Fourteenth Amendment to the United States Constitution and pursuant to Title VI of the Civil Rights

25   Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, the Title VI implementing regulations issued by the United

26   States Department of Justice, 28 C.F.R. §§ 42.101 to 42.112, Title VI contractual assurances, and 28

27   U.S.C. §§ 2201–2202.

28       33.    The case presents a federal question within this Court's jurisdiction under Article III, § 2

1  of the United States Constitution, and 28 U.S.C. §§ 1331 and 1343.

2  34.    Venue is proper in this Court under 28 U.S.C. § 1391 because the parties reside in this

3  District, and a substantial part of the events giving rise to this claim occurred in this District.

4  **STATEMENT OF FACTS**

5  **A.    The Police Department Targeted Plaintiffs and Other Black People for Federal**
       **Charges for Drug Activity in the Tenderloin**

6

7  35.    The Tenderloin is a neighborhood in downtown San Francisco, California.

8  36.    The Tenderloin is known to be an area in which there are high rates of drug sales and open

9  drug use.

10  37.    Individuals of many different races engage in drug sales in the Tenderloin, including

11  individuals who are Black, Latino, white, Asian, and Pacific Islander.

12  38.    Within the Tenderloin, Black, Latino, white, Asian, and Pacific Islander persons are

13  generally identifiable, including to police officers, as members of their respective racial groups.

14  39.    Consistent with its diversity, drug dealing in the Tenderloin is not limited to members of

15  any one racial group or ethnicity.  One set of survey results suggests that approximately half of those

16  persons who sell drugs within the Tenderloin are Black, while 20% are Latino and 17% are white.

17  40.    Police Department officers interact frequently with individuals involved in drug-related

18  activity within the Tenderloin.  Many of these officers have had repeated contact with individuals in the

19  Tenderloin District.

20  41.    Police Department officers know the Tenderloin is racially diverse and that drug activity

21  in the Tenderloin is not limited to one racial group or ethnicity.  For example, multiple law enforcement

22  reports demonstrate the Police Department's awareness of the presence of Hispanic or Latino dealers in

23  the Tenderloin.  There are also hundreds of San Francisco Superior Court cases that involve non-Black

24  individuals arrested by the Police Department for drug-trafficking crimes in the Tenderloin between

25  January 2013 and February 2015, a period that covers the events giving rise to this suit.

26  42.    The arrests that give rise to the instant suit were part of the Operation which involved the

27  USAO, the DEA, and the Police Department.  The overwhelming majority of law enforcement activity in

28  the Operation occurred in the Tenderloin.

43.     Some 46 members of law enforcement were involved in the Operation, including at least 34 officers, sergeants, and other members of the Police Department; 10 DEA officers; a United States Marshal; and a Daly City police officer.

44.     The purported goal of the Operation was to target drug sales taking place near schools in the Tenderloin.  By law, 21 U.S.C. § 860, certain federal drug-related offenses carried out within 1,000 feet of a school are subject to enhanced sentencing.

45.     Because of the layout of schools within the Tenderloin, almost every part of the Tenderloin is within 1,000 feet of a school.

46.     According to the USAO, the goal of the Operation was to "target[] persistent, recidivist, and repeat offenders."  *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1053 (N.D. Cal. 2016) (attached hereto as Exhibit A).

47.     The core actions involved in the Operation consisted of undercover law enforcement officers or confidential informants carrying out a series of "buy-walk" transactions.

48.     In those buy-walks, undercover law enforcement officers or confidential informants approached targeted individuals in the Tenderloin to buy small amounts of drugs from them.

49.     During these approaches, law enforcement, including some Defendants, surveilled the transactions and sought to capture them on video.

50.     Police Department officers decided which individuals to target for buy-walks and surveillance before the enforcement operations took place.

51.     The federal indictments that later issued rested almost exclusively on information obtained during these "buy-walk" transactions, meaning that Police Department officers' decisions to select and target individuals for surveilled buy-walks resulted in federal prosecution of those individuals.

52.     Certain Police Department officers were involved in the vast majority of buy-walks and arrests in the Operation.

53.     The first wave of the Operation, which consisted of 20 buy-walks, took place on various dates from August to November 2013 and resulted in federal charges against 14 of the individuals targeted.  All 14 individuals were Black.

54.     The second wave, which consisted of 23 buy-walks, took place on various dates from

October to December 2014 and resulted in federal charges against all 23 of the individuals targeted. All 23 individuals were Black. All six Plaintiffs in this action were arrested in the second wave. They were each charged with felony distribution of narcotics within 1,000 feet of a school, in violation of 21 U.S.C. §§ 841 and 860.

55.     Defendant Nocetti indicated to certain people arrested pursuant to the Operation, including Plaintiff McNeal after her arrest, that the decisions to target these Arrestees—all of whom were Black—were made deliberately and intentionally.

56.     In sum, between the two waves, the USAO, based on enforcement decisions made by officers of the City and County of San Francisco's Police Department, charged 37 Black people with selling drugs within 1000 feet of a school in violation of 21 U.S.C. §§ 841 and 860.

57.     The alleged transactions at issue in these arrests involved small amounts of drugs sold, such as one "rock" of crack.

58.     All 37 people who were arrested in the two waves ("OSS Arrestees") faced at least a one-year mandatory minimum sentence pursuant to 21 U.S.C. § 860(a), (d), though several faced greater exposure.

59.     Against this exposure, all OSS Arrestees from the first wave pleaded guilty, as well as more than half of the second wave.

**B.      The District Court Found a Sufficient Showing of Discriminatory Effect and Intent by Police Department Officers and Others to Justify Discovery from the USAO Relating to the OSS Arrestees' Selective Enforcement Claim**

60.     The Federal Public Defender represented most of the defendants charged in the Operation. In that capacity, the Federal Public Defender was the first to discover evidence suggesting racially selective enforcement and prosecution.

61.     On March 31, 2015, the Federal Public Defender filed a notice of related cases for eight of the OSS Arrestees—including the Plaintiffs in this case—noting this pattern of racially selective enforcement and prosecution, and the intent to file a motion to dismiss the criminal indictments based on violations of the Equal Protection Clause's prohibition against racially selective enforcement of the laws.

62.     The criminal cases were deemed related and consolidated before the same federal court

judge.

63.     The OSS Arrestees in the consolidated case then moved for discovery relating to their claims of racially discriminatory selective enforcement and prosecution, seeking information such as the "charging selection criteria for Operation Safe Schools," files on the Police Department officers involved in the Operation, and communications between Police Department officers and the DEA and USAO.

64.     The OSS Arrestees supported their motion with declarations, hundreds of exhibits, expert reports, and statistical analyses.  That proffer showed that: (1) there were many similarly situated non-Black dealers in the Tenderloin who could have been targeted but were not; (2) there was evidence of explicit racial bias on the part of some of the individual officers involved in the buy-walks; and (3) the Police Department has a well-documented history of tolerating racism against Black people by officers and supervisors.

65.     In response to the motion for discovery, the USAO submitted declarations by DEA agents involved in the two Operation sweeps, who claimed that the DEA did not consider race in the Operation.

66.     However, no declarations or other evidence was submitted on behalf of the Police Department, the City and County of San Francisco, or any Police Department officer or employee.  At oral argument on May 9, 2016, concerning whether to grant the motion to compel, the USAO stated that the Police Department was "unwilling to cooperate in allegations of racism against them."

67.     A claim of selective enforcement requires a showing of law enforcement that has a discriminatory effect and that has a discriminatory purpose.  The District Court concluded that the OSS Arrestees had made a sufficient showing of the Operation's discriminatory effect on Black people and its discriminatory purpose to justify discovery.  Ex. A at 1047–63.

68.     In granting the motion for discovery relating to selective enforcement, the District Court found that the following evidence submitted by the OSS Arrestees demonstrated discriminatory effect (*see* Ex. A at 1059–63):

         a.     The fact that 100% of the individuals who were targeted and prosecuted in the Operation were Black.

         b.     Evidence of similarly situated non-Black people who were not arrested and prosecuted under the Operation, including:

i.      San Francisco Superior Court data for hundreds of cases in which a non-Black individual was charged with a drug trafficking crime originating in the Tenderloin in state court during the two-year time period during which the Operation took place.  These individuals could have been targeted under the Operation and charged with a violation of 21 U.S.C. § 860, as nearly every place within the Tenderloin was within 1,000 feet of a school, but they were not;

ii.     The fact that many of the non-Black individuals who were not targeted under the Operation had extensive histories of drug-trafficking in the Tenderloin and elsewhere and/or were well-known to the Police Department officers in the Tenderloin.[2]  Arresting officers also often made explicit reference to the fact that the drug transaction for which these individuals were arrested was occurring near a school;

iii.    A survey administered to active drug users in the Tenderloin showing racial diversity among people who sold drugs in the Tenderloin.  Users reported that 56% of recent drug transactions in the Tenderloin involved Black drug sellers; 20% involved Latino drug sellers; and 16.8% involved white drug sellers; and

iv.     A video from the investigation of a Black OSS Arrestee, Cassie Roberts, showing Officer Doe 1, who was acting in undercover capacity as a buyer, declining an offer from an Asian dealer and instead purposefully waiting for Ms. Roberts to get off the phone so he could approach her.  *See* Manny Ortez, *SFPD/DEA surveillance of Tenderloin drug dealing*, YouTube (Apr. 8, 2015).[3] On the recording, the undercover officer explains that Ms. Roberts was not paying attention to him, but he got her attention and avoided the "Asian chick."

c.      An expert's statistical analysis based on the state court figures and survey results, as cited in the Federal Public Defender's motion for discovery, in which the expert concluded that it was "very unlikely to be the result of chance" that all 37 OSS Arrestees were Black.  In fact, there was a greater than 95% likelihood that the selection was ***not*** a result of chance.

69.     The evidence that the District Court found to demonstrate discriminatory intent included

---

[2] The Federal Public Defender, in order to illustrate the disparate treatment of their clients, provided detailed descriptions of approximately 60 of the non-Black individuals arrested for drug trafficking charges during the relevant time period who were not charged or prosecuted federally.

[3] *Available at* https://www.youtube.com/watch?v=Y7vp2em25Zc&t=1s.

(*see* Exhibit A at 1063-64):

    a.    The fact that all 37 OSS Arrestees were Black even though the relevant population was not 100% Black.

    b.    Police Department incident reports that showed that the Police Department was aware of the presence of and locations frequented by Latino dealers in the Tenderloin.

    c.    Evidence that some of the Police Department officers who were part of the Operation were aware of the existence of non-Black persons engaged in drug sales in the Tenderloin, as these officers were personally involved with the arrests of more than 30 of the non-Black comparators identified by the Federal Defender.

    d.    A video from the investigation of Plaintiff McNeal, in which Officer Doe 2 stated, "fucking BMs,"—i.e., Black males—as the camera is focused on a group of Black men and women, and in response, Officer Doe 3 stated, "shh, hey, I'm rolling."[4]

    e.    The case of Ms. Roberts, described above, where a non-Black person selling drugs was purposefully avoided in favor of a Black person selling drugs.

    f.    Racially biased conduct or comments made by other officers involved in the Operation, in other contexts.

70.    On June 30, 2016, the District Court granted the motion seeking discovery for selective enforcement and denied without prejudice the motion seeking discovery for selective prosecution.

71.    The Court found there was "substantial evidence suggestive of racially selective enforcement" and "that evidence [was] countered by a conspicuously meager rebuttal by the government." The Court specifically noted that "even under the government's purported criteria for prosecution under OSS (e.g. history of drug dealing, strength of the evidence), [the OSS Arrestees had] demonstrated that there were similarly situated non-African-Americans who were not arrested and subjected to prosecution under OSS." Ex. A at 1061.

72.    The District Court directed the parties to meet and confer on the scope of discovery. Subsequently, the USAO's office provided some of the information sought by the Federal Public

---

[4] *Id.*

Defender's office, but before the parties resolved ongoing disputes as to the proper scope of discovery, the USAO abruptly sought dismissal, without explanation, of the charges against the 12 OSS Arrestees.

73.     The prosecution moved for dismissal before the Police Department had responded to third-party subpoenas issued by the Federal Public Defender's office regarding the Department's role in the arrests.

74.     On January 25, 2017, the District Court dismissed the indictments, including those against the Plaintiffs in this suit, with prejudice.[5]  But the court flagged the possibility of a new "venue" or "forum" appropriate to the "public interest in airing the issues that have been raised":

> These are serious issues, serious allegations regarding claims of discriminatory enforcement patterns and this sort of thing, and as I stated in my earlier order, I think the defendants in this case have raised a very substantial prima facie case that, at the very least, raises some serious questions that would warrant a response and a full airing of the issues, given the seriousness of the allegations.

Transcript of Proceedings, *United States v. Matthew Mumphrey*, dated Jan. 25, 2017.

75.     As shown in more detail below, each Plaintiff has suffered and continues to suffer injuries as a result of being targeted for the racially discriminatory enforcement pursuant to the Operation, including without limitation significant emotional distress, dignitary harms, and lost income and other out-of-pocket costs.

C.     **The Police Department Has a Longstanding and Entrenched History of Racism and Racially Biased Policing that Led to the Selective Enforcement in the Operation**

1.     **The Department's history of racism, racially biased policing and failure to implement recommendations to stop this behavior is well-documented**

76.     The targeting of 37 Black people, and no non-Black people, for federal prosecution in the Operation, was consistent with the Police Department's long history of racially biased policing of Black people.

77.     Before and during the events giving rise to this suit, there was a long-established pattern of Police Department officers employing racist policing practices without accountability.  The City and

---

[5] Accordingly, the statute of limitations for Plaintiffs' claims under 42 U.S.C. § 1983 and Title VI, and its implementing regulations, began to run on January 25, 2017.

County of San Francisco has repeatedly commissioned reports and released data in response to race-related scandals or violence and the resulting public outcry.  Each time, the reports issued common-sense recommendations, including greater transparency through improved data collection and reporting, training addressing racial bias, and various additional ways to hold the Police Department and its officers accountable for anti-Black actions.  Each time, the Police Department failed to act on these recommendations.  As a result, it has continued to engage in actions that result in discriminatory enforcement against, harassment of, and violence against Black people.

78.     Since 2002, at least *seven* major studies or reports have detailed the racist policing practices at the Police Department.  These include reports commissioned by the City and County of San Francisco and conducted by the U.S. Department of Justice ("DOJ").  The reports—as well as the steady beat of news coverage of race-related scandals at the Police Department—document the Police Department's consistent custom and practice of deliberately targeting Black people for law enforcement scrutiny.  The Police Department's disregard for those reports' recommendations confirm that the Police Department has long been on notice of the need for reform yet has refused to undertake even the most common-sense recommendations to curb racist policing practices.

79.     These reports are, in chronological order:

a.     **The ACLU Report**:  A 2002 ACLU report concluded, based on its examination of the Police Department's stop data, that Black motorists were significantly more likely to be stopped by Police Department officers than motorists of other races and that Black and Latino people were subject to a disproportionately high number of searches, even though those searches were less likely to reveal evidence of criminality.  Mark Schlosberg, *A Department in Denial: The SFPD's Failure to Address Racial Profiling*, American Civil Liberties Union of Northern California 3, 6, 8 (Oct. 7, 2002) ("ACLU Report").[6]  The report also documented a systemic, widespread pattern of Police Department officers failing to fill out data collection forms despite requirements to do so, indicating rampant underreporting of stops and searches throughout the Police Department.  The report included recommendations for data collection and accountability.

---

[6] *Available at* https://www.aclunc.org/publications/department-denial-san-francisco-police-departments-failure-address-racial-profiling.

1          b.    **The Fridell Report**:  In late 2005 and early 2006, the *San Francisco Chronicle*

2  reported that San Francisco had the highest arrest rates of Black people, proportional to population, of

3  any large city in California.  Susan Sward, *High black arrest rate raises call for inquiry*, San Francisco

4  Chronicle, Dec. 17, 2006, at A1 ("Chronicle, Dec. 17, 2006"); Susan Sward, *Police fail to report traffic*

5  *stop data*, San Francisco Chronicle, Mar. 7, 2007, at A1.[7]  In response, the City contracted Dr. Lorie

6  Fridell, a national expert on biased policing, to meet with police and community leaders and "present a

7  framework for ongoing discussions in the city about fair policing."  Dr. Lorie Fridell, *Fair and Impartial*

8  *Policing: Recommendations for the City and Police Department of San Francisco* (March 2007) (the

9  "Fridell Report").[8]  The Fridell Report acknowledged the same rampant underreporting of stops and

10  searches by the Police Department observed in the ACLU Report and further found that, three years later,

11  the Department had failed to improve its data collection and reporting practices.  The Fridell Report set

12  out concrete recommendations for the Police Department to pursue fair and impartial policing through

13  training, leadership, supervision, accountability, recruitment and hiring, outreach to diverse communities,

14  institutional priorities, and data collection policies and practices.  Subsequent reports, such as the DOJ

15  and Blue Ribbon Panel reports (*see infra*), found that Dr. Fridell's recommendations were largely

16  ignored by the Police Department.

17          c.    **The 2013 Haywood Burns Report**:  In 2013, at the request of the Reentry

18  Council of the City and County of San Francisco (the "Reentry Council"), the W. Haywood Burns

19  Institute for Juvenile Justice Fairness & Equity (the "Burns Institute") issued the first of two reports on

20  racial and ethnic disparity analysis in San Francisco's criminal justice system.  Burns Institute*, San*

21  *Francisco Justice Reinvestment Initiative: Racial and Ethnic Disparities Analysis for the Reentry*

22  *Council*, Summary of Key Findings 2 (2013) (the "2013 Haywood Burns Report").[9]  The 2013 Haywood

23  Burns Report found that a disproportionate number of Black adults were represented at every stage of the

24

[7] *Available at* https://www.sfgate.com/crime/article/HIGH-BLACK-ARREST-RATE-RAISES-CALL-FOR-INQUIRY-2482118.php; https://www.sfgate.com/news/article/Police-fail-to-report-traffic-stop-data-S-F-2612341.php.

[8] *Available at* https://sanfranciscopolice.org/sites/default/files/FileCenter/Documents/14851-Fair_and_Iimpartial_Policing_Report.pdf.

[9] *Available at* http://www.burnsinstitute.org/wp-content/uploads/2013/12/JRI_SF-RED-Analysis-SUMMARY-of-FINDINGS.pdf.

criminal justice process in San Francisco:  while Black adults represented only 6% of the adult

population in San Francisco, they represented 40% of the people arrested, 44% of the people booked in

County Jail, and 40% of the people convicted.

       d.    **The 2015 Haywood Burns Report**:  In November 2014, the Reentry Council

commissioned the Burns Institute to provide an in-depth analysis on the racial and ethnic disparities at

five key decision points in San Francisco's criminal justice system: arrest, bail and pretrial jail, pretrial

release, sentencing, and motion to revoke probation.  The report documented gross disparities between

Black adults and white adults at all five decision points.  Burns Institute, *San Francisco Justice

Reinvestment Initiative: Racial and Ethnic Disparities Analysis for the Reentry Council* (2015) (the

"2015 Haywood Burns Report").[10]  In addition, thirteen years after the ACLU Report noted deficiencies

in data collection, the 2015 Haywood Burns Report emphasized the Police Department's "significant and

repeated problems" of data collection, integrity, and availability.  The 2015 Haywood Burns Report

observed that the Police Department data required to answer basic and fundamental questions were

"largely unavailable."  *Id.* at 1.

       e.    **The Quattrone Report**:  The Quattrone Center for the Fair Administration of

Justice at the University of Pennsylvania Law School published a report following a study of more than

10,700 complete case records between 2011 and 2014 from the San Francisco Public Defender's Office.

Emily Owens, *et al.*, *Examining Racial Disparities in Criminal Case Outcomes among Indigent

Defendants in San Francisco*, Summary Report 1, 5, 7 (2017) (the "Quattrone Report").[11]  The Quattrone

Report's key findings showed that in San Francisco, Black people experienced lengthier pretrial

detention, were convicted of more serious crimes, and received longer sentences than white people, in

part because "[p]eople of color receive more serious charges at the initial booking stage, reflecting

decisions made by officers of the San Francisco Police Department."  *Id.* at 2.

       f.    **The Blue Ribbon Report**:  In May 2015, the San Francisco District Attorney

formed the Blue Ribbon Panel on Transparency, Accountability, and Fairness in Law Enforcement as an

---

[10] *Available at* http://www.burnsinstitute.org/wp-content/uploads/2015/06/SF_JRI_Full_Report_FINAL_7-21.pdf.

[11] *Available at* http://sfpublicdefender.org/wp-content/uploads/sites/2/2017/06/quattronefullreport.pdf.

advisory body following revelations that 14 Police Department officers had exchanged numerous racist and homophobic text messages.  The Blue Ribbon Panel, composed of three former judges, was tasked with issuing a report on "the extent to which bias was institutionalized within the SFPD's policies and practices, and to recommend solutions to address any bias or threat of bias they discovered."  Hon. LaDoris H. Cordell, *et al.*, *Report of The Blue Ribbon Panel on Transparency, Accountability, and Fairness in Law Enforcement* 7 (July 2016) (the "Blue Ribbon Report").[12]  The July 2016 Report documented a sordid history of racially biased enforcement by the Police Department.  The Panel concluded that the Police Department was "in urgent need of important reforms" but had "an unfortunate history of troubling incidents, followed by outside reviews of the department leadings to reports and recommendations that are not implemented."  *Id.* at 1, 3.

g.      **The U.S. DOJ Report**:  By 2016, after several high profile officer-involved shootings and race-based scandals, the City and County of San Francisco, through then-Mayor Ed Lee and Police Chief Greg Suhr, asked the U.S. DOJ to conduct an independent assessment of the Police Department through the DOJ's Community Oriented Policing Services Collaborative Reform Initiative. When the U.S. DOJ issued its report in October 2016, its conclusions about the Police Department's racist policing were stark, showing racially disproportionate patterns in traffic stops and the use of deadly force.  Specifically, the U.S. DOJ's 432-page report found that there were significant "disparities in traffic stops, post-stop searches, and use of deadly force against African Americans," that the Police Department failed to adequately investigate and audit incidents of biased conduct, and that the Department had failed to adequately implement training and protocols to mitigate bias in police practices. U.S. Department of Justice, Community Oriented Policing Services, *Collaborative Reform Initiative: An Assessment of the San Francisco Police Department* xi (Oct. 2016) (the "DOJ Report").[13]  The U.S. DOJ's report noted that prior reform recommendations had not been fully implemented and detailed reforms necessary for the Police Department to combat its legacy of racially biased policing.  The DOJ's findings about the Police Department, as an organization, were equally troubling, including failures to investigate officers' uses of force, failures to develop formal training on the use of force, failures to

---

[12] *Available at* http://sfdistrictattorney.org/sites/default/files/Document/BRP_report.pdf.

[13] *Available at* https://ric-zai-inc.com/Publications/cops-w0817-pub.pdf

adequately audit or investigate incidents of biased conduct, and higher termination rates for recruits of color as compared to white male recruits.

80.     The evidence amassed in these reports over the last 16 years paints a clear picture of a Police Department that suffers from widespread racial bias, systematically and selectively enforces the law against Black people, refuses to be held accountable, and deliberately ignores common-sense reforms that would go far to remedy the racially biased policing customs and practices that pervade the Department.

81.     The Police Department maintains a custom or practice of racial targeting, as shown by its (a) history of racially disparate arrests, stops, searches and use of force, (b) history of racially disparate arrest rates for both drug offenses and non-drug offenses, and (c) the pervasive and tolerated racism within the Police Department.

82.     The Police Department has also systemically failed to act on any recommendations to end or even mitigate racially biased policing.  Specifically, the Police Department has repeatedly (a) failed to implement recommended changes to its data collection protocols to identify and track racially biased policing, (b) failed to implement recommended changes in training and procedure in order to eliminate racially biased policing, (c) failed to adequately supervise and discipline officers who have engaged in racially biased policing, and (d) failed to take additional corrective actions to reduce the institutionalization of racially biased policing in the Police Department.

> **2.     The Police Department has a long history of racially disparate stops, searches, arrests and uses of force that led to the selective enforcement in the Operation**

83.     Before and during the events giving rise to this suit, the Police Department has stopped, searched, arrested, and otherwise targeted Black people for law enforcement scrutiny and violence at racially disparate rates.

> **a.     There is a history of racial disparities in Police Department traffic stops and searches**

84.     The Police Department's history of racially biased policing is evident in its use of vehicle stops and other forms of stops and searches—the discretionary nature of which underscores the Police Department's racial bias.

85.     The Police Department has long employed racially disparate vehicle stops.  For example, the ACLU Report's analysis of Police Department data from July 1, 2001, through June 30, 2002, showed that Black motorists were significantly more likely to be stopped by Police Department officers than motorists of other races, and that this finding held true across every district in the City.  ACLU Report at 3, 6, 8.  The report detailed how these disparities were impossible to explain based on underlying demographics, and suggested that the stops of Black motorists were for "pretextual reasons."  *Id.* at 9.

86.     The more recent Blue Ribbon Report showed that as of the report's release in 2016, no real progress on these disparities had been made.  Data provided by the Police Department showed that between 2011 and 2014, traffic stop rates for Black motorists were vastly disproportionate to the proportion of the Black population in San Francisco.  Blue Ribbon Report at 28–29.   For example, in 2014, Black people made up 14% of all traffic stops, despite making up only 5.8% of San Francisco's total population.  In 2016, Black people made up 15% of total traffic stops.  *Id.* at 28.

87.     The DOJ analyzed the Department's stop data from May 2013 to May 2016 and came to similar conclusions.  The DOJ found that "African-American drivers were 24 percent more likely to be stopped by the police than their estimated representation in the driving population, and they were 9 percent more likely to be stopped than their estimated representation among potential traffic violators."  DOJ Report at 71.  Meanwhile, "Hispanic and Asian drivers . . . were considerably less likely to be stopped than their representation in the estimated driving and traffic violating populations in the city."  *Id*. at 76.

88.     An analysis of the outcome of the stops showed that Black drivers were also more likely to be warned rather than given a citation compared to other racial and ethnic groups and were more likely to face arrest at the conclusion of a traffic stop than the other groups.  DOJ Report at 73.  The relative lack of citations given to Black drivers indicates that officers frequently lacked substantial reason to make the stop in the first place.

89.     The Blue Ribbon Panel also identified anecdotal examples of Police Department officers subjecting Black people to unjustified stop-and-frisks.  Blue Ribbon Report at 41.  Plaintiffs to the present suit have also observed first-hand the unjustified stops of Black persons within the Tenderloin.

90.     Data on searches following traffic stops are commonly analyzed in order to give indication of racial bias in policing.

91.     Consent searches—those searches in which an officer requests consent of the driver to make a search—can indicate discretion on the part of officers since the officer needs no probable cause justification for requesting permission for the search.  *See e.g.* Joaquin Palomino, *Racial Disparities in SF Traffic Searches Raise Concerns of Bias*, San Francisco Chronicle, Apr. 8, 2016 ("Chronicle, Apr. 8, 2016").[14]

92.     Non-consent searches—which must be based on an officer's reported determination that there was reasonable suspicion or probable cause to believe illegal activity was taking place—can also indicate racial bias because they show whether the purported probable cause determination turned out to be correct, or whether it may have been unfounded, and thus based on something else, like race.  *Id.*

93.     The Police Department's search data show a history of racial disparities in both consent and non-consent searches and in the evidence found in both types of searches.

94.     As far back as 2002, the ACLU Report showed that at that time Black and Latino people faced a disproportionately high number of intrusive searches by the San Francisco Police Department, even though the same data showed that those searches were less likely to reveal any evidence of criminality.  ACLU Report at 3, 5, 6.  Indeed, the Report found that Black people were "***over twice as likely*** to be subjected to a consent search than whites." *Id.* at 10.

95.     The trend of Police Department officers searching Black people more intrusively than members of other races, and with less justification, has continued.

96.     In its review of data from May 2013 to May 2016, the DOJ concluded that "African American drivers were more likely to be warned, arrested, and searched (for both consent and high discretionary [non-consent] reasons) but less likely to be cited or found to be in possession of contraband than White drivers."  DOJ Report at 76.

97.     In terms of probable-cause based searches, the DOJ found that Black drivers made up almost 40 percent of "high discretion" searches, as compared to only 22 percent for white drivers and

---

[14] *Available at* https://www.sfchronicle.com/crime/article/Racial-disparities-in-SF-traffic-searches-raise-7235690.php.

that "the odds of African-American drivers being searched without consent were nearly 200 percent higher than those of White drivers."  DOJ Report at 75.

98.    Critically, while "the SFPD conducted high discretion searches on a far greater number of African-American drivers than drivers of any other race … the hit-rates [rate at which contraband evidence of illegal activity was found] in these high discretion searches of African-American drivers were lower than in high discretion searches of all other drivers."  DOJ Report at 75.  Specifically, "the hit-rate analysis revealed that roughly 7 out of every 10 high discretion searches of White drivers yielded contraband, while 3 out of 10 high discretion searches of African-American drivers yielded contraband," and "[t]he odds that contraband or evidence was found were 70 percent lower for African-American drivers . . . than for White drivers who were searched without consent."  *Id.*

99.    The Blue Ribbon Panel similarly found that "although Black people accounted for less than 15 percent of all stops in 2015, they accounted for over 42 percent of all non-consent searches following stops."  Blue Ribbon Report at 30.  "Of all people searched without consent, Black and Hispanic people had the lowest 'hit rates' (i.e., the lowest rate of contraband recovered)" with 36% and 47% respectively, compared to a 73% hit rate for white people.  *Id*.  These findings echoed those reported in the San Francisco Chronicle, which found that in the Police Department's 3,450 evidence-based searches (those based on reasonable suspicion or probable cause) from 2013 to 2015, "officers found guns, drugs or other contraband just 32 percent of the time after an evidence-based search of African American motorists," and "[b]y comparison, when police searched white drivers, evidence was recovered 74 percent of the time."  Chronicle, Apr. 8, 2016.

100.    Dr. Fridell, who conducted the 2007 study on racially biased policing in the Department, explained that "[a] lower hit rate for ethnic minorities is a red flag for bias," and that the data on the hit rate disparities in the Department "implies that when police search whites . . . they're pretty darn sure they're going to find something," and conversely, that "there's a wider net being cast and a lower level of proof (required) before initiating a search of African Americans and Latinos."  Chronicle, Apr. 8, 2016.

**b.    The Police Department has a history of racially disparate arrest rates for drug offenses**

101.    Numerous studies have shown that for decades Black individuals in San Francisco have

faced higher rates of drug arrests than individuals of other races, which cannot be explained by the alleged criminal conduct.

102. The Center for Juvenile and Criminal Justice ("CJCJ") found that from 1977 through 2016, San Francisco had consistently higher felony drug arrests rates for Black people than persons of any other race. Michael Males, *Fact Sheet: Racial Disparities Persist Amid Large Drug Arrest Declines in San Francisco*, Center on Juvenile and Criminal Justice 1 (Feb. 2018) ("CJCJ Study").[15] Although the overall disparity had decreased somewhat by 2016, the felony drug arrest rates for Black people in San Francisco were still "10 times higher than San Franciscans of other races, and 2.4 times than African Americans elsewhere in California." *Id.* at 1–2.

103. The CJCJ Study also found that "[r]acial patterns in drug arrests [did] not match racial patterns in drug use." CJCJ Study web page.[16] For example, for the five-year period from 2012 to 2016, Black people made up 42% of the city's 5,691 drug felony arrests while only making up 25% of the people who died in that period from using illicit drugs. CJCJ Study at 2.

104. A report by the Police Department itself similarly showed that Black people constituted 47% of all people arrested from 2009 to 2014, and that Black people made up 53% of all drug arrests, even though Black people only make up 6% of the city's population. Jonah Owen Lamb, *Questions About Racial Disparities Surround SFPD Arrests Report*, SF Examiner, April 17, 2015.[17]

105. Similarly, a report by the national ACLU on marijuana possession arrests nationwide found that based on 2010 data, San Francisco had the highest disparity between Black and white marijuana possession arrests of any city in California with a population of 30,000 or greater and a Black population of 2% or greater. ACLU, *The War on Marijuana in Black and White* 139 (June 2013).[18] Black people in San Francisco were 4.3 times more likely to be arrested for marijuana possession than whites, which was double the statewide disparity of 2.2 times, and greater than the national disparity of

[15] *Available at* http://www.cjcj.org/uploads/cjcj/documents/racial_disparities_persist_amid_large_drug_arrest_declines_in_san_francisco.pdf.

[16] *Available at* http://www.cjcj.org/news/11968.

[17] *Available at* http://www.sfexaminer.com/questions-about-racial-disparities-surround-sfpd-arrests-report/.

[18] *Available at* https://www.aclu.org/files/assets/aclu-thewaronmarijuana-rel2.pdf.

3.7. *Id.* at 17, 47, 130.

106.    Anecdotal evidence also indicates that in neighborhoods with a high concentration of people of color, including the Tenderloin, "youth of color were . . . put into the juvenile justice system for possession of marijuana while White youth only received a warning." Blue Ribbon Report at 34–35.

107.    Defendants have refused to address these racial disparities in drug arrest rates over time. Despite overall reductions in rates of arrest for drug offenses in San Francisco between 1994 and 2013, over those two decades, "the [racial] disparity gap increased for every drug offense category." Blue Ribbon Report at 28.

> **c.    The Police Department has a similar pattern of racially disparate arrests for all offenses, without limitation to drug offenses**

108.    Racially disparate arrest rates in San Francisco are not limited to drug-related offenses. San Francisco stands out among its sister cities in California for the scale of its racially biased policing. A study of arrest data from California's largest cities in 1986, 2002, 2003, 2004, and 2005 found that "Black people in San Francisco are arrested for all felonies at nearly twice the rate they are in Sacramento.  They are arrested at twice the rate of black people in Fresno, three times the rate in San Jose, Los Angeles, Long Beach and San Diego, and four times the rate in Oakland." Chronicle, Dec. 17, 2006.  As the article recounted, "San Francisco's high black arrest rate is not of recent origin: 20 years ago, San Francisco was making black felony arrests at a rate much higher than California's seven other largest cities, state Justice Department reports show.  In 1986, for example, San Francisco's black felony arrest rate was almost 45 percent greater than Los Angeles' and almost 51 percent higher than Oakland's." *Id.*

109.    Data from 2013 showed that in San Francisco, Black adults were approximately seven times more likely than white adults to face arrest and approximately 11 times more likely to be booked in jail.  2013 Haywood Burns Report at 2.

110.    This trend is borne out in the Tenderloin, which remains one of the top residence zip codes where Black adults are booked into San Francisco County Jail.  2015 Haywood Burns Report at 13.

111.    Between 1994 and 2013, in San Francisco, "the disparity gap between White and Black

adult arrests [] increased for almost every felony and misdemeanor drug offense." *Id.* at 12.  The 2015 Haywood Burns Report observed that "[d]uring the same time period that San Francisco's disparity gap [in arrests] increased by 45 percent, from Black adults being 4.6 times as likely as White adults to be arrested to 7.1 times as likely, the disparity gap in arrest rates for the State of California decreased." *Id.* at 11.

112.    According to an April 2015 report from CJCJ, Black women in San Francisco were arrested at rates 13 times higher than women of other races.  Michael Males, *San Francisco's Disproportionate Arrest of African American Women Persists*, Center on Juvenile and Criminal Justice 1 (April 2015).[19]

113.    Similar disparities exist in the rates of charges for resisting arrest.  "From January 2010 to April 24 of [2015], law enforcement officers cited suspects with resisting arrest 9,633 times in cases where the suspect was not charged with a felony," and "African Americans accounted for 45 percent of those cited, even though they ma[de] up just 6 percent of the city's population."  Emily Green, *African Americans cited for Resisting Arrest at High Rate in S.F.*, San Francisco Chronicle, April 28, 2015.[20] "Whites [and Latinos], who make up roughly half of San Francisco's population, made up 39 percent of those cited for resisting arrest," and "Asian Americans, who make up roughly a third of the population, accounted for just 3 percent of those cited for resisting arrest." *Id.*

114.    Data from San Francisco criminal cases from 2011 through 2014 showed statistically significant disparities of Black and white defendants after controlling for contextual factors such as age at arrest, criminal history, neighborhood crime, and poverty.  Quattrone Report at 1, 5, 7.  Black people were booked for 8 percent more crimes and 22 percent more total booked felonies than whites, and Black people faced initial cases that were 46 percent more severe than whites in terms of number and severity of charges. *Id.* at 7.

d.    **The Police Department uses force disproportionately on Black people**

115.    The Police Department uses force against Black people far more readily, and with more

---

[19] *Available at* http://www.cjcj.org/uploads/cjcj/documents/disproportionate_arrests_in_san_francisco.pdf.

[20] *Available at* https://www.sfchronicle.com/bayarea/article/African-Americans-cited-for-resisting-arrest-at-6229946.php.

lethal results, than against members of other races.

116.     Between May 2013 and May 2016, the Police Department was involved in 11 fatal police shootings.  DOJ Report at 5.  Nine victims were people of color.  Blue Ribbon Report at 5, 61; *see also* Sarah Ravani & Evan Sernoffsky, *The 5 San Francisco police shootings that put the city in the spotlight*, San Francisco Chronicle, May 24, 2018 ("Chronicle, May 24, 2018").[21]  Their deaths prompted strong community responses, and generally supported the commissioning of the Blue Ribbon Panel, investigation by the DOJ, and the resignation of Police Chief Greg Suhr.  Chronicle, May 24, 2018; Blue Ribbon Report at 1–2.

117.     In examining the Police Department's officer-involved shootings, the Blue Ribbon Panel reported that, for the four and a half year period of January 23, 2010, through July 30, 2015, Black people made up 39 percent of victims shot by the Department officers where race was reported.[22]  *See* Blue Ribbon Report at 69.  Hispanics made up 31 percent of officer-involved shootings where race was reported, and whites 21 percent.  *See id.*[23]

118.     A report from the Police Department's own Internal Affairs Division stated "that 69 percent of all people killed by law enforcement in San Francisco since 1985 were people of color, and 40 percent were Black."  Blue Ribbon Report at 62; s*ee also Killings By Law Enforcement, San Francisco*, The Anti-Eviction Mapping Project.[24]

119.     Police Department data from January to March 2016 also showed the majority of the use-of-force incidents in which guns were pulled during that three-month period involved Black people.  Jonah Owen Lamb, *First-of-its-kind Data Release Shows Racial Disparities in SFPD's Arrests, Use of Force*, SF Examiner, Aug. 3, 2016.[25]

---

[21] *Available at* https://www.sfchronicle.com/crime/article/The-5-San-Francisco-police-shootings-that-put-the-12941386.php.

[22]  The Police Department failed to maintain demographic information on 18 officer-involved shootings, or 26 percent of overall victims, during the same period.

[23]Both the DOJ Report and the Blue Ribbon Report found that, at the time of these officer-involved shootings, the Police Department's use of force policy and general orders had been out of date for twenty years.  Blue Ribbon Report at 62; DOJ Report at 9.

[24] *Available at* http://www.antievictionmappingproject.net/murdermap.html.

[25] *Available at* http://www.sfexaminer.com/first-kind-data-release-shows-racial-disparities-sfpds-arrests-use-force/.

**3.    Racist behavior is prevalent in and has been openly tolerated by the Police Department**

120.    Before and during the events giving rise to this suit, the Police Department has overtly tolerated racism within the Police Department.  The Police Department's actions and omissions show a deliberate indifference to racist attitudes, failure to either train or supervise to prevent acting on explicit and implicit bias, and inadequate discipline for racist policing.  The Police Department has also proactively encouraged racial bias through various training practices and in failing to address racism towards its own officers.

121.    In addition to the long-documented problems with racially disparate enforcement and use of force described above, the Department has been long-aware of racism within its the Department.

122.    Some of the most overt instances of racism in the Police Department were revealed in reporting on recent racist text messaging scandals.

123.    Throughout 2011 and 2012, 14 Police Department officers exchanged racist text messages referencing the N-word, Black people as savages, and cross burnings.  *See e.g.* Blue Ribbon Report at 3–4.[26]

124.    In one exchange an officer told a sergeant that "All n[—] must fucking hang."  Blue Ribbon Report at 4.

125.    In another, an officer responded to a sergeant's query about whether he should be concerned about a Black acquaintance coming over to his house by saying: "Get ur [sic] pocket gun. Keep it available in case the monkey returns to his roots.  Its [sic] not against the law to put an animal down . . . U [sic] may have to kill the half breed kids too.  Don't worry.  Their [sic] an abomination of nature anyway."  Blue Ribbon Report at 4; *see also* Alex Emslie, *Judge Rules in Favor of S.F. Cops Who Sent Bigoted Texts*, KQED News, Dec. 21, 2015.[27]

126.    In response to a question from an officer about whether another officer's child's school celebrated Kwanzaa, a celebration of African heritage and principles, the second officer responded:

---

[26] The below represent only a sampling of the text messages.  A full set of the messages that were included in federal court proceeding is included in the Blue Ribbon Report at Appendix C.

[27] *Available at* https://www.kqed.org/news/10798240/judge-nears-ruling-on-s-f-cops-who-sent-bigoted-texts.

"Yeah we burn the cross on the field!  Then we celebrate Whitemas.  It[']s worth every penny to live here away from the savages."  Blue Ribbon Report at 4.

127.    In yet another exchange, officers called Police Department Lieutenant Yulanda Williams, a Black woman, a "n— b—."  *See, e.g.*, Jesse Washington, *Black and Blue: This is What Happens When a Black Cop Calls Out Racism in Her Own Department*, The Undefeated (Dec. 7, 2017) ("Undefeated Article).[28]

128.    The Police Department had known about the texts since December 2012, but never responded to them in any meaningful way.  Alex Emslie, *Judge Rules in Favor of S.F. Cops Who Sent Bigoted Texts*, KQED News, Dec. 21, 2015.[29]

129.    In fact, no changes were made within the Police Department, until the text exchanges were made public in March 2015, during a proceeding against Sergeant Ian Furminger, who was being investigated for robbing drug dealers.  Furminger had been indicted in February 2014 with his colleagues Edmond Robles and Reynaldo Vargas for egregious civil rights violations.  Indictment,,*U.S. v. Ian Furminger, Edmond Robles, and Reynaldo Vargas*, No. 3:14-cr-00102-CRB, Indictment, ECF No. 1 (N.D. Cal. Feb. 25, 2014).[30]

130.    A second set of racist text messages involving three or four additional officers was uncovered in April 2016.  Thomas Fuller, *San Francisco Police Chief Releases Officers' Racist Texts*, The New York Times, Apr. 29, 2016;[31] Blue Ribbon Report at 1, 103.

131.    The second set of text messages was discovered not due to an internal investigation, but only came to light through an unrelated criminal investigation of one of the officers involved.  Blue Ribbon Report at 1, 103.

132.    Texts from the second scandal explicitly referred to the first texting scandal in jest,

---

[28] *Available at* https:// http://theundefeated.com/features/this-is-what-happens-when-a-black-cop-calls-out-racism-in-her-own-department/.

[29] *Available at* https://www.kqed.org/news/10798240/judge-nears-ruling-on-s-f-cops-who-sent-bigoted-texts.

[30] *Available at* https://media.nbcbayarea.com/documents/SFPD-Mission-Indictment.pdf.

[31] *Available at* https://www.nytimes.com/2016/04/30/us/san-francisco-police-orders-officers-to-complete-anti-harassment-class.html.

evidencing the Police Department's continued culture of acceptance of racist behavior.  Blue Ribbon Report at 1.  This set of texts, like the first set, used racial slurs and other dehumanizing language to refer to the City's Black community.  Vivian Ho, *Under pressure over racist texts, SFPD releases transcripts*, San Francisco Chronicle, April 30, 2016 ("Chronicle, Apr. 20, 2016").[32]

133.    In one of the exchanges, an officer sent a picture of an elderly man with the caption, "BACK IN MY DAY WE DIDN'T HAVE VIDEO GAMES. WE WENT OUTSIDE AND BEAT N— WITH STICKS," as well as a picture of a white man spraying a black child with a hose with the caption, "Go be a n— somewhere else."  Chronicle, Apr. 20, 2016

134.    Another text message stated, "I hate that beaner . . . but I think the nig is worse." *Id*.  Scott Glover and Dan Simon, *"Wild animal": Racist Texts Sent by San Francisco Police Officer, Documents Show*, CNN, April 26, 2016 ("CNN, April 26, 2016").[33]

135.    In another, an officer made a disparaging joke about President Barack Obama and explained that he hated basketball star LeBron James by saying "F--- that nig."  CNN, April 26, 2016. And in others he described a group of Black people as "a pack (of) wild animals on the loose," and referred to Black people as "barbarians."  *Id*.

136.    Racism in the Department was not a new phenomenon revealed by the text message scandals.  In an interview with CNN, San Francisco District Attorney George Gascon "concluded two things about the police department he once ran. 'No. 1: There's a substantial number of people within the organization that are racist,' he said. 'And No. 2: There's a culture that has allowed those people to thrive and survive and even promote within that environment.'"  CNN, April 26, 2016.

137.    For example, in addition to the above scandals, Department officers had in an earlier scandal posted online a series of videos that depicted racist, sexist, homophobic, and transphobic views. One video depicted an officer complaining about having to help a Black homeless woman hit by a patrol car, and another video invoked racist stereotypes about Black people.  DOJ Report at 60.

138.    Black officers have also been targets of racism within the Police Department.  For

---

[32] *Available at* https://www.sfgate.com/crime/article/Under-pressure-over-officers-racist-texts-7384205.php.

[33] *Available at* https://www.cnn.com/2016/04/26/us/racist-texts-san-francisco-police-officer/index.html.

example, in conversation with the Blue Ribbon Panel, "[o]ne Black officer observed the department hired people who did not understand the importance of building trust with community members, stating 'the racist culture is deeply rooted and goes back years and years.'"  Blue Ribbon Report at 146.

139.    Separately, a "Black, female SFPD officer stated that when she joined the department, she felt isolated among her classmates and, later, her colleagues, because of the 'clear divide between White and Black cadets.'  This witness stated that when she joined the department, some senior officers told her that she would not be treated fairly because she was a Black woman.  Initially, she did not believe them, but over time she saw 'glaring' differences in the treatment of officers based on race.  The witness stated further that while there were some older White officers who understood the issues of racial discrimination within the department, officers of color and White officers did not generally agree on whether racism existed.  How officers were treated, disciplined, and even spoken to by supervisors differed based on race; one witness stated that Black Police Department officers were not respected unless they 'play[ed] ball a little bit.'"  Blue Ribbon Report at 140.

140.    Another officer who was interviewed by the Blue Ribbon Panel "stated that racist language, while not appropriate for the 'streets,' could be appropriate for use between partners in their patrol cars."  Blue Ribbon Report at 139.

141.    The Police Department has promoted officers who have engaged in the types of blatantly racist conduct described herein, indicating endorsement of their racism and an utter lack of any consequences for it or accountability by the Department.

142.    According to a community leader quoted in the Blue Ribbon Report, officers assigned as "neophytes" to training stations gain "'exercise in ticket writing and stopping Black folks.'"  Blue Ribbon Report at 35.  This practice of training new officers ensures that they will "not see African-Americans 'as humans'" and are instilled with the notion that their job is to "'protect against African-Americans.'"  *Id.*  "A retired Officers for Justice [] officer who has remained active with the police independently confirmed this view, stating that the SFPD uses Black neighborhoods as training locations to train recruits in aggressive policing techniques."  *Id.*

143.    Officer training that disparately focuses on Black people reflects pervasive racist stereotypes within the Department equating Black people with criminals.  As recently as 2006, a Police

Department officer said publicly that "many black criminals today quickly resort to violence and this occurs at a younger and younger age." *Chronicle*, Dec. 17, 2006.[34]

144.     By grounding the training of new police officers in predominantly Black neighborhoods and allowing a culture in which officers are exposed to explicitly racist statements, the Department facilitates the likelihood that its officers will experience racial anxiety and engage in racialized policing and violence against people of color. *See* Rachel D. Godsil & L. Song Richardson, *Racial Anxiety*, 102 Iowa L. Rev. 2235, 2243, 2249 & n.88 (2017).

145.     The relationship between the accepted racist attitudes of Police Department officers, and the impact on the Police Department's policing efforts, including in the instant suit, is unmistakable.  The results of the Police Department's overt acceptance of racism within its ranks is borne out directly in the Police Department's record of racially biased policing, which both pre- and post-dates the selective enforcement at issue in this case.

**4.     The Police Department has failed to implement repeated recommendations to correct racially biased policing**

146.     The well-documented history of racism and racial bias in the Police Department should long ago have led the Police Department to implement meaningful reforms and accountability. Nonetheless, the Blue Ribbon Panel and the DOJ both concluded that the Police Department has failed to implement recommended changes in training and procedure to address racially biased policing; adequately supervise and discipline officers for racially biased policing; implement recommended reforms to institutional practices that implicitly or explicitly sanction racist behavior and racially biased policing; and to collect or report data that would facilitate its ability to monitor and detect racially biased policing.

**a.     The Police Department has failed to implement recommended changes in training and procedure in order to eliminate racially biased policing**

147.     Defendant City and County of San Francisco has long been on notice that the Police Department requires adequate training to prevent racially biased policing.

---

[34] *Available at* https://www.sfgate.com/crime/article/HIGH-BLACK-ARREST-RATE-RAISES-CALL-FOR-INQUIRY-2482118.php.

148.    In 2002, the ACLU Report made a number of recommendations regarding racial bias training and data collection later reiterated in the 2007 Fridell Report and 2016 Blue Ribbon Report. Specifically, the ACLU reported, "The San Francisco Police Department's early warning systems should be improved and expanded to monitor and re-train those officers who are taking enforcement actions against members of minority groups at rates that seem significantly disproportionate in comparison to similarly situated officers.  The system should also be used to trigger intervention for officers who are the subject of complaints alleging racial bias.  Officer identifying information collected on data forms will need to be incorporated into the early warning system."  ACLU Report at 19.

149.    In 2007, Dr. Fridell recommended in her report that the Police Department add training materials pertaining to implicit bias and provide officers with tools to ensure they act without bias in performing their duties.  Fridell Report at 8.

150.    More recently, the Blue Ribbon Panel made similar recommendations.  Blue Ribbon Report at 28, 42, 80.

151.    Dr. Fridell also recommended that the Police Department develop a training module for field training officers, sergeants, and lieutenants to give them the tools they need to promote fair and impartial policing among those they supervise/train and that "[c]ommand staff members participate in educational/discussion forums on the topic of racially biased policing."  Fridell Report at 8.

152.    The DOJ concluded that despite Dr. Fridell's recommendations, the "SFPD ha[d] not significantly institutionalized training on bias or ensured that it is a part of an overall strategy aimed at reducing bias."  DOJ Report at 53.

153.    The DOJ found that there was an "organizational disconnect as it relates to bias training," and that "the department ha[d] been slow to fully enact training and clear protocols to mitigate bias in police practices."  DOJ Report at 53–54.

154.    Overall, the DOJ concluded that "there has not been a consistent, measured approach to the goals and objectives of training," and that "bias training is not part of an overall strategic plan and has not fully taken root in the SFPD."  DOJ Report at 54.  It noted that "other than recruit training, just over half of the department's officers and sergeants ha[d] received the training entitled Bias-Based Policing: Remaining Fair and Impartial during the time period June 2015 to June 2016."  *Id.*

**b.** **The Police Department has failed to adequately supervise and discipline officers for racially biased policing**

155.     Related to the 2002 ACLU Report's recommendation for identifying officers who exhibit signs of racially biased policing, the Blue Ribbon Panel recommended that when the department investigates an officer, "[a]ll prior complaints against an officer for similar conduct for at least the prior five years should be reviewed as a matter of course in an investigation." Blue Ribbon Report at 97. The panel noted, "This is a common practice in officer discipline." *Id*. The Police Department's then-current practices did not require "consideration of prior allegations and conduct." *Id*.

156.     Although according to the DOJ, "[s]upervisors play a critical role in addressing the impact of bias in a policing organization because they are responsible for observing officers' behaviors and for mentoring and correcting inappropriate actions" and "[i]n effective organizational accountability systems, supervisors invoke discipline and corrective action ranging from coaching and employee improvement plans through termination of employment and criminal charges, as appropriate, to abate biased conduct," DOJ Report at 56, there was no indication in the DOJ Report that Police Department supervisors employed these practices.

157.     The Police Department's apparent failure to adequately supervise officers known for racist conduct is evidenced by the first racist text message scandal. The Police Department's Internal Affairs Division learned of the racially biased and homophobic text messages in December 2012 but "[f]or more than two years, some of the police officers in question continued to work in the field, participate in criminal investigations, and testify in criminal trials." Blue Ribbon Report at 124.

158.     The DOJ Report also concluded more broadly that while a Police Department policy prohibits biased policing, "the team did not find any meaningful accountability arising out of the policy." DOJ Report at 55, 62.

159.     Similarly, the Blue Ribbon Panel Report highlights the fact that none of the cases against Police Department officers involving racial bias raised in the 2010-2014 period resulted in termination. Blue Ribbon Report at 111. All officers charged with bias and brought before the Police Commission were permitted to remain on the force. *Id.*

160.     The DOJ Report found that from January 1, 2013, to December 31, 2015, there were 219

complaints filed with the Office of Citizen Complaints that included bias-related allegations, but that *none* were sustained.  DOJ Report at 62; *see also* Blue Ribbon Report at 106.[35]

161.    The Police Commission and the Office of Citizen Complaints, like the Police Department, are under the jurisdiction of the City and County of San Francisco.  Each entity's failures indicate that Defendant City and County has been deliberately indifferent to the deeply entrenched patterns of racially biased policing and has refused to implement institutional accountability mechanisms.

### c.    The Police Department has failed to take corrective actions to reduce the institutionalization of racially biased policing

162.    In light of the Police Department's racially disparate policing data, in 2007, Dr. Fridell recommended that the Police Department identify institutional policies and practices that may produce biased policing, beginning with gang injunctions, consent searches, and patrol practices.  Fridell Report at 10.  For each practice, the SFPD should "use available data to determine if (1) the practice produces disparate impact, (2) the disparate impact can be explained by race-neutral practices, and/or (3) changes are advisable to reduce disparate impact or communication is advisable to reduce perceptions of racial bias."  *Id*. at 10.

163.    The Police Department failed to adhere to this recommendation.

164.    Moreover, despite repeated agency recommendations, the Police Department has failed to reform existing policies that may produce biased policing, or otherwise to address bias in the institutional practices of the Department, even after being put on notice of reports on the existence of racial bias within the Police Department and the racially discriminatory effect of Department policies.  The exposure of these racist text messages *led to* the formation of the Blue Ribbon Panel in May 2015.  After a year of work, in July 2016 the Panel issued a report with recommendations to address the Police Department's racially biased policing.  Shortly after the Blue Ribbon Panel's report issued, the DOJ's Office of Community Oriented Policing Services agreed to conduct a collaborative review of the Police

---

[35]  The reports also strongly critique the failure of the Police Commission—an oversight body separate from the Police Department—to launch a broader investigation about racial bias and racism in the ranks following the two racist text-messaging scandals in 2011-2012 and 2014-2015.  Blue Ribbon Report at 103; DOJ Report at 56, 205.

Department—*at the request of city officials*.  The resulting report referenced those reports that preceded it, noting Police Department's continued failure to implement earlier recommendations.[36]

165.    The DOJ report also found that "the department ha[d] been slow to fully enact training and clear protocols to mitigate bias in police practices" and that "SFPD has been stalled in progressing toward a comprehensive strategy to address bias."  DOJ Report at 54–55.  For example, in the spring of 2015, after the two waves of the Operation, the Police Department created the "Not On My Watch" program "to help create an internal and external message that bias is not tolerated in the SFPD."  *Id.* at 55; *About Not On My Watch*, SFPD.[37]  Yet, "[c]onsistent with other bias initiatives undertaken by the SFPD, the program [was] not robust or fully embraced, and SFPD leadership ha[d] not driven participation in or visibility around the program."  DOJ Report at 55.

166.    The DOJ found failures in the Police Department's response to the racist text messaging incidents: instead of simply disciplining the officers involved, "[g]iven the nature of the officers' open and flagrant behavior, the SFPD should have considered that this may be an institutionalized problem and taken steps to address the behavior from an organizational perspective." DOJ Report at 56.  The DOJ found that "It [was] not enough to investigate complaints of bias in a vacuum without clearly denouncing the behavior and openly recognizing its impact on the larger group of officers."  *Id*.

167.    The DOJ Report further found that Police Department leadership did not appear to have instilled "conscious organizational focus on avoiding bias," and that "[i]n particular, the department ha[d] not developed any routine roll-call training to address biased behavior, performance reviews [were] not completed, and there [were] no easily accessible data relative to performance or complaints."  DOJ Report at 56.

168.    To that end, the Blue Ribbon Panel recommended that the Police Department follow measures to guard against unlawful stop-and-frisk practices as they have been widely linked to racial profiling.  Blue Ribbon Report at 47.  The proposed measures included keeping records of stops not resulting in arrest or citation and providing the stopped person with a receipt including the reason for the

---

[36]Although the report is complete and the Police Department claims to be in the process of attempting to implement the recommended reforms, any reforms that may result from the DOJ review were too late to prevent the conduct at issue in this suit.

[37] *Available at* http://notonmywatchsfpd.org/about/.

encounter and information facilitating later submission of any civilian complaints regarding the stop.  *Id*.

169.    The DOJ concluded that "[a]ctions undertaken by the SFPD to date to address bias in institutional practice have been tepid when they need to be a cultural imperative."  DOJ Report at 58.

170.    Overall, the DOJ concluded that "the recommendations arising out of [Dr. Fridell's] report have not been significantly advanced," and that the "recommendations, drafted in 2007, remain valid and are supported by the findings of the [DOJ's] assessment."  DOJ Report at 52.

### d.    The Police Department has failed to improve data collection to identify and monitor racial bias

171.    Despite being on notice of the need to take action through many recommendations in various reports addressing Police Department conduct, Defendant City and County of San Francisco has failed to adequately collect data to detect racial discrimination by the Police Department.

172.    Since at least 2002, the City and County has had notice of the Department's racially disparate traffic stops and corresponding deficiencies in data collection, after the ACLU documented the problem and recommended that the Department expand data collection to include pedestrian stops, length of detention, contraband seized, result of searches, and passenger information.  ACLU Report at 19.  The ACLU also recommended that the City create an independent auditor to oversee data collection, adopt an order providing for discipline of officers who fail to fill out the data form, and hold supervisors accountable for officers under their direction who fail to report traffic stops by analyzing reporting patterns by supervisor and individual officer and by disciplining a supervisor that fails to actively monitor and take corrective action on any data non-compliance by officers under their command.  *Id*. at 20.

173.    Defendant City and County of San Francisco has failed to adhere to these recommendations.

174.    The Fridell Report further established the need to improve Police Department data collection regarding vehicle stops and race.  Fridell Report at 6.  But Dr. Fridell's recommendations on data collection were not implemented.  Because the recommendations in that report had not been implemented, the Blue Ribbon Panel again recently recommended that the Police Department collect race data for pedestrian stops.  Blue Ribbon Report at 43.  Also, similar to the ACLU recommendation in

1    2002, the Blue Ribbon Panel noted that the Police Department "needs a system to monitor compliance

2    with data collection on 'detentions,' which are not limited to traffic stops." *Id.* at 44.

3          175.    The panel also noted that the stop form "still does not appear to have been updated to

4    collect additional information beyond the limited categories included when it was developed." Blue

5    Ribbon Report at 35.  The panel recommended that a written explanation of reason for detention be a

6    required part of the form. *Id.* at 43.  The panel also noted that the Police Department has failed to collect

7    data for a separate Hispanic category. *Id.* at 38.

8          176.    The Blue Ribbon Panel also noted that the Police Department has not regularly analyzed

9    its stop data.  Blue Ribbon Report at 37.  Similar to the ACLU recommendation in 2002, the panel

10   recommended that the City engage outside researchers or consultants to analyze Police Department stop

11   data. *Id.* at 44.

12         177.    Although "Former Chief Suhr imposed a system of 'progressive discipline' for officers

13   who repeatedly failed to collect [race vehicle stop] data," notwithstanding continued data collection

14   deficiencies, "the Police Commission has heard only one case involving failure to collect traffic stop data

15   in the past five years, and that case originated in the [Office of Citizen Complaints]."  Blue Ribbon

16   Report at 36.  The panel concluded, "It does not appear as though the SFPD has made much progress" in

17   consistently collecting traffic stop data since Fridell's 2007 report. *Id.*

18         178.    Similar to the ACLU recommendation in 2002, the panel recommended that the Police

19   Department supervisors be held accountable if officers they supervise fail to maintain sufficient

20   compliance with SFPD's data collection policy.  Blue Ribbon Report at 44.

21         179.    "When the [Blue Ribbon] Panel requested that the SFPD provide it with the number of

22   bias complaints investigated or sustained over the last five years, the SFPD could not respond to the

23   request because it did not track this data."  Blue Ribbon Report at 89.

24         180.    The Panel further recommended that the Police Department should collect and audit data,

25   since it was not already doing so, "to identify whether there are patterns that may raise concerns

26   regarding bias, such as disparities across station locations."  Blue Ribbon Report at 119.

27         181.    The DOJ made similar findings that the Department had failed to "develop[] a robust data-

28   led approach to mitigate and root out bias."  DOJ Report at 57.  The DOJ found that the Department's

data collection practices did not allow it to collect and analyze critical data about bias in policing and that "[t]he absence of technology and robust data collection practices including in-car cameras, global positioning satellite (GPS) tracking modalities, and body-worn cameras contributes to the lack of evidence needed to ensure proper behavior and to prove or disprove complaints of bias against members of the SFPD." *Id*.

182.    In addition to failing to collect adequate data, the Police Department also failed to implement proper auditing mechanisms that would have allowed it to identify problems.  *Id*.

183.    Because there was no internal audit of the Police Department's communication systems after the text messaging scandals, the DOJ recommended, and the Police Department agreed, that it would "conduct an audit of its electronic systems to ensure bias-free communications."  DOJ Report at 57.  However, at the time of the report, the DOJ noted that "the SFPD has not significantly advanced this process," and that "[i]n interviews, SFPD members who were tasked with advancing the audit did not display appropriate understanding of the importance of such an audit," and "were more focused on explaining why such an audit was not a good idea."  *Id*.  The DOJ concluded that "[t]his type of disconnect between policy and action [was] unacceptable."  *Id*.

**D.    The Police Department's Failures Were Ongoing During, and Relate Directly to, the Events Giving Rise to the Instant Suit**

184.    The Police Department's longstanding use of racially biased policing, its failures to reform its policies to stop the use of racially biased policing, and its failure to heed repeated recommendations to do so, caused the events giving rise to the instant suit.  Police Department officers selected targets for the Operation on the basis of race, knowing they would not be held accountable for such actions.  This was a foreseeable result of the Police Department's failure to track racial disparities, its inadequate training and supervision, and the tolerance of racism within the Police Department.  In this way, the repeated failures to make reforms to reduce racially biased policing led to the racially selective enforcement at issue in this case.

185.    The racially biased nature of the Police Department's practices are especially clear in the Tenderloin:

a.    Before and during the events giving rise to this suit, when interacting with Black

1    persons in the Tenderloin, Police Department officers have used violence and excessive force.

2              b.      Before and during the events giving rise to this suit, Police Department officers

3    have harassed and subjected Black individuals who live or spend significant time within the Tenderloin,

4    including Plaintiffs and relatives and close friends of the Plaintiffs in the instant suit, for harassment and

5    violence.  According to some OSS Arrestees, Police Department officers in the Tenderloin pay more

6    attention to Black people than to people of other races.  *See* Ex. A at 1050.

7              c.      Before and during the events giving rise to this suit, Police Department officers

8    have repeatedly used sexually charged or suggestive language to address Black women within the

9    Tenderloin, and have used homophobic language to address queer Black women within the Tenderloin.

10       186.    Against this backdrop, the Police Department's history renders the *fact* of racially

11   selective enforcement in this case unmistakable, by providing critical context for how 37 individuals, all

12   Black, could be targeted by law enforcement, to the exclusion of members of any other race.

13       187.    The Police Department's refusal to pursue reform or accountability for racist policing has

14   been borne out again in the events giving rise to this suit.  Despite the District Court's finding in *United*

15   *States v. Mumphrey* of "substantial" prima facie evidence of selective enforcement based on race, in

16   violation of the Constitution, Plaintiffs are not aware of discipline of any Police Department officer

17   involved in the Operation.  Plaintiffs are not aware of any efforts by Department leadership or

18   supervisors to investigate, let alone correct, the conduct described herein by Police Department officers.

19       **E.    Defendants' Discriminatory Targeting of Plaintiffs Based on their Race Has Caused**
20              **and Is Causing Plaintiffs Ongoing Injury**

21       188.    The racial targeting that led to each Plaintiff's arrest and prosecution caused Plaintiffs to

22   suffer grave dignitary, psychological, and other harms as a result of being singled out by law

23   enforcement on the basis of their race.

24       189.    Racial discrimination can inflict mental and psychological harm on its victims.  *See*, *e.g.*,

25   Robert T. Carter and Sinéad M. Sant-Barket, *Assessment of the Impact of Racial Discrimination and*

26   *Racism: How to Use the Race-Based Traumatic Stress Symptom Scale in Practice*, American

27   Psychological Association, Traumatology, Vol. 21, No. 1, 32–39, 32 (2015) ("Racial discrimination has

28   been empirically documented to have adverse mental health effects[.]"); Tony N. Brown, *et al.*, *"Being*

*Black and Feeling Blue": The Mental Health Consequences of Racial Discrimination*, Race and Society, Vol. 2, No. 2, 117–131, 124, 125 (2000) (citing studies showing that "actual and perceived racial discrimination is linked to adverse mental health outcomes among Black Americans" and that discrimination has been found to be "related to high levels of psychological distress" among Black Americans); *see also* Elizabeth A. Klonoff, *et al*., *Racial Discrimination and Psychiatric Symptoms Among Blacks*, Cultural Diversity and Ethnic Minority Psychology, Vol. 5, No. 4, 329–39 (1999);  Alex L. Pieterse, *et al.*, *Perceived Racism and Mental Health Among Black American Adults: A Meta-Analytic Review*, Journal of Counseling Psychology, 2012, Vol. 59, No. 1, 1–9, 6 (conducting a meta-analysis of 66 studies and confirming that "the mental health of Black Americans is negatively impacted by exposure to racism").

190.    The knowledge that they were targeted by Defendants because of their race has caused Plaintiffs to suffer the sting of stigmatization and an assault on their personal dignity, as well as the loss of their federally protected constitutional rights.  As a result, each Plaintiff suffers ongoing psychological distress and harm.

191.    Each Plaintiff has furthermore suffered financial losses, emotional distress, and substantial disruption to their lives and personal relationships, as set forth below, due in part to harsh conditions of their incarceration for federal drug charges and ensuing federal pretrial supervision.

**1.    Ms. Tiffany Cross**

192.    Plaintiff Tiffany Cross was arrested on or about February 6, 2015.  She was released on February 9, 2015.

193.    Ms. Cross has two children who, at the time of her arrest, were 13 years old (her daughter) and 7 years old (her son).  She is the primary caretaker for her children.  Her immediate concern after her arrest was about who was going to care for them.  She was scared and under an extreme amount of stress both in jail and during the pretrial period with fears about who would care for her children while she was in pretrial detention and what would happen to her children long-term if she were to receive a federal prison sentence.

194.    At the time of her arrest, Ms. Cross and her children were living with a friend in Oakland.  After her arrest, Ms. Cross's friend told her she could no longer live at the apartment because the friend

did not want to be associated with any alleged criminal activity.  This forced her to move immediately.
Ms. Cross and her children lived in a motel for approximately two weeks.  Then, because they could not
find housing they could afford, they had to move to Stockton, California, away from the children's
schools and the rest of their family.

195.    Ms. Cross and her children had to move in the middle of the school year.  For the first two
months after the move, Ms. Cross brought her children to Oakland from Stockton every weekday.  Ms.
Cross did not have a driver's license, so they commuted on Amtrak.  During this period Ms. Cross
traveled with her children to Oakland, waited for her children to be done with school, and then traveled
home to Stockton with them.

196.    After two months, and before the end of the school year, the children transferred to
schools in Stockton.

197.    During the months when the children commuted to school in Oakland, Ms. Cross's
children missed school on the days when Ms. Cross had to attend case-related hearings in San Francisco,
because she could not take them to Oakland.  Attending the criminal court proceedings in San Francisco
caused Ms. Cross additional stress and lost wages due to the time and expense of traveling to San
Francisco from Stockton.  She was required to be in court for pretrial proceedings approximately once
every two months.  The commute from Stockton, which is approximately 80 miles outside of San
Francisco in the San Joaquin Valley, took several hours on Amtrak and other public transportation, which
was time Ms. Cross would have otherwise spent working, and which incurred costs each time.

198.    Ms. Cross was required to submit to drug tests during the period of her pretrial release.
She had to attend tests two to three times a week, for a period of approximately nine months, after which
she had to undergo testing once a week.  The drug tests generally took 30 minutes to an hour, and it took
her about 20 minutes to get to the drug testing location from her house.

199.    Ms. Cross was also required to attend two hour-long counseling sessions per month.

200.    Ms. Cross lost wages due to the drug tests and therapy sessions.  During the pretrial
period, Ms. Cross worked at several jobs through a temp agency, including working at two separate
warehouses, and in an in-home care position.  When she worked shifts at these positions during the day,
she had to clock out at work to go to drug tests, counseling sessions, and court hearings.  She was not

paid for that time missed from work.

201.    Ms. Cross was subjected to home visits from her pretrial officer approximately every 90 days.  Ms. Cross also was restricted in her travel to a designated area, from which she was not allowed to depart by more than 50 miles.  The home visits caused Ms. Cross stress and anxiety, because she was living in an extra room at her cousin's house at the time and she was worried about the burden on her cousin.  She was particularly sensitive to this since, because of her arrest, she had already been asked to leave one apartment by a friend who did not want to be associated with criminal activity or subject to home visits.

202.    Ms. Cross and her children also lost an opportunity for public housing due to her charges.  During the pretrial period Ms. Cross was accepted for public housing in Fresno, after two or three years on the waitlist.  When the Fresno Housing Authority conducted a background check, it discovered her open federal case and denied Ms. Cross housing.  Given the opportunity, Ms. Cross would have moved to Fresno with her children, as she believed it offered a better quality of life.

203.    As a result of her arrest, detention, and pretrial supervision and conditions, Ms. Cross has suffered and is suffering emotional distress and out-of-pocket losses.

### 2.    Ms. Shalonda Adams

204.    Plaintiff Shalonda Adams was arrested on or around January 29, 2015.  She was detained in jail for approximately four days before her release.

205.    At the time of her arrest, Ms. Adams' baby son was four months old.  Ms. Adams is her son's primary caregiver.  She had no opportunity to make arrangements for her son's care prior to her arrest.  Although she eventually found friends who could help care for the baby while she was in jail, she experienced a great deal of mental anguish not knowing if her son would be safe or who would care for him.  Ms. Adams' son is almost four years old now and to this date, the four days Ms. Adams spent in jail on this arrest is the longest she has ever been away from her child.

206.    During the four days she spent in detention, Ms. Adams was only allowed to make approximately two phone calls per day.  After she was moved into the main jail from her initial holding cell, Ms. Adams found it difficult to make phone calls: she was required to either have money in her account at the jail to make calls, or, if she was making collect calls, the person on the other end was

required to have their own account set up with funds in it.  Ms. Adams did not have any money in her own account and was required to make collect calls.  As a result, it was difficult to get in touch with people, as she was not certain when people would be available to accept the calls.  Even if Ms. Adams was able to connect, the person accepting the call had to go through the process to put funds in an account in order to accept the call.  The communication barriers made it difficult for Ms. Adams to contact the people caring for her baby and to get updates on where he was or how he was doing.  Uncertainty about the well-being of her infant child was very frightening for her.

207.    In addition to the pain of being separated from her newborn and the extreme anxiety she suffered in trying to arrange for his care from jail, Ms. Adams suffered additional stress when her mother had to be hospitalized after suffering a panic attack upon finding out about Ms. Adams' arrest.  Ms. Adams felt worried and anxious that she could not visit her mother in the hospital or otherwise check up on her.

208.    Ms. Adams's conditions of release included mandatory drug testing, therapy, additional life skills classes, and check-ins with her pretrial officer.

209.    Complying with the drug testing requirements was expensive, time-consuming, and stressful.  For the first approximately month of the pretrial supervision period, Ms. Adams was required to submit to random drug tests nearly twice a week.  After that she was required to submit to tests once a week for approximately one year, after which the testing schedule changed to once every two weeks.

210.    During the initial months of the pretrial period, the drug testing took place at a central location on Market Street near Powell at the Flood Building, but after approximately 8 months the testing changed to a location in Chinatown, which was inconvenient for her to reach.

211.    Ms. Adams was required to call-in to the drug testing center every morning to see if she was required to report for testing that same day, during a narrow window from 4 p.m. to 7 p.m.  The actual testing could take up to 40 minutes depending on how many people were waiting in line.

212.    Ms. Adams's mandatory therapy sessions occurred once a week for most of the pretrial period.  Near the end of the pretrial period, the frequency decreased to twice a month.  The therapy sessions took place first at the Flood Building and then were switched to the same location on Chinatown where the drug testing took place.  Each therapy session lasted approximately one hour.

213.   Ms. Adams expended significant resources complying with the therapy and drug testing requirements which oftentimes required multiple trips a week to the Chinatown location, including money for gas, parking, tolls, and public transportation.

214.   Ms. Adams's mandatory check-ins with her pretrial officer took place at the Federal Building in San Francisco.  For the first few months of the pretrial period, the check-ins occurred approximately once a week, after which time they moved to approximately once a month.  She also had home visits from her pretrial officer every three months after the time of her arrest.

215.   Ms. Adams was also required to attend the criminal court hearings at the Federal Building, which, at the beginning of the pretrial period took place approximately once a month and then later in the pretrial period took place approximately once every two or three months.

216.   For about four months at the beginning of the pretrial period Ms. Adams also attended a weekly class called Courage to Change, which was a two-and-a-half hour class held at the Federal Building.  She did not have childcare, so she generally brought her baby with her to the classes.

217.   Ms. Adams expended significant resources to get to the Federal Building for the pretrial check ins, court hearings and classes, including paying for gas, toll and parking depending on where she was coming from.  Parking was difficult near the Federal Building and often times the only place she could find to park was an expensive lot that cost approximately $16 per hour.

218.   At the time of her arrest Ms. Adams was living in Vallejo, California, approximately 30 miles north of San Francisco.   The travel time between Vallejo and San Francisco can take up to an hour-and-a-half in traffic.  Although she had to come to San Francisco to work and care for her mother, she was required to spend additional time and expense to go to the pretrial appointments and hearings. On the days on which she was not working for her client or caring for her mother, she was often required to make extra trips to San Francisco for the pretrial appointments and hearings.

219.   Ms. Adams was often required to bring her son with her to the various pretrial appointments. Other times she got the client for whom she worked to come with her to watch the baby while she completed her appointments, and other times she was required to pay for childcare so she could attend the appointments.  Her need for additional childcare also put a strain on her ailing mother and elderly grandmother who helped out with childcare.

220.    Ms. Adams was in a constant state of stress and anxiety and felt as if her whole life was taken over by the court process and adhering to the pretrial conditions.

221.    The arrest and pretrial conditions also caused Ms. Adams to lose wages and economic opportunity.

222.    At the time of her arrest, Ms. Adams was working as a home healthcare provider for two clients in the Tenderloin.  After her arrest, when Ms. Adams explained that she would have to cut down on her hours in order to fulfill the pretrial conditions and attend court hearings, one of her clients decided he would not be able to work with her any longer since he needed more hours than she would be able to provide.  Ms. Adams's income declined as a result of losing this client.

223.    Fulfilling the pretrial conditions caused Ms. Adams to take time off of work at her remaining hourly job providing in-home care to a client in the Tenderloin, causing her to lose wages.

224.    Due to Ms. Adams's decrease in income, she had a hard time paying for basic expenses like rent and was required to apply for general assistance in order to help her make ends meet.  She worried that because of the impact on her economic security of having to devote time from work to complying with pretrial conditions, that she and her son might become homeless.

225.    Like Ms. Rouse, Ms. Adams had a stay-away order from the Tenderloin, but because her home healthcare job was in the Tenderloin, she had to return there for work.  She requested an exception to the stay-away order for her job, but the request was denied by her pretrial officer.  Because this job was her only source of income she had to keep going to work in order to earn money to take care of her baby and herself.  When she went to the Tenderloin for work she was under constant stress that she would be picked up for a pretrial violation.

226.    Ms. Adams's mother also lived in the Tenderloin. Although Ms. Adams got an exception from the stay-away order to help care for her mother, she was still harassed by Police Department officers for being in the area when she went to visit her mother.

227.    The entire pretrial period was incredibly difficult for Ms. Adams for the additional reason that she did not know what would happen to her young son if she were sent to prison.  The prospect of spending a year or more away from her baby was emotionally devastating.  Ms. Adams knew her son would likely have to go into the foster care system if she went to prison, an anguishing prospect.

228.   Ms. Adams's mother and grandmother also depended on her for care, and she was constantly worried about what would happen to them if she were to receive a federal prison sentence.

229.   As a result of her arrest, detention, and pretrial supervision and conditions, Ms. Adams has suffered and is suffering emotional distress and out-of-pocket losses.

### 3.   Ms. Crystal Anthony

230.   Plaintiff Crystal Anthony was arrested on or around February 10, 2015.  She remained in custody for approximately 311 days before her release on or around December 18, 2015.

231.   Ms. Anthony's arrest and incarceration caused her to lose her job at UPS, her apartment in Pittsburg, California, and most of her belongings, including furniture, clothing, family photographs, and her car.  In addition, Ms. Anthony's credit score dropped as a result of missed car payments, and she is still trying to restore her score.

232.   Ms. Anthony's mother, who has schizophrenia, went missing during Ms. Anthony's period of confinement.  Ms. Anthony, who regularly checked in on her mother and monitored her well-being, was unable to do so from jail and was unable to help find her.  Ms. Anthony's mother remains missing, and Ms. Anthony has not seen her mother since before she was arrested in 2015.  This has caused Ms. Anthony suffering and mental anguish.

233.   After she was released from jail, Ms. Anthony was ordered to approximately 60 days' confinement in a halfway house and reentry facility run by the Geo Group in the Tenderloin.  After those 60 days expired, Ms. Anthony lived at the facility for an additional approximately 60 days in order to build up to the stable employment and housing the court required in order to approve her release from the facility.

234.   During the first 60 days of her detention in the halfway house, Ms. Anthony was under strict conditions of confinement and was not permitted to leave the house, even to go to work.

235.   It was particularly agonizing for Ms. Anthony to spend so much time in the halfway house because the residence was in very poor condition and was infested with rats and roaches.

236.   During Ms. Anthony's second 60-day period at the halfway house, she was permitted to work but was required to get permission each time she needed to leave the facility for a work shift.  There were times that staff at the halfway house were not available to approve her work leave, and other

times when staff were not up-to-date on the paperwork that her pretrial officer had sent them, which resulted in Ms. Anthony being late to work on some occasions and missing some days of work entirely. As a result, Ms. Anthony lost wages.

237.     Because of the burdensome pretrial conditions, Ms. Anthony also faced challenges in accruing enough work time to transition from her status as a temporary employee to a permanent position at the Amazon Distribution facility where she was employed at the time.  Ms. Anthony attempted to seek other employment, but was told by at least one potential employer that he would not hire her due to her pending criminal case.

238.     Further, because Ms. Anthony's stay-away order prevented her from getting work in the Tenderloin, she was unable to seek employment opportunities that would have been readily offered to her, including at least one position as a front desk clerk at a Tenderloin Neighborhood Development Corporation residential hotel.  Barred from employment in the Tenderloin, Ms. Anthony could only procure employment that required a 20-mile commute to San Leandro, which caused her stress and additional expense.  There were times when Ms. Anthony had to borrow money from friends or family to pay for BART fare to get to and from work.  This compounded her anxiety as she was desperately trying to save enough to move out of the halfway house.

239.     Ms. Anthony was required to submit to drug tests throughout the period of pretrial release, both at the halfway house and when she was living on her own.  While she was at the halfway house, she was required to submit to drug tests at the facility two to three times a week.  Ms. Anthony was frequently humiliated by the halfway house staff's unprofessional behavior in the course of administering drug tests.  For example, during one testing session, a staff member ordered her to take her clothes off. Ms. Anthony told the staff member she did not want to take her clothes off and requested a reason for the order that she do so.  She did not get an explanation and instead the staff member wrote her up for what was characterized as a refusal to do the drug test.

240.     After she left the halfway house, Ms. Anthony moved to Castro Valley, which is approximately 25 miles outside of San Francisco.

241.     Ms. Anthony spent significant time and money coming from Castro Valley to San Francisco for court hearings, pretrial hearings, check-ins with her pretrial officer, and monthly drug tests

1  at the Federal Building.

2      242.    When she obtained employment at a shipping facility in Livermore, even farther from San

3  Francisco than Castro Valley, she often had to miss all or most of a day of work to accommodate the

4  travel and appointment time necessary to comply with the pretrial conditions and attend court hearings.

5  Missing work in order to participate in the criminal trial and to comply with pretrial release conditions

6  impeded her opportunities for advancement at her workplace.

7      243.    In addition to the lost wages from the missed time at work, Ms. Anthony incurred

8  significant out-of-pocket expenses to comply with pretrial conditions and attend court hearings that

9  included gas money, bridge tolls, parking fees, and money for public transportation.

10      244.    As a result of her arrest, detention, and pretrial supervision and conditions, Ms. Anthony

11  has suffered and is suffering emotional distress and out-of-pocket losses.

12          **4.    Mr. Arron Lee Mathews**

13      245.    Plaintiff Arron Lee Mathews was arrested on or around February 17, 2015.  He was

14  released the next day on or around February 18, 2015.

15      246.    During the pretrial period, Mr. Mathews was required to submit to drug tests at the

16  Federal Building in Oakland on a weekly basis and was occasionally required to test more than a

17  week.

18      247.    Mr. Mathews was also required to check in with his pretrial services officer at the Federal

19  Building in Oakland over the course of the pretrial period.  The checks occurred on a monthly basis for a

20  good part of the pretrial period and became slightly less frequent as the pretrial period progressed.

21      248.    Mr. Mathews incurred expenses complying with his drug testing and pretrial officer

22  check-ins in Oakland and attending pretrial and court proceedings in San Francisco, including costs for

23  gas, bridge tolls, and parking.

24      249.    For the first eight to nine months of the pretrial period, Mr. Mathews lived in Vallejo,

25  approximately 30 miles from Oakland and San Francisco.  During the remainder of the pretrial period,

26  Mr. Mathews lived in Oakland but still incurred expenses for the local commute to the Federal Building

27  in Oakland for the drug tests and check-ins and the Federal Building in San Francisco where the court

28  hearings were held.  Mr. Mathews also worked in San Francisco for part of the pretrial period, during

1  which time he was required to commute back to Oakland from San Francisco for the drug tests and

2  check-ins.

3        250.    Mr. Mathews's stay-away order from the Tenderloin interfered with his ability to secure

4  employment and caused him to lose wages and economic opportunity.  After his arrest, Mr. Mathews was

5  under consideration for a full-time job at Next Door, a shelter in the Tenderloin.  Mr. Mathews's pretrial

6  officer prohibited Mr. Mathews from pursuing this opportunity due to its location, and it took Mr.

7  Mathews approximately four months to secure alternative employment.

8        251.    Mr. Mathews eventually secured employment working as a security guard in San

9  Francisco.  He was paid on an hourly basis and lost wages for the time he had to take off work to comply

10  with his pretrial conditions and to attend court hearings.  Taking time off work and constantly

11  rescheduling shifts to accommodate the drug tests, check-ins, and court hearings caused him to be

12  reprimanded by his boss and put him at risk of losing his job, causing additional stress and anxiety.

13        252.    During the pretrial period Mr. Mathews also worked as a driver for the ride-share service

14  Uber.  He missed out on rides, and corresponding wages, that he would have otherwise received if he had

15  not had to spend time complying with the pretrial conditions and attending court hearings.

16        253.    Mr. Mathews was under stress due to the length of his potential prison sentence and

17  believed he would lose everything if he went to prison, including his apartment and a chance at creating a

18  stable life.

19        254.    Mr. Mathews also experienced a great deal of stress and anxiety during the pretrial period

20  due to what he believed was unreasonable aggression on the part of his pretrial officer, who placed

21  unreasonable and onerous demands on him such as requiring him to perform drug tests on short notice.

22  The last-minute nature of the requests interrupted his ability to perform his work and led to reprimands,

23  because he was required to rearrange shifts on short notice to accommodate the tests.

24        255.    The pretrial services officer also made five to six unannounced visits to Mr. Mathews's

25  apartment during the pretrial period, during which visits the officer informed Mr. Mathews's neighbors

26  that the officer was a federal pretrial officer.  Mr. Mathews felt humiliated by this intrusion on his

27  privacy and the knowledge that his neighbors were aware he was under federal monitoring.

28        256.    Mr. Mathews attempted to raise the issue about his pretrial officer's unreasonable

behavior with the court, but Mr. Mathews, like any other criminal defendant, had a limited ability to complain about or protect himself from this harassment, as he faced the possibility of serious sanction if the pretrial officer were to deem him to be in violation of his pretrial conditions.

257.    During the end of the pretrial period Mr. Mathews was required to attend a Courage to Change class, which was one-and-a-half hours long and took place one to two times per week.  Attending the class took significant time and caused him to lose wages and incur travel expenses.

258.    As a result of his arrest, detention, and pretrial supervision and conditions, Mr. Mathews has suffered and is suffering emotional distress and out-of-pocket losses.

### 5.    Ms. Acacia McNeal

259.    Plaintiff Acacia McNeal was arrested on or around February 16, 2015.  She was released on or around February 20, 2015.

260.    At the time of her arrest, Ms. McNeal was the primary caretaker of her grandfather, who suffered from diabetes and related complications and was in hospice care.  Ms. McNeal provided her grandfather with full-day care four days a week, including fulfilling critical needs such as changing his dressings from bed sores, tending to his pain from an amputation, and feeding him.  While incarcerated, she suffered fear and anxiety for his care until extended family arranged to care for him.

261.    At the time of her arrest, Ms. McNeal, a victim of domestic violence, was recovering from an abusive relationship with her ex-husband.  She was seeking medical treatment for the effects of domestic violence and lived in an apartment secured through No Violence Alliance ("NoVA"), a collaborative project between the Center for Juvenile and Criminal Justice and the San Francisco Sheriff's Department.  As a result of her arrest, Ms. McNeal experienced both the stress of a potential federal prison sentence and interruption in her therapy.

262.    Ms. McNeal's arrest and detention also caused her to lose employment.  At the time of her arrest, Ms. McNeal worked night shifts in a warehousing position in Burlingame, California.  Because she was incarcerated, Ms. McNeal missed two shifts and, as a result, she lost her job.

263.    Ms. McNeal's conditions for pretrial release included weekly drug tests, weekly therapy sessions, participation in the Courage to Change class, and weekly check-ins with her pretrial services officer throughout the entire pretrial period.

264.    At the request of her pretrial services officer, Ms. McNeal was forced to reside in a halfway house for a period of six months.  As a result, Ms. McNeal lost her housing through NoVA, and was forced to live in an overcrowded, dirty facility.

265.    While in the halfway house, Ms. McNeal's pretrial services officer refused her permission to leave the halfway house to continue caring for her grandfather, forcing her to make arrangements for other long-term care for him.

266.    Ms. McNeal's pretrial services officer also prevented Ms. McNeal from seeking employment, or even starting job training, for a four- or five-month period while she was detained in the halfway house.  During that period, Ms. McNeal could not earn any money.

267.    With limited exceptions, Ms. McNeal was not permitted to leave the halfway house at all for that same four- or five-month period.  Her pretrial services officer permitted her to leave only for court hearings, court-ordered appointments, group meetings in another facility, and one or two hours of personal time on the weekends.

268.    While Ms. McNeal was detained in the halfway house, her grandmother, who had raised her, passed away.  Because of the pretrial conditions, Ms. McNeal was unable to attend her grandmother's funeral, which was personally devastating to Ms. McNeal and has continued to cause strife within her family.

269.    Throughout her pretrial release, Ms. McNeal was subjected to drug tests two to three times each week.

270.    In addition, after Ms. McNeal was released from the halfway house and moved in with her mother in the Hunters Point neighborhood, she had to submit to weekly drug tests in a location in Chinatown for the rest of the pretrial period, a location that was difficult to get to, and far from both her home and employment.  Ms. McNeal also had to attend weekly therapy sessions.

271.    Ms. McNeal was also required to attend the criminal court proceedings which took place approximately once every two or three months.

272.    Ms. McNeal expended significant time and resources on a weekly and monthly basis to get to Chinatown for drug tests, to get therapy appointments and to get to the Federal Building in San Francisco for court hearings, check-ins with her pretrial officer and the Courage to Change class.

273.   After Ms. McNeal was released from the halfway house, she secured work as a cement mason.

274.   Ms. McNeal's obligations to comply with ongoing check-ins with her pretrial services officer, frequently scheduled with only a few hours' notice, directly interfered with Ms. McNeal's work schedule, forcing her to lose wages and expend time and money on public transit to attend.  The locations of Ms. McNeal's job sites changed and there were times when she was forced to commute from as far away as Hayward, which is about 30 miles from San Francisco, to get back to the City for her appointments.  Eventually, Ms. McNeal's absences from the work to participate in pretrial appointments or check-ins caused her to lose one of her jobs as a cement mason.

275.   Since the dismissal of the federal criminal charges, Ms. McNeal has continued to suffer from her federal indictment.  Ms. McNeal has been denied housing on the basis of the indictment showing up in her background check.  Ms. McNeal has also been denied employment by Walgreens for the same reason.

276.   As a result of her arrest, detention, and pretrial supervision and conditions, Ms. McNeal has suffered and is suffering emotional distress and out-of-pocket losses.

### 6.   Ms. Darlene Rouse

277.   Plaintiff Darlene Rouse was arrested on or around February 3, 2015.  She was booked into jail and released the same day as her arrest.

278.   Ms. Rouse experienced a great deal of stress during the arrest and detention, including when she was subject to two strip searches in jail.

279.   Ms. Rouse's conditions of release included twice-a-month drug tests, once-a-week therapy sessions, regular check-ins with her pretrial officer, and a stay-away order from the Tenderloin, where she lived and worked.  Because of the stay-away order, Ms. Rouse had to move to Vallejo, approximately 30 miles away.

280.   Although Ms. Rouse had an exception from the stay-away order to go to her job in the Tenderloin, it was stressful going to and from work due to the stay-away order.  On more than one occasion Ms. Rouse was harassed by members of the Police Department when she was on a break from work and threatened with being taken to jail for violating the order.

281.    Ms. Rouse was first required to submit to drug testing at the Federal Building in downtown San Francisco and then at a location in the City's Chinatown.  She was required to check whether she was required to report for testing on a daily basis by using a call-in system.  That system was poorly designed and consisted of a recording of a person quickly reading out all of the potential testers' ID numbers in a row.  She could not always understand the recording, which caused her to miss some of her test dates, for which she received violations.

282.    Ms. Rouse's mandatory therapy sessions were once a week for approximately an hour and were held at the same locations as the drug testing in Chinatown.  Because she could not miss work to attend the therapy sessions, she scheduled them for her day off.  This meant that although Ms. Rouse already traveled to San Francisco for work approximately six days a week, she often had to make an additional trip in on her day off to attend the therapy sessions, and occasionally to attend drug tests.  Ms. Rouse incurred the additional costs of taking BART and the bus to the city for these trips.

283.    Ms. Rouse became pregnant during the pretrial period and the time, expense and effort spent fulfilling the pretrial release conditions made Ms. Rouse especially anxious, because she had a high-risk pregnancy, in part due to her high blood pressure, and her doctors had advised her not to engage in stressful activities.  She was threatened with being detained in a halfway house for missing some of her drug tests, which caused her enormous stress because she did not want to live in a halfway house while she was pregnant.

284.    Ms. Rouse delivered her baby boy in April 2016 by cesarean section.

285.    Despite the fact that she was caring for a newborn and recovering from the cesarean surgery, Ms. Rouse was only given two weeks off from attending the therapy sessions and submitting to the drug tests.

286.    After the two weeks' reprieve, Ms. Rouse was required to bring her son with her to her appointments or to find childcare.  Because she did not want to take a newborn all the way into San Francisco and into the drug testing and therapy facility or to court, she was often forced to find and pay for childcare during these trips.

287.    Ms. Rouse was required to check in with her pretrial officer after every court hearing and at additional times depending on the circumstance.

288.   Ms. Rouse had to take time off from her job at Homebridge, a home care organization in the Tenderloin, to attend court hearings.  She generally had to take the whole day off work when she had hearings, since she would have to stay at the Federal Building and meet with her pretrial officer after the hearing.  Ms. Rouse lost wages for the time she missed work.

289.   As a result of her arrest, detention, and pretrial supervision and conditions, Ms. Rouse has suffered and is suffering emotional distress and out-of-pocket losses.

**F.   On the Basis of these Constitutional Deprivations, Persistent Customs and Practices, Supervisory Failures, and a Repeated Pattern of Indifference, All Defendants Are Liable for Violating Plaintiffs' Rights**

290.   All Defendants are liable for the violations of Plaintiffs' rights set forth above.

291.   Defendant Doe 1 selected, or participated in the decision to target, Plaintiffs and other Black persons, for arrest and referral for federal prosecution in the Operation, on the basis of their race.

292.   Defendant Doe 2 and Defendant Doe 3 selected, or participated in the decision to target, Plaintiffs and other Black persons for arrest and referral for federal prosecution in the Operation, on the basis of their race.

293.   Other Individual Defendants (including Does 4–33) selected, or participated in the decision to target, Plaintiffs and other Black persons for arrest and referral for federal prosecution in the Operation, on the basis of their race.

294.   Defendant Nocetti's rank of sergeant bestowed supervisory responsibilities upon him for participating Police Department officers.  Sergeant Nocetti selected, or participated in the decision to target, certain Plaintiffs and other Black persons for arrest and referral for federal prosecution in the Operation, on the basis of their race.  Defendant Nocetti is liable for the deprivation of Plaintiffs' constitutional and federal rights because of his participation in the operation.  Defendant Nocetti indicated to certain OSS Arrestees, including Plaintiff McNeal after her arrest, that the decisions to target these Arrestees—all of whom were Black—were made deliberately and intentionally.

295.   Defendant Nocetti furthermore failed to take action to prevent Police Department officers under his supervision in the Operation from targeting Plaintiffs because of their race.  That failure caused the deprivation of Plaintiffs' rights.

296.   Some individual Defendants who have supervisory responsibilities, including Defendants

Does 34–40, Nocetti, and Cherniss, had knowledge of the Police Department's persistent and widespread practice of racially discriminatory policing and failed to take corrective action to stop it.  That failure caused the deprivation of Plaintiffs' rights.

297.    Each individual Defendant (Nocetti, Cherniss, and Does 1–50) acted intentionally or at least recklessly and with callous disregard for Plaintiffs' rights to be free from racially biased law enforcement.

298.    The Police Department has a persistent and widespread practice of racially discriminatory policing, whereby Police Department officers carry out their duties against Black people with racial animus or otherwise selectively target Black people for enforcement on the basis of race.

299.    Before and during the events giving rise to this suit, Police Department officers have employed racial slurs, verbal harassment, and other racist, sexist, homophobic, or otherwise derogatory language against Black persons across San Francisco.

300.    Defendant City and County of San Francisco's final policymakers for the Police Department have been deliberately indifferent to racially discriminatory law enforcement practices, as shown by their knowledge of the discriminatory practices and failure to act to prevent or change those practices.

301.    Defendant City and County of San Francisco's final policymakers' deliberate indifference to racially discriminatory law enforcement practices by its Police Department demonstrates a custom and practice of allowing racially discriminatory enforcement that caused Plaintiffs to be deprived of their right to equal protection.  Defendant City and County of San Francisco has failed to address racially discriminatory policing as a result of deficiencies in training, supervision, discipline, and other corrective action, and its inadequate data collection to detect racial discrimination by the Police Department.

302.    Defendant City and County of San Francisco's knowledge of the Police Department's persistent and widespread custom or practice of racially discriminatory policing and failure to take corrective action to prevent it caused the deprivation of Plaintiffs' right to be free from the selective enforcement of criminal laws because of their race.

303.    Given the persistent and widespread nature of the conduct described herein by Police Department officers, those in the Police Department with supervisory responsibilities and the City and

1   County of San Francisco's decision-makers knew or should have known that the failure to take corrective

2   action would result in the recurring violations of Black persons' rights to be free from racially

3   discriminatory law enforcement by the Police Department.

4        304.   Yet Defendant City and County of San Francisco refused to heed those warnings—which

5   came in the form of numerous civilian complaints, expert reports, and local reporting.

6        305.   Defendants in the Police Department who have supervisory responsibilities and the City

7   and County of San Francisco's decision-makers exhibited deliberate indifference to Plaintiffs'

8   constitutional and federal rights to be free from racially discriminatory law enforcement practices.

9        306.   That custom and practice caused Plaintiffs to be deprived of their right to equal protection.

10       307.   The Individual Defendants' acts and omissions showed an intentional or at least callous

11   and reckless indifference for the deprivation of the Plaintiffs' constitutional rights.

12                           **FIRST CLAIM FOR RELIEF**

13      Violation of Fourteenth Amendment Equal Protection Rights Against Selective Enforcement
                                    42 U.S.C. § 1983
14                       (Against Defendants Nocetti and Does 1-33)

15       308.   Plaintiffs incorporate the foregoing allegations by reference.

16       309.   The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution

17   requires that all people be treated equally under the law without regard for their race or ethnicity.

18       310.   As such, the Equal Protection Clause prohibits law enforcement officers from selectively

19   enforcing criminal laws against individuals because of their race or ethnicity.

20       311.   Defendants Nocetti and Does 1–33 intentionally targeted Plaintiffs and other Black people

21   for arrest and referral for federal prosecution in the Operation on the basis of their race, in violation of

22   the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and displayed an

23   intentional or at least callous and reckless indifference to the deprivation of the Plaintiffs' constitutional

24   rights.

25       312.   This deprivation caused harm to Plaintiffs.

26

27

28

**SECOND CLAIM FOR RELIEF**

Violation of Fourteenth Amendment Equal Protection Rights Against Selective Enforcement
42 U.S.C. § 1983
(Against Defendants Cherniss, Nocetti and Does 34–50)

313. Plaintiffs incorporate the foregoing allegations by reference.

314. Defendants Nocetti, Cherniss, and Does 34–50 exercised supervisory authority over the Police Department officers participating in the Operation who targeted Plaintiffs for arrest and referral for federal prosecution in OSS on the basis of their race.

315. Defendants Nocetti, Cherniss, and Does 34–50 had knowledge of the Police Department's persistent and widespread practice of racially discriminatory policing, in San Francisco generally and the Tenderloin in particular.

316. Defendants Nocetti, Cherniss, and Does 34–50, in carrying out the training, supervision, and control of their subordinates, failed to take corrective action to stop the racially discriminatory selective enforcement of the law against Plaintiffs, and displayed an intentional or at least callous and reckless indifference to the deprivation of the Plaintiffs' constitutional rights.

317. This deprivation caused harm to Plaintiffs.

**THIRD CLAIM FOR RELIEF**

Violation of Fourteenth Amendment Equal Protection Rights Against Selective Enforcement
42 U.S.C. § 1983
(Against Defendant City And County Of San Francisco)

318. Plaintiffs incorporate the foregoing allegations by reference.

319. Plaintiffs were targeted for arrest and federal prosecution in the Operation on the basis of their race, in violation of their rights to equal protection under the law.

320. At all times relevant herein, Defendant City and County of San Francisco, through the Police Department, deliberately chose to engage in a custom or practice of targeting Black people on the basis of race when carrying out law enforcement duties.

321. Police Department officers participating in the Operation acted pursuant to that policy, custom, or practice when they targeted Plaintiffs for arrest and federal prosecution in the Operation on the basis of their race.

322. Final policymakers of Defendant City and County of San Francisco had knowledge of the

Police Department's persistent and widespread practice of racially discriminatory law enforcement.

323.     Defendant City and County of San Francisco failed to establish adequate procedures, policies, training, supervision, discipline, and other corrective action to prevent the Police Department's racially discriminatory law enforcement, disregarding the known and foreseeable consequences of their existing policies and of failing to implement reforms.

324.     This deprivation caused harm to Plaintiffs.

## FOURTH CLAIM FOR RELIEF

Violation of Title VI of the 1964 Civil Rights Act
42 U.S.C. § 2000d, 28 C.F.R. §§ 42.101–42.112
(Against Defendant City And County Of San Francisco)

325.     Plaintiffs incorporate the foregoing allegations by reference.

326.     At all time periods relevant herein, Defendant City and County of San Francisco has received federal financial assistance, including yearly grants from the DOJ through the Byrne JAG Program.

327.     The Byrne JAG Program is administered by the Bureau of Justice Assistance ("BJA"), an agency within the U.S. Department of Justice.  The BJA awards Byrne JAG funding to state and local governments to support program areas including law enforcement, prosecution, and drug enforcement.

328.     Defendant City and County of San Francisco receives annual Byrne JAG awards from the BJA and allocates that federal funding to its Police Department.

329.     Between 2014 and 2017, the annual Byrne JAG award to Defendant City and County of San Francisco ranged from $458,753 to $524,845.  Defendant City and County of San Francisco then allocates at least some of the Byrne JAG award funds to its Police Department for law enforcement purposes.

330.     In violation of the anti-discrimination conditions attached to the Byrne JAG awards and other federal funding it receives, the City and County of San Francisco, through its Police Department, has discriminated against Plaintiffs by targeting Plaintiffs for arrest on the basis of their race.

331.      At all times relevant herein, Defendant City and County of San Francisco, through the Police Department, created and enforced a custom or practice of targeting Black people on the basis of race when carrying out law enforcement duties.

332.   Police Department officers participating in the Operation acted pursuant to that policy, custom, or practice when they targeted Plaintiffs for arrest and federal prosecution in the Operation on the basis of their race.

333.   Final policymakers of Defendant City and County of San Francisco had knowledge of the Police Department's persistent and widespread practice of racially discriminatory law enforcement.

334.   Defendant City and County of San Francisco failed to establish adequate procedures, policies, training, supervision, discipline, and other corrective action to prevent the Police Department's racially discriminatory law enforcement, disregarding the known and foreseeable consequences of their existing policies and of failing to implement reforms.

335.   As a result, Defendant City and County of San Francisco caused the deprivation of Plaintiffs' rights under Title VI of the Civil Rights Act of 1964 and its implementing regulations.

336.   This deprivation caused harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

     a.   Compensatory and punitive damages pursuant to 42 U.S.C. § 1983;

     b.   Compensatory damages pursuant to Title VI;

     c.   An award of reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and any other applicable laws;

     d.   Pre-judgment interest and post-judgment interest on any award of damages to the extent permitted by law; and

     e.   Any additional relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs demand trial by jury in this action of all issues so triable.

Date:  October 3, 2018

By: _____
                    /s/ Daralyn J. Durie
DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
LAUREN E. KAPSKY (SBN 321395)
lkapsky@durietangri.com
ERIC G. MESSINGER (SBN 320298)
emessinger@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

Date:  October 3, 2018

By: _____
                  /s/ Novella Yvette Coleman
ACLU FOUNDATION OF NORTHERN CALIFORNIA
NOVELLA YVETTE COLEMAN (SBN 281632)
ncoleman@aclunc.org
MICAELA DAVIS (SBN 282195)
mdavis@aclunc.org
ABRE' LEANN CONNER (SBN 306024)
aconner@aclunc.org
CHRISTINE P. SUN (SBN 218701)
csun@aclunc.org
JAMIE L. CROOK (SBN 245757)
jcrook@aclunc.org
39 Drumm St
San Francisco, CA 94111
Telephone:    415-621-2493
Facsimile:    415-255-8437

Date:  October 3, 2018

By: _____
                    /s/ Ezekiel R. Edwards
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
CRIMINAL LAW REFORM PROJECT
EZEKIEL R. EDWARDS (*pro hac vice* pending)
eedwards@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone:    212-549-2500
Facsimile:    212-549-2651

Attorneys for Plaintiffs
Tiffany Cross, Shalonda Adams, Crystal Anthony, Arron
Lee Mathews, Acacia McNeal, and Darlene Francine
Rouse

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), regarding signatures, I, Daralyn J. Durie, attest that concurrence in the filing of this document has been obtained.

Date:  October 3, 2018

By: _____*/s/ Daralyn J. Durie*_____
DARALYN J. DURIE