# EXHIBIT A

tlement would not preclude the *Zamora* plaintiffs from pursuing (potentially on behalf of a proposed class of drivers) the claims based on this same alleged wrongdoing that *do not* depend on a finding that Lyft drivers are "employees" rather than "independent contractors." In other words, notwithstanding this settlement, drivers may still attempt to collect on the commissions that Lyft allegedly kept from the Prime Time premiums.

**[7]**  In sum, the relative weakness of the section 351 claims, the low value of those claims relative to the value of the reimbursement claims, and the fact that drivers might still be able to pursue reimbursement of the Prime Time commissions under other legal theories, combine to lead to the conclusion that, even though counsel for the *Cotter* plaintiffs ought to have identified and considered the Prime Time gratuity claims before negotiating a settlement agreement, their failure to do so does not render the current settlement unfair, unreasonable, or inadequate within the meaning of Rule 23(e)(2).

### IV.

**[8]**  The new proposed settlement agreement fixes the monetary flaws the Court previously identified and enhances the nonmonetary benefits at least to some degree. Considering the risks the plaintiffs would face in taking this case to trial, together with the value of all of the claims being released and the value of the proposed settlement (both monetary and nonmonetary) to the class members, the Court concludes that the settlement, on the current record, is "fair, reasonable, and adequate" within the meaning of Rule 23(e)(2). *See also Hanlon,* 150 F.3d at 1026. Accordingly, the motion for preliminary approval is granted. Within 7 days of this order, the parties should submit a revised proposal for notifying the class members of the settlement. The revised notice should include a description of the *Zamora* lawsuit,

and the fact that the current agreement releases the section 351 claims being pursued by the *Zamora* plaintiffs (without releasing other claims based on the same facts).

**IT IS SO ORDERED.**



**UNITED STATES of America,
Plaintiff,**

v.

**Matthew MUMPHREY,
et al., Defendants.**

**Case No. 14-cr-00643-EMC-1**

United States District Court,
N.D. California.

Signed 06/30/2016

**Background:**  In a collection of cases, a group of African American criminal defendants being prosecuted for relatively low level drug trafficking contended their arrests and prosecution were based on racially selective actions taken by local and federal law enforcement. Defendants moved to compel discovery.

**Holdings:**  The District Court, Edward M. Chen, J., held that:

(1) as a matter of first impression, dismissal of criminal proceedings is a proper remedy for selective enforcement;

(2) evidence established discriminatory effect of city drug bust program, as required to establish entitlement to discovery;

(3) evidence gave rise to an inference of discriminatory intent in conducting

program, as required to establish entitlement to discovery;

(4) evidence did not give rise to an inference of discriminatory intent required to warrant African American defendants' entitlement to discovery on claim of selective prosecution.

Motion granted in part and denied in part.

**1. Criminal Law** ⟺**37.10(1)**

Dismissal of criminal proceedings is a proper remedy for selective enforcement.

**2. Criminal Law** ⟺**627.8(3)**

Statistical showing made by defendants, that all 37 individuals targeted and arrested under city drug bust program were African American, established discriminatory effect, as required to establish African American defendants' entitlement to discovery on claim of selective prosecution based on race.  U.S. Const.Amend. 14.

**3. Criminal Law** ⟺**627.8(3)**

Even if statistical showing alone was not sufficient to show discriminatory effect, credible evidence showed that similarly situated defendants of other races could have been prosecuted, but were not, as required to establish African American defendants' entitlement to discovery on claim of selective prosecution based on race; 100% of defendants charged with federal crimes as result of city's drug bust program were African American, despite fact that charging data showed that 61.4% of those arrested and charged for drug-trafficking crimes pursuant to the program were African American, and survey of drug users in the area showed 56% of the drug transactions involved African American drug sellers, 20% involved Latino drug sellers, and 16.8% involved white drug sellers, defendants identified approximately sixty specific instances in which non-African American drug dealers were arrested for committing drug-trafficking crimes in the same area but were not federally charged, and video of undercover drug buy showed informant declining to buy drugs from an Asian woman and waiting to buy drugs from an African American woman.  U.S. Const.Amend. 14.

**4. Criminal Law** ⟺**37.10(1)**

The kind of intent to be proved in a selective enforcement case is that the government undertook a particular course of action at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group.

**5. Criminal Law** ⟺**627.8(3)**

Evidence of city police department's and individual officers' knowledge of the presence, behavior, and specific geographic locations frequented by non-African American drug dealers, combined with the failure to arrest any non-African American drug dealers as part of city drug bust program, and race-based comments and conduct by officers and informant gave rise to an inference of discriminatory intent, as required to establish African American defendants' entitlement to discovery on claim of selective prosecution based on race.  U.S. Const.Amend. 14.

**6. Criminal Law** ⟺**627.8(3)**

There was no evidence that federal prosecutors who made prosecutorial decisions were aware, either individually or collectively, of similarly situated non-African Americans that could have been presented for prosecution pursuant to city's drug bust program, but were not, as would give rise to an inference of discriminatory intent required to warrant African American defendants' entitlement to discovery on claim of selective prosecution based on race.  U.S. Const.Amend. 14.

———————

Brian J. Stretch, Acting United States Attorney, David R. Callaway, Lloyd Farn-

**1042**         **193 FEDERAL SUPPLEMENT, 3d SERIES**

ham, Sarah K. Hawkins, J. Douglas Wilson, Assistant United States Attorney, San Francisco, CA, for United States of America.

Steven G. Kalar, Federal Public Defender, Galia Amram, Assistant Federal Public Defender, Steven J. Koeninger, Daniel Blank, Assistant Federal Public Defender, Candis Mitchell, Assistant Federal Public Defender, Ellen Leonida, Assistant Federal Public Defender, San Francisco, CA, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL

EDWARD M. CHEN, United States District Judge

In this collection of cases, a group of individuals, all of whom are African American and all who are being prosecuted for relatively low level drug trafficking in the Tenderloin under a program entitled Operation Safe Schools ("OSS") (collectively, "Defendants"), contend their arrests and prosecution were based on racially selective actions taken by local and federal law enforcement. The issue currently before the Court is not whether racially selective actions were in fact taken, but whether Defendants are entitled to discovery to substantiate their claims of selective enforcement and prosecution.

After reviewing extensive briefing, the Court concludes that the record presented by the parties in connection with this motion contains substantial evidence suggestive of racially selective enforcement by the San Francisco Police Department ("SFPD") and other federal law enforcement in connection with the conduct of OSS; that evidence is countered by a conspicuously meager rebuttal by the government. Accordingly, the Court concludes Defendants have made sufficient showing entitling them to discovery with respect to the claim of selective enforcement. However, the Court holds that, at least at this juncture, Defendants are not entitled to discovery with respect to their claim of selective prosecution. Defendants' motion to compel discovery is thus **GRANTED** in part and **DENIED** in part.

### I. BACKGROUND

The above-referenced cases arise in the context of Operation Safe Schools ("OSS"). OSS was a program jointly undertaken by the U.S. Attorney's Office ("USAO"), the Drug Enforcement Administration ("DEA"), and the San Francisco Police Department ("SFPD").[1] *See United States v. Anthony*, No. CR–15–0005 EMC (Docket No. 11–2) (Phillips (FPD) Decl., Ex. C) (USAO press release, dated 12/9/2013) (USA Haag stating that she has " 'directed my office to work with the DEA and the [SFPD] to aggressively prosecute drug trafficking in areas around Tenderloin schools' "). The purpose of OSS "was to aggressively prosecute drug dealers around schools and playgrounds in the Tenderloin district." Docket No. 51–5 (Hasib (USAO) Decl. ¶ 3).

---

1.  According to Defendants, at least 46 law enforcement officers were involved in OSS, 34 being SFPD officers, 1 a Daly City officer, 10 DEA officers, and 1 a U.S. Marshal assigned to the DEA. *See* Mot. at 10. Defendants also claim that at least some of the SFPD officers were cross-designated as federal agents. *See* Mot. at 11. The government does not contest these claims. *See also United States v. Anthony*, No. CR–15–0005 EMC

(Docket No. 11–1) (Sommerfeld (FPD) Decl., Att. A) (bar graph showing law enforcement officers involved and number of OSS cases each officer worked on); *United States v. Anthony*, No. CR–15–0005 EMC (Docket No. 42–1) (Nocetti (SFPD) Decl. ¶ 1) (testifying that he has been with the SFPD since 1991 and was assigned to serve as a Task Force Officer with DEA from 2000 until December 2013).

Two "sweeps" were done pursuant to OSS: one in late 2013 (August to November) and a second in late 2014 (October to December). *See* Defs.' Ex. 3 (Cruz-Laucirica (FPD) Decl., Att. A) (spreadsheet of OSS cases). For the first sweep, 20 "buy/walk" operations were conducted. Fourteen out of the 20 individuals were prosecuted. *See* Docket No. 146–3 (Dorais (DEA) Decl. ¶ 4). For the second sweep, 23 operations were conducted, and all 23 individuals were prosecuted. *See* Docket No. 146–3 (Atakora (DEA) Decl. ¶ 1). Altogether (*i.e.*, for both sweeps), 37 individuals were prosecuted, more specifically, for violations of 21 U.S.C. §§ 841 and 860.[2] All 37 individuals are African American.

Currently pending before the Court is a joint motion filed by 12 of the individuals who were targeted, arrested, and prosecuted pursuant to OSS. For convenience, these individuals shall hereinafter be referred to collectively as "Defendants." Defendants seek leave to serve discovery related to two different, but related theories: (1) that law enforcement targeted persons for arrest based on their race (*i.e.*, selective enforcement) and (2) that the prosecutors prosecuted the persons based on their race (*i.e.*, selective prosecution). As indicated by the above, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion to compel.

## II. *ARMSTRONG*

The parties agree that *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), provides the governing standard for Defendants' selective prosecution claim. As for the selective enforcement claim, the parties also agree that *Armstrong* provides at least some general guidance, although Defendants assert that *Armstrong* is not completely controlling given that some of its analysis was specific to the role of a prosecutor which is distinct from the role of law enforcement. Given the significance of *Armstrong*, the Court provides a brief synopsis as to the holding therein.

In *Armstrong*, the defendants were indicted on drug and firearm offenses. They alleged that they were selected for prosecution because of their race (African American) and thus moved for discovery or for dismissal of the indictment. *See id.* at 458–59, 116 S.Ct. 1480.

> In support of their motion, [the defendants] offered only an affidavit by a "Paralegal Specialist," employed by the Office of the Federal Public Defender representing one of the [defendants]. The only allegation in the affidavit was that, in every one of the 24 § 841 or § 846 [*i.e.*, drug] cases closed by the office during 1991 [*i.e.*, the year before the defendants were indicted], the defendant was black. Accompanying the affidavit was a "study" listing the 24 defendants, their race, whether they were prosecuted for dealing cocaine as well as crack, and the status of each case.

*Id.* at 459, 116 S.Ct. 1480.

The district court ordered the government to provide discovery. Subsequently,

---

**2.** *See* 21 U.S.C. § 841(a)(1) (providing that "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance"); *id.* § 860(a) (providing that "[a]ny person who violates [§ 841(a)(1)] by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university, or a playground, or housing facility owned by a public housing authority, or within 100 feet of a public or private youth center, public swimming pool, or video arcade facility, is…subject to [certain enhanced punishment]").

the government moved for reconsideration of the discovery order and submitted evidence for the court's consideration, including (1) affidavits from the federal and local agents participating in the case, which stated that "race played no role in their investigation"; (2) an affidavit from an AUSA who stated that the decision to prosecute met the general criteria for prosecution because, of, *e.g.*, the amount of cocaine base involved, the criminal histories of the defendants, the strength of the evidence, etc.; and (3) sections of a DEA report which concluded that " 'large-scale, interstate tracking networks controlled by Jamaicans, Haitians, and Black street gangs dominate the manufacture and distribution of crack.' " *Id.* at 460, 116 S.Ct. 1480.

In turn, the defendants provided additional information to the district court, including (1) an affidavit from one of defense counsel, stating that "an intake coordinator at a drug treatment center had told her that there are 'an equal number of Caucasian users and dealers to minority users and dealers' "; (2) an affidavit from another criminal defense attorney, stating that "in his experience many nonblacks are prosecuted in state court for crack offenses"; and (3) a newspaper article "reporting that federal 'crack criminals . . . are being punished far more severely than if they had been caught with powder cocaine, and almost every single one of them is black.' " *Id.* at 460–61, 116 S.Ct. 1480.

The district court denied the government's motion for reconsideration and then, when the government stated it would not comply with the discovery order, dismissed the case.[3] *See id.* at 461, 116 S.Ct. 1480.

The specific issue as presented to the Supreme Court was what showing was necessary "for a defendant to be entitled to *discovery* on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race." *Id.* at 458, 116 S.Ct. 1480 (emphasis added). However, before addressing this issue, the Supreme Court addressed the requirements for a selective prosecution claim. The Court explained first that there is a presumption that the prosecuting attorney has properly discharged his or her official duties and not violated equal protection. This presumption arises from the broad discretion a prosecutor is given in enforcing the criminal laws. *See id.* at 464–65, 116 S.Ct. 1480 (noting, *e.g.*, that, "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion' "). "[T]o dispel that presumption . . . , a criminal defendant must present 'clear evidence to the contrary.' " *Id.* at 465, 116 S.Ct. 1480. More specifically, the defendant must present clear evidence of discriminatory effect and discriminatory purpose. *See id.*

"Having reviewed the requirements to prove a selective-prosecution claim, [the Court] turn[ed] to the showing necessary to obtain discovery in support of such a claim." *Id.* at 468, 116 S.Ct. 1480. According to the Court, "[t]he justifications for a rigorous standard for the elements of a selective prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim," especially as discovery "will divert prosecutors' resources" and "may disclose the Govern-

---

**3.**  In a footnote, the Supreme Court noted that it had "never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of his race." *Armstrong,* 517 U.S. at 461 n. 2, 116 S.Ct. 1480.

ment's prosecutorial strategy." *Id.* It distilled the showing required for discovery as follows: there must be " '*some evidence* tending to show the existence of the essential elements of the [selective prosecution] defense,' discriminatory effect and discriminatory intent." *Id.* (emphasis added).

For purposes of the case at hand, the Supreme Court only had to consider "what evidence constitutes 'some evidence tending to show the existence' of the discriminatory effect element." *Id.* at 469, 116 S.Ct. 1480. "The Court of Appeals [had] held that a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are similarly situated to the defendant." *Id.* The Supreme Court concluded that the appellate court was "mistaken in this view." *Id.* It held that there must be "some evidence that similarly situated defendants of other races could have been prosecuted, but were not," *i.e.*, "some evidence of differential treatment of similarly situated members of other races or protected classes." *Id* at 469–70, 116 S.Ct. 1480.

The Supreme Court indicated that a similarly situated requirement was necessary in part because one could not assume, as the appellate court did below, that " 'people of *all* races commit *all* types of crimes"—*i.e.*, as opposed to "the premise that any type of crime is the exclusive province of any particular racial or ethnic group.' " *Id.* (emphasis added). The Court noted that not only was there no authority

cited for the appellate court's assumption but also that assumption "seems contradicted by the most recent statistics of the United States Sentencing Commission," which showed, *e.g.*, that "[m]ore than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black, 93.4% of convicted LSD dealers were white, and 91% of those convicted for pornography or prostitution were white." *Id.*[4]

In response to the concern that the similarly situated requirement would pose an evidentiary obstacle to a defendant, the Supreme Court stated as follows:

> In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents. For example, respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court.

*Id.* at 470, 116 S.Ct. 1480.[5]

Ultimately, the Supreme Court held that, in the case under consideration, the defendants had not satisfied the requirement of "some evidence" of discriminatory effect. Defendants' "study" (*i.e.*, that, in every one of the 24 § 841 or § 846 cases closed by the FPD during 1991, the defendant was black)

---

**4.** The Court did not address the question-begging nature of these statistics; it is possible that these statistics on conviction and sentencing themselves reflect bias patterns of enforcement and prosecution, not simply the pattern of actual law violations. *See, e.g.*, Sonja B. Starr & M. Marit Rehavi, *Mandatory Sentencing & Racial Disparity: Assessing the Role of Prosecutors and the Effects of* Booker, 123 Yale L.J. 2 (2013).

**5.** Even though the Supreme Court made reference to whether federal law enforcement *knew* of similarly situated persons being prosecuted in state court, that would seem to be more an issue with respect to discriminatory *intent* rather than discriminatory *effect*. *Cf. United States v. Tuitt,* 68 F.Supp.2d 4, 10 (D.Mass.1999) (noting that *"the Supreme Court's actual analysis of the evidence offered in* Armstrong . . . *in some ways appears to conflate the elements of effect and intent"*).

failed to identify individuals who were not black and could have been prosecuted for the offenses for which responds were charged, but were not so prosecuted....The newspaper article, which discussed the discriminatory effect of the federal drug sentencing laws, was not relevant to an allegation of discrimination in decisions to prosecute. [The] affidavits, which recounted one attorney's conversation with a drug treatment center employee and the experience of another attorney defending drug prosecutions in state court, recounted hearsay and reported personal conclusions based on anecdotal evidence.

*Id.*

After *Armstrong*, the Supreme Court issued another opinion on selective prosecution. *See United States v. Bass*, 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) (per curiam). The opinion—very brief—addressed a contention made by a defendant that the government had decided to seek the death penalty against him because of his race. The defendant sought dismissal based on this claim or, in the alternative, discovery about the government's capital charging practices. *See id.* at 862–63, 122 S.Ct. 2389. The Supreme Court concluded that the defendant had failed to "make a 'credible showing' that 'similarly situated individuals of a different race were not [charged],'" as required to demonstrate discriminatory effect. *Id.* at 863, 122 S.Ct. 2389.

The Sixth Circuit concluded that respondent had made such a showing based on nationwide statistics demonstrating that "the United States charges blacks with a death-eligible offense more than twice as often as it charges white" and that the United States enters into plea bargains more frequently with whites than it does with blacks. Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants....*

*Id.* at 863–64, 122 S.Ct. 2389 (emphasis added).[6]

In the instant case, both parties agree that *Armstrong* provides the general framework for both selective prosecution and selective enforcement claims—*i.e.*, there must be both a discriminatory effect and a discriminatory purpose. *See, e.g.*, *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir.2002) (noting that defendant was "complain[ing] not of selective prosecution, but of racial profiling [by the DEA], a selective law enforcement tactic[,] [b]ut the same analysis governs both types of claims: a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that *Armstrong* outlines for selective prosecution claims"). Defendants, argue, however, that the specific discriminatory effect analysis in *Armstrong* applies only to selective prosecution claims, and not selective enforcement claims, because the analysis was targeted to the special role that a prosecutor has. Defendants point out that, in *United States v.*

---

**6.** Although the *Armstrong* and *Bass* Courts focused on similarly situated as part of the discriminatory effect analysis, evidence of differential treatment is also probative of discriminatory intent. *See United States v. Smith*, 231 F.3d 800, 809 (11th Cir.2000) ("recogniz[ing] that the nature of the two prongs of a selective prosecution showing are such that

they will often overlap to some extent"); *cf. Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir.2013) (indicating that, in a civil case, where discrimination is alleged, preferential treatment of a similarly situated person can be evidence of discriminatory intent).

*Davis*, 793 F.3d 712 (7th Cir.2015) (en banc), the Seventh Circuit, sitting en banc, acknowledged the distinction between selective enforcement and selective prosecution and found the rationale of *Armstrong* does not apply with full force where prosecutorial discretion is not involved.

In *Davis*, there were seven African American defendants who were charged "with several federal offenses arising from a plan to rob a stash house, where the defendants believed they would find drugs and money." *Davis*, 793 F.3d at 714. The defendants argued that "the prosecutor, the FBI, and the ATF engaged in racial discrimination" by proceeding against them. *Id.* In support of their claim of discrimination, the defendants informed the district court that, "since 2006[,] the United States Attorney for the Northern District of Illinois has prosecuted 20 stash-house stings, and that of the defendants in these cases 75 were black and 19 white." *Id.* at 715 (adding that "13 of the 19 white defendants were Hispanic"). The district court permitted discovery because " 'the overwhelming majority of the defendants named [were] individuals of color.' " *Id.* at 719.

The Seventh Circuit disagreed with the district court, stating that its decision was inconsistent with *Armstrong*. The record in *Armstrong* showed that *every* defendant in *every* crack-cocaine prosecution filed by a particular United States Attorney's office and assigned to the public defender was black. If, as the Supreme Court held, that evidence did not justify discovery into the way the prosecutor selected cases, then proof that in the Northern District of Illinois three-quarters of the defendants in stash-house cases have been black does not suffice. *Id.* at 719–20.

But the Seventh Circuit then went on to note that the matter before it was not

"that simple" because *Armstrong* was a pure selective prosecution case. *Id.* at 720. The Supreme Court [noted] that federal prosecutors deserve a strong presumption of honest and constitutional behavior, which cannot be overcome simply by a racial disproportion in the outcome, for disparate impact differs from discriminatory intent. The Justices also noted that there are good reasons why the Judicial Branch should not attempt to supervise how the Executive Branch exercises prosecutorial discretion. In order to give a measure of protection (and confidentiality) to the Executive Branch's deliberative processes, which are covered by strong privileges, the Court in *Armstrong* insisted that the defendant produce evidence that persons of a different race, but otherwise comparable in criminal behavior, were presented to the United States Attorney for prosecution, but that prosecution was declined.

*Id.*

The Seventh Circuit then noted that the case before it was not really a selective prosecution case but rather a selective enforcement case—"the defendant's principal targets are the ATF and the FBI." *Id.* But

[a]gents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have es-

tablished probable cause. Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.

*Id.* at 720–21. *But see United States v. Alcaraz–Arellano*, 441 F.3d 1252, 1264 (10th Cir.2006) (stating that "[s]imilar caution is required in reviewing a claim of selective law enforcement").

Although the Court agrees with the reasoning in *Davis*, it need not resolve this issue whether *Armstrong* applies with full force to claims of selective enforcement. The Court finds that, even assuming it does, Defendants have satisfied *Armstrong* in respect to their claim of selective enforcement.

### III. RECORD EVIDENCE

Both parties have provided evidence in conjunction with the pending motion. The primary evidence is briefly outlined below.

A. Defendants' Evidence
● The fact that all 37 OSS defendants are African American.
● Charging data (between January 1, 2013, and February 28, 2015) from the San Francisco Superior Court, more specifically, with respect to drug-trafficking crimes in the Tenderloin. *See* Mot. at 20. The data reflected that 61.4% of those arrested and charged were African American, 24.7% were Latino, and 10.7% were white. *See* Mot. at 21; *see also* 2d Phillips (FPD) Decl., Ex. M (Beckett Rpt. at 7). Defendants' expert, Dr. Beck-

ett, concluded that, based on a comparison of the charging data to the OSS results (where all persons charged were African American), there was a Z score of 4.75. A Z score of 4.75 is highly significant. *See* Amram (FPD) Reply Decl., Att. A (Supp. Beckett Rpt. at Ex. 05248-49). As Defendants explain, and the government does not dispute, a Z score is used to measure the statistical significance of an observed difference. "Z scores with an absolute value of 2 or more are considered statistically significant, meaning that the observed difference is very unlikely to be the result of chance." Mot. at 14 n.24.

● A survey administered to active drug users accessing services at the Tenderloin Needle Exchange site of the San Francisco AIDS Foundation's Needle Exchange Program. The survey commenced in August 2015, *see* Defs.' Ex. 41 (2d Phillips Decl., Ex. M) (Beckett Expert Report at 5), and was conducted on seven consecutive weeks.[7] *See* Mot. at 14. "In the survey, respondents were asked to recall up to six recent drug transactions that took place in the Tenderloin neighborhood and to identify the race/ethnicity of the person from whom they obtained the drugs." Mot. at 14. The data from the survey reflected as follows: 56% of the Tenderloin drug transactions involved African American drug sellers; 20% involved Latino drug sellers; and 16.8% involved white drug sellers. *See* Mot. at 14. Similar to above Defendants' expert, Dr. Beckett, concluded that, based on a comparison of the survey results to the OSS results, there was a Z score of 5.23. *See* Amram (FPD) Reply Decl., Att. A (Supp. Beckett Rpt. at Ex. 05248-49).

---

**7.** The government attempts to equate the survey with anecdotal evidence, *see* Opp'n at 21,

but that is not a fair criticism given the way that the survey was designed and conducted.

- Declarations from six persons who work in the Tenderloin. *See* Defs.' Ex. 25 (Martinez Decl.); Defs.' Ex. 26 (Sandoval Decl.); Defs.' Ex. 27 (Brown Decl.); Defs.' Ex. 28 (Allen Decl.); Defs.' Ex. 32 (Harkin Decl.); Defs.' Ex. 36 (Leslie Decl.). The declarations generally indicate that there is a significant presence of non-African American drug dealers in the Tenderloin, particularly in certain locations within the Tenderloin. *See, e.g.*, Defs.' Ex. 32 (Harkin Decl. ¶ 6) (Program Manager for GLIDE Health Services HIV and Hepatitis C programs, stating that "I have found that drug dealers of the same ethnic group tend to work the same areas of the Tenderloin[;] [f]or example, most recently, Leavenworth has Honduran and Mexican drug dealers, Golden Gate Avenue has Whites and African Americans above Jones Street and just African Americans at Jones Street and below, and Hyde Street has Mexicans regularly dealing drugs there").

- SFPD incident reports, some of which indicate SFPD "awareness of the presence, behavior, and specific geographic locations frequented by Hispanic/Latino dealers" in the Tenderloin. Mot. at 22 (giving six incident reports as examples). *See, e.g.*, Koeninger (FPD) Decl., Att. D at Ex. 00773 (SFPD incident report, dated April 2013 and authored by Officer G. Darcy) (stating that "I have participated in hundreds of buys busts and surveillance in this area" and that "I know that many of the drug dealers in the Hyde Street area are of Honduran descent"); Koeninger (FPD) Decl., Att. D at Ex. 00736 (SFPD incident report, dated April 2015 and authored by Officer D. Casey) (stating that, "[b]ased off prior arrests and contacts, I know that the corner of Eddy Street and Hyde Street is primarily controlled by Honduran national drug dealers").

- Evidence related to approximately sixty non-African American drug dealers who Defendants claim are similarly situated to Defendants. *See* Mot. at 24 *et seq.* (identifying approximately forty such drug dealers); Reply at 14 *et seq.* (adding more comparators). Like Defendants, these sixty or so persons were arrested for committing drug-trafficking crimes in the Tenderloin within the OSS timeframe but, unlike Defendants, were not federally charged under OSS. Some of the OSS officers were involved with the arrests of some of these individuals. *See* Reply at 37-38. *See, e.g.*, Koeninger (FPD) Decl., Att. A at Ex. 226-3) (SFPD incident report for Doe 6) (reflecting that the following OSS officers were involved in the arrest of Doe 6: Officers MacDonald (involved in 21 OSS cases), Lee (involved in 21 OSS cases), Daggs (involved in 23 OSS cases), Solorzano (involved in 13 OSS cases), Payne (involved in 9 OSS cases), and Hagan (involved in 11 OSS cases)).

- Video from one of the OSS cases (*United States v. McNeal*, No. CR–15–0028 EMC) showing that one officer says, "Fucking BMs" (*i.e.*, black males) and another officer says, "Shh, hey, I'm rolling." *See* Defs.' Ex. 5 (1st Phillips (FPD) Decl. ¶¶ 3, 5). The officer who made the first statement was involved in a total of 18 OSS cases; the officer who made the second statement was involved in a total of 11 OSS cases.

- Video from one of the OSS cases (now resolved) (*United States v. Roberts*, No. CR–13–0760 CRB) where the undercover informant declines to buy drugs from an Asian woman and waits to buy drugs from the defendant, an African American woman. *See* Mot. at 60-61; *see also United States v. Anthony*, No. CR–15–0005 EMC (Docket No. 11–2) (Phillips (FPD) Decl., Ex. G) (video in *Roberts* case).

- The USAO's knowledge of problems with racism within the SFPD, at least prior to the second sweep in late 2014 (October to December). Defendants point to the fact that, in early 2014, the USAO indicted three SFPD officers for, *inter alia*, civil rights violations and, prior to trial in November 2014, racist texts were disclosed. (However, none of the officers appears to have been involved with OSS.)

- Declarations from approximately 20-25 OSS defendants (some of the defendants are moving parties, some are not) who describe how SFPD officers have treated African Americans, including but not limited to how they have paid more attention to African Americans than to persons of other races.

  ○ Some of the OSS defendants talk about negative interactions with officers who were specifically involved with OSS—*e.g.*, (1) Shaughn Ryan (2 OSS cases), *see, e.g.*, Defs.' Ex. 7 (Nash Decl.); Defs.' Ex. 9 (McNeal Decl.); Defs.' Ex. 10 (Jones Decl.); Defs.' Ex. 14 (Rouse Decl.); Defs.' Ex. 18 (Williams Decl.); Defs.' Ex. 19 (Reed Decl.); Defs.' Ex. 20 (Adams Decl.); Defs.' Ex. 21 (Reddic Decl.); Defs.' Ex. 24 (Jules Decl.); Defs.' Ex. 29 (Johnson Decl.); Defs.' Ex. 30 (Cross Decl.); Defs.' Ex. 35 (Wallace Decl.); (2) Darren Nocetti (29 OSS cases), *see, e.g.*, Defs.' Ex. 8 (Mathews Decl.); Defs.' Ex. 37 (Mackey Decl.); (3) Ryan Crosby (11 OSS cases), *see, e.g.*, Defs.' Ex. 12 (Anthony Decl.); Defs.' Ex. 16 (White Decl.); (4) D. Goff (6 OSS cases), *see, e.g.*, Defs.' Ex. 19 (Reed Decl.); Defs.' Ex. 34 (Jackson Decl.); Defs.' Ex. 35 (Wallace Decl.); (5) Anthony Assaretto (8 OSS cases), *see, e.g.*, Defs.' Ex. 34 (Jackson Decl. ¶ 2); (6) Micah Hope (6 OSS cases), *see, e.g.*, Defs.' Ex. 20 (Adams Decl.); and (7) A. Scafani (14 OSS cases), *see,*

*e.g.*, Defs.' Ex. 35 (Wallace Decl.). Some of these interactions, while negative, do not clearly involve race.

  ○ According to some of the defendants, some of the OSS officers (*e.g.*, Shaughn Ryan, Darren Nocetti, Anthony Assaretto, D. Goff, and A. Scafani) have expressly made racist statements or engaged in racist conduct. *See, e.g.*, Defs.' Ex. 7 (Nash Decl. ¶ 5) ("On other occasions, Officer Ryan has referred to African-American females as 'bitches' and has made comments that women who are confidential informants for him are 'bitches that work for me.' "); Defs.' Ex. 9 (McNeal Decl. ¶ 5) ("Officer Ryan said a comment to me like, 'I just got married and you better be glad . . . or I'll take some black pussy.' "); Defs.' Ex. 21 (Reddic Decl. ¶ 4) ("On other occasions, Officer Ryan has referred to me as a 'bitch' or 'little black girl.' "); Defs.' Ex. 37 (Mackey Decl. ¶ 3) ("Shortly before my arrest in December, an SFPD officer I know as Darren yelled that I 'better get [my] black ass off the block.' "); Defs.' Ex. 34 (Jackson Decl. ¶ 2) ("On one occasion, I heard Officer Assaretto call an Africa[n]-American man 'nigger.' "); Defs.' Ex. 35 (Wallace Decl. ¶ 7) ("In 2014, I witnessed Officers Goff, Scafani and another [SFPD] Officer harass a small group of African-American teenagers. One of the officers told the group, 'Hands up, don't shoot.' The comment seemed to be intended to make fun of the Black Lives Matter movement.").

  ○ According to some of the female OSS defendants, some of the OSS officers have engaged in sexually inappropriate behavior with them. *See* Mot. at 63-67 (identifying Shaughn Ryan as a particular problem but also pointing to D. Goff and Ryan Crosby). While the incidents are clearly gender based, they are not always clearly race based.

B. Government's Evidence

In its opposition, the government provided declarations from several USAO attorneys and two DEA agents (both supervisors). In these declarations, the attorneys and supervisors deny they considered race or directed anyone to consider race in their management of the OSS. Below is a summary of the evidence the government submitted in support of its position. The declarations submitted by the government have been categorized by sweep.

For the **first OSS sweep**:

- Katie Dorais, Special Agent of the DEA. *See* Pl.'s Ex. 3 (Dorais (DEA) Decl.). Ms. Dorais worked on the first sweep only. Her supervisor in the DEA assigned her as the lead investigator for OSS. According to Ms. Dorais, the investigation "focused on repeat offenders and/or known drug traffickers who were selling drugs near schools in the Tenderloin." Pl.'s Ex. 3 (Dorais (DEA) Decl. ¶ 2). Also according to Ms. Dorais, race was not a consideration: "At no time did I consider race during either phase of [OSS]. In addition, I was not instructed by an [AUSA] to consider race during the investigation [and] I did not direct any law enforcement officer to take race into consideration." Pl.'s Ex. 3 (Dorais (DEA) Decl. ¶ 3). "Between August of 2013 and December of 2013 [the investigatory] team conducted twenty buy/walk Operations." Pl.'s Ex. 3 (Dorais (DEA) Decl. ¶ 4). Ms. Dorais does not explain whether she directly supervised each team member in the field when the arrests were made or whether she delegated the arrest decision to other law enforcement officers,

*e.g.,* other DEA officers or SFPD officers. Fourteen out of the 20 persons were arrested and indicted. The remaining 6 were not prosecuted because she and the supervising ASUA (see below) concluded that the evidence was not sufficient for prosecution—*i.e.*, the evidence was not strong enough. *See* Pl.'s Ex. 3 (Dorais (DEA) Decl. ¶ 4). Ms. Dorais does not explain why the evidence was not strong enough. In its brief, however, the government indicates that the evidence was not strong enough because "the videotape did not show the drug deal with sufficient clarity." Opp'n at 17 n.10; *see also* Pl.'s Ex. 2 (Supp. Hasib (USAO) Decl. ¶ 4). The Court does not have any information about the race of the 6 persons who were not prosecuted.

- Waqar Hasib, AUSA in the USAO. There are technically two declarations from Mr. Hasib, one being submitted as a part of this motion and one that was submitted earlier in the proceedings in conjunction with a different motion. *See* Pl.'s Ex. 1 (Hasib (USAO) Decl.); Pl.'s Ex. 2 (Supp. Hasib (USAO) Decl.). OSS was Mr. Hasib's idea. *See* Pl.'s Ex. 1 (Hasib (USAO) ¶ 3). According to Mr. Hasib, the purpose of OSS "was to aggressively prosecute drug dealers around schools and playgrounds in the Tenderloin district." Pl.'s Ex. 1 (Hasib (USAO) Decl. ¶ 3). It appears that Ms. Hasib was the attorney who primarily authorized prosecutions in the first sweep cases.[8] *See* Pl.'s Ex. 1 (Hasib (USAO) Decl. ¶ 4). (The government did not submit any declarations from the line AUSAs who recommended prosecution to Mr. Hasib.) Mr.

---

8. Another AUSA, Matthew McCarthy, seems to have authorized prosecution on a handful of OSS cases. *See* Pl.'s Ex. 2 (McCarthy (USAO) Decl. ¶ 2). Like Mr. Hasib, Mr. McCarthy states that race was not a consideration in his decision to commence prosecu-

tion. *See* Pl.'s Ex. 2 (McCarthy (USAO) Decl. ¶ 3) ("AUSA Hasib's prosecution memoranda did not mention the race of the proposed defendants, and I did not review video or photographs of those defendants.").

Hasib authorized the prosecutions based on the sufficiency of the evidence (each case included a videotaped drug deal) and did not consider race. *See* Pl.'s Ex. 2 (Supp. Hasib (USAO) Decl. ¶ 2). "Indeed, in the large majority of these cases, [he] was entirely unaware of any particular individual's race when [he] authorized presentation to the grand jury." Pl.'s Ex. 1 (Hasib (USAO) Decl. ¶ 4). Mr. Hasib did consider the individual's criminal history prior to authorizing indictment because OSS was intended to "target recidivist, repeat offenders who were selling drugs near schools." Pl.'s Ex. 1 (Hasib (USAO) Decl. ¶ 6). Mr. Hasib did decline to authorize prosecution on some of the first sweep cases and typically did so "because the video recording did not clearly identify the individual who sold drugs." Pl.'s Ex. 2 (Supp. Hasib (USAO) Decl. ¶ 4).

For the **second sweep**:

- Charles Atakora, Special Agent of the DEA. Mr. Atakora appears to have worked on the second sweep cases only. He was assigned to OSS by his supervisor as the Case Agent. He "coordinated the investigations, collected evidence and presented twenty[-]three cases to the [USAO]. The [USAO] then presented the evidence to the grand jury which resulted in twenty[-]three indictments." Pl.'s Ex. 3 (Atakora (DEA) Decl. ¶ 1). According to Mr. Atakora, the investigation focused on "repeat offenders, prior arrestees, and/or known narcotic dealers in the Tenderloin . . . that were conducting narcotic transactions near schools." Pl.'s Ex. 3 (Atakora Decl. (DEA) Decl. ¶ 2). Also according to Mr. Atakora, he "did not consider race during the investigative process, and [he is] not aware of any investigator or prosecutor considering race during [OSS]." Pl.'s Ex. 3 (Atakora Decl. (DEA) Decl. ¶ 2). Like Ms. Dorais, Mr. Atakora does

not explain whether he directly supervised each team member in the field when the arrests were made or whether he delegated the arrest decision to other law enforcement officers, *e.g.*, other DEA officers or SFPD officers.

- Sarah Hawkins, AUSA in the USAO. There are technically two declarations from Ms. Hawkins, one being submitted as a part of this motion and one that was submitted earlier in the proceedings in conjunction with a different motion. *See* Pl.'s Ex. 1 (Hawkins (USAO) Decl.); Pl.'s Ex. 2 (Supp. Hawkins (USAO) Decl.). Ms. Hawkins worked only on second sweep cases. More specifically, she worked on cases involving 12 out of the 23 persons implicated in the second sweep. *See* Pl.'s Ex. 1 (Hawkins (USAO) Decl. ¶¶ 2-3). Ms. Hawkins recommended prosecutions for these 12 people. (She did not have the authority to commence prosecutions.) *See* Pl.'s Ex. 1 (Hawkins (USAO) Decl. ¶¶ 1-3). For each of the cases, she was "provided an account of the individual's conduct memorialized in a [DEA] Form 6, surveillance video of drug buys taken by the [SFPD], and the criminal history of the defendant." Pl.'s Ex. 1 (Hawkins (USAO) Decl. ¶ 5); *see also* Pls.' Ex. 2 (Supp. Hawkins (USAO) Decl. ¶ 2). She recommended prosecutions based on the sufficiency of the evidence and did not consider race. *See* Pl.'s Ex. 1 (Hawkins (USAO) Decl. ¶¶ 4-5). She worked on her OSS cases independent of the other line AUSA (*i.e.*, Mr. Farnham). *See* Pl.'s Ex. 1 (Hawkins (USAO) Decl. ¶ 10).

- Lloyd Farnham, AUSA in the USAO. There are technically two declarations from Mr. Farnham, one being submitted as a part of this motion and one that was submitted earlier in the proceedings in conjunction with a different motion. *See* Pl.'s Ex. 1 (Farnham (USAO) Decl.); Pl.'s Ex. 2 (Supp. Farnham

(USAO) Decl.). Like Ms. Hawkins, Mr. Farnham worked only on second sweep cases. More specifically, he worked on cases involving 11 out of the 23 persons implicated in the second sweep. *See* Pl.'s Ex. 1 (Farnham (USAO) Decl. ¶¶ 2-3). Mr. Farnham recommended prosecutions for these 11 people. (He did not have the authority to commence prosecutions.) *See* Pl.'s Ex. 1 (Farnham (USAO) Decl. ¶¶ 1-3). For each of the cases, he was "provided an account of the individual's conduct memorialized in a [DEA] Form 6, surveillance video of drug buys taken by the [SFPD], and the criminal history of the defendant." Pl.'s Ex. 1 (Farnham (USAO) Decl. ¶ 5); *see also* Pls.' Ex. 2 (Supp. Farnham (USAO) Decl. ¶ 2). He recommended prosecutions based on the sufficiency of the evidence and did not consider race. *See* Pl.'s Ex. 1 (Farnham (USAO) Decl. ¶¶ 4-5). He worked on his OSS cases independent of the other line AUSA (*i.e.,* Ms. Hawkins). *See* Pl.'s Ex. 1 (Farnham (USAO) Decl. ¶ 10).

- Kevin Barry, AUSA in the USAO. There are technically two declarations from Mr. Barry, one being submitted as a part of this motion and one that was submitted earlier in the proceedings in conjunction with a different motion. *See* Pl.'s Ex. 1 (Barry (USAO) Decl.); Pl.'s Ex. 2 (Supp. Barry (USAO) Decl.). Mr. Barry worked only on second sweep cases. More specifically, Mr. Barry approved the recommendation of prosecution for 7 out of the 23 people captured in the second sweep. *See* Pl.'s Ex. 1 (Barry (USAO) Decl. ¶¶ 2-3). Mr. Barry authorized the prosecutions based on the sufficiency of the evidence and did not consider race. In fact, he was "unaware of any individual's race at the time [he] authorized prosecution to the grand jury, and [he] remained unaware of their race at the time the grand jury returned the indictments." Pl.'s Ex. 1 (Barry (USAO) Decl. ¶ 5). Mr. Barry did consider the individual's criminal history prior to authorizing an indictment because OSS was "targeted [at] persistent, recidivist, and repeat offenders selling drugs near schools in the Tenderloin." Pl.'s Ex. 1 (Barry (USAO) Decl. ¶ 7). Three of the 7 persons whom Mr. Barry authorized for prosecution were career offenders, and another 2 were likely classified as Category III. *See* Pl.'s Ex. 1 (Barry (USAO) Decl. ¶ 7).

- Daniel Kaleba, AUSA in the USAO. There are technically two declarations from Mr. Kaleba, one being submitted as a part of this motion and one that was submitted earlier in the proceedings in conjunction with a different motion. *See* Pl.'s Ex. 1 (Kaleba (ASAO) Decl.); Pl.'s Ex. 2 (Supp. Kaleba (USAO) Decl.). Mr. Kaleba worked only on second sweep cases. More specifically, Mr. Kaleba approved the recommendation of prosecution for 16 out of the 23 people captured in the second sweep. *See* Pl.'s Ex. 1 (Kaleba (USAO) Decl. ¶¶ 2-3). Mr. Kaleba authorized the prosecutions based on the sufficiency of the evidence and did not consider race. In fact, he was "unaware of any individual's race at the time [he] authorized prosecution to the grand jury, and [he] remained unaware at the time the grand jury returned its indictments." Pl.'s Ex. 1 (Kaleba (USAO) Decl. ¶ 5). Mr. Kaleba did consider the individual's criminal history prior to authorizing an indictment because OSS was "targeted [at] persistent, recidivist, and repeat offenders selling drugs near schools in the Tenderloin." Pl.'s Ex. 1 (Kaleba (USAO) Decl. ¶ 6). Nine of the 16 persons whom Mr. Kaleba authorized for prosecution were career offenders. *See* Pl.'s Ex. 1 (Kaleba (USAO) Decl. ¶ 6).

Surprisingly, the government has *not* provided *any* declarations from SFPD officers or any nonsupervisory DEA agents about the actual operation of OSS. *As a result, the Court has no information on the critical question as to how the targeting and arrests of the OSS defendants operated in the field.* While there is evidence that high-level supervisors did not direct officers in the field to target suspects on the basis of race, the government offers no explanation as to how the highly improbable outcome that all 37 suspects were African Americans occurred, even though it appears from the record that African Americans constitute roughly 60%, not 100%, of drug trafficking in the Tenderloin. The government presented no evidence of how suspects for OSS "buys" were selected.

At the hearing, the government suggested for the first time that, as OSS operated in the Tenderloin, certain corners of the area were targeted first, which explained why all the OSS defendants are all African American—*i.e.*, those corners of the Tenderloin are dominated by African American drug dealers as opposed to, *e.g.*, Hispanic drug dealers. But the government never presented to the Court any *evidence* supporting this claim. Moreover, that representation, even if true, is problematic; it does not address who made the decision as to which corners should first be targeted and *why* only corners dominated by African American were targeted. Nor does the representation address Defendants' evidence showing racial patterns are not so clear as the government contends. For instance, non-African Americans were, in fact, arrested for drug offenses (by the SFPD) all over the Tenderloin—even on corners that purportedly had predominantly African American drug dealers; yet, no non-African American drug dealers in those areas was ever arrested and prosecuted for a federal crime under OSS. *See* Sommerfeld (FPD) Decl. ¶ 9 & Att. C

(map showing location of Tenderloin arrests with respect to San Francisco Superior Court charging data).

The fact that the government failed to present any evidence as to how OSS suspects were selected for "buys" and arrested for OSS prosecution—despite Defendants' substantial evidence suggesting race-based enforcement—is puzzling. At the hearing, the government stated that the lack of any evidence from the SFPD was because the SFPD refused to cooperate or provide assistance. This is surprising given that SFPD officers appear routinely in federal prosecution for *e.g.*, drug offenses, including prosecution arising out of OSS specifically. Obtaining SFPD cooperation in prosecutions where the SFPD has been involved in investigations and arrests has never been a problem to this Court's knowledge. It is also questionable why the government could have not compelled at least some of the SFPD officers to cooperate since some were also cross-designated as federal agents. Furthermore, the government failed to explain why it did not secure any declarations from nonsupervisory DEA agents who were familiar with the operation in the field. Although the government indicated, at the hearing, that one of the supervisory DEA agents did actually participate in the targeting and/or arrest of some of the OSS defendants, his declaration is, notably, lacking in any detail about how the targeting and arrests actually operated in the field (*e.g.*, how were the targeting decisions made?).

As a consequence, Defendants' evidence of selective enforcement is left largely unrebutted.

## IV. **SELECTIVE ENFORCEMENT**

As stated above, Defendants seek discovery on two different theories: (1) selective enforcement and (2) selective prosecu-

tion. The Court addresses the selective enforcement theory first.

## A. Dismissal as a Remedy for Selective Enforcement

[1]  As an initial matter, the government argues that Defendants' motion to compel discovery on the selective enforcement theory should be denied outright because dismissal is not a remedy where a criminal defendant raises a claim of selective enforcement. The Court does not find the government's position persuasive.

First, the Court takes note that the government does not challenge dismissal as an available remedy for a selective prosecution claim—only as a remedy for a selective enforcement claim.[9] But racial discrimination in enforcement of criminal laws is constitutionally as injurious as racial discrimination in prosecution. It is difficult to discern why selective prosecution warrants dismissal, but selective enforcement (upon which prosecution is necessarily predicated) would not. Racially selective action by law enforcement inflicts harm whether it is perpetrated by law enforcement in the streets or by a prosecutor in an office—both inflict substantial injury on the victim and society: in addition to violating the victim's rights to equality and lib-

erty, such discriminatory conduct impugns the integrity of the criminal justice system and compromises public confidence therein. As the Tenth Circuit explained in *Alcaraz–Arellano*, " '[r]acially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment.' " *Id.* at 1263. The Seventh and Tenth Circuits have likewise held that dismissal of criminal proceedings is a proper remedy for selective enforcement. *See Davis,* 793 F.3d at 712 (en banc) (addressing a motion to dismiss based on selective enforcement); *Alcaraz–Arellano,* 441 F.3d at 1252 (same).

At the hearing, the government suggested that dismissal as a remedy for selective enforcement would be unfair to prosecutors who did not engage in discrimination. This argument is flawed. It ignores the fact that, in cases of selective enforcement, even if the prosecutors did not discriminate, law enforcement did, and thus there has still been a constitutional injury suffered by the victim of discrimination. The focus of the Fourteenth Amendment is not so much what is fair to prosecutors, but

---

9.  As noted above, in *Armstrong,* the Supreme Court stated in a footnote that it had "never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of *prosecution* on the basis of his race." *Armstrong,* 517 U.S. at 461 n. 2, 116 S.Ct. 1480 (emphasis added). Notwithstanding this statement, the government does not dispute that dismissal is in fact a remedy for a claim of selective prosecution. Indeed, that the remedy of dismissal is proper is supported by *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), which is discussed *infra.* Furthermore, circuit courts that have acknowledged that dismissal is a remedy for a selective prosecution claim, *see, e.g., In re Aiken County,* 725 F.3d 255, 264 n. 7 (D.C.Cir.2013) (stating that, "[i]f the Execu-

tive selectively prosecutes based on impermissible considerations, the equal protection remedy is to dismiss the prosecution"); *United States v. Vazquez,* 145 F.3d 74, 82 n. 6 (2d Cir.1998) (stating that "[s]elective prosecution claims usually come up in litigation as affirmative defenses to prosecution, and the remedy is generally dismissal of the suit that was selectively prosecuted"); *Feder v. Village of Shiloh,* No. 97–1101, 1997 U.S. App. LEXIS 19190, at *5 n. 3 (7th Cir. July 22, 1997) (acknowledging the *Armstrong* footnote but adding that the remedy of dismissal "seems to be implicit in other decisions of the Supreme Court, and this court implicitly has accepted that as the correct remedy"), and the government does not point to any authority to the contrary.

what is fair for the victims of discrimination.

Second, as amicus ACLU points out in its brief, in *Yick Wo*, the Supreme Court found dismissal an appropriate remedy for selective enforcement. In *Yick Wo*, the petitioners were Chinese persons who were arrested and ultimately imprisoned for violating local ordinances regarding laundry establishments. Each ordinance provided that it was unlawful for persons to operate laundry establishments in wooden buildings without first getting the consent of the board of supervisors. *See Yick Wo*, 118 U.S. at 368, 6 S.Ct. 1064. The consent of the supervisors was not given to the petitioners and some 200 other Chinese persons while some 80 non-Chinese persons were "permitted to carry on the same business under similar conditions." *Id.* at 374, 6 S.Ct. 1064. The petitioners argued that their imprisonment was a violation of the Equal Protection Clause (*i.e.*, based on race). The Supreme Court agreed, holding that the administration of the ordinances was

> directed so exclusively against a particular class of persons [*i.e.*, Chinese persons] as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are *applied by the public authorities charged with their administration*, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws.... Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as to practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

*Id.* at 373–74, 6 S.Ct. 1064 (emphasis added). The administration of the ordinances was within the province of the board of supervisors, not the local prosecutor. *See id.* at 374, 6 S.Ct. 1064 (stating that "[n]o reason whatever, except the will of the supervisors, is assigned why [the petitioners] should not be permitted to carry on, in the accustomed manner, their harmless and useful occupation, on which they depend for a livelihood"). Thus, although the discrimination at issue in *Yick Wo* was a form of selective enforcement rather than selective prosecution, the Supreme Court ordered that the petitioners be discharged as a remedy for the equal protection violation—a remedy that is akin to a dismissal.

Third, while the government argues that in, *United States v. Gomez–Lopez*, 62 F.3d 304 (9th Cir.1995) (a pre-*Armstrong* case), the Ninth Circuit held that selective enforcement is not a ground for dismissal (in the absence of a prosecutor's knowledge of law enforcement officers' targeting decisions), *see* Opp'n at 3-6, *Gomez–Lopez* is inapposite. In *Gomez–Lopez*, the defendant brought a claim for selective prosecution, not selective enforcement. The main holding of the case was that circuit-wide discovery was not permissible when all evidence pointed to decision-making being made at the local level. *See, e.g.*, 306-07 (stating that "the question in this case is whether the district court abused its discretion in ordering circuit-wide discovery without any indication that decision-making occurred at the circuit level"; adding that "[t]here is no evidence that the decision to prosecute [the defendant] was made by anyone other than the USAO for the Central District").

The government protests still that *Gomez–Lopez* weighs in its favor based on the following language from the opinion:

> We held in *United States v. Erne*, 576 F.2d 212 (9th Cir.1979), that the proper focus in discriminatory prosecution cases

is on the ultimate decision-maker. In *Erne*, we considered whether an evidentiary hearing was required on allegations that an Internal Revenue Service officer who referred Erne for prosecution impermissibly discriminated on the basis of Erne's exercise of his First Amendment rights. Because the revenue officer's recommendation for prosecution went through several internal reviews, and the United States Attorney ultimately decided whether to initiate criminal proceedings, we held that "even if [the revenue officer's] initial role in referring the matter for prosecution involved an improper discriminatory motive, it would be insufficient to taint the entire administrative process."

Likewise in *United States v. Greene*, 698 F.2d 1364 (9th Cir.1983), the defendant pursued a claim of selective prosecution based on a showing that an IRS agent referred Greene for prosecution because of an impermissible motive. Again, we held that even if the agent's role in referring the matter for prosecution involved an improper discriminatory motive, it would be insufficient because "the ultimate decision to prosecute is several steps removed from the revenue officer."

*Gomez–Lopez*, 62 F.3d at 306. However, this language simply indicates that a selective prosecution claim should focus on the acts of the prosecutor. It does not foreclose a selective enforcement claim.

Finally, while there is authority to support the government's position—most notably, the Sixth Circuit's decision in *United States v. Nichols*, 512 F.3d 789 (6th Cir.2008)[10]—that authority is distinguishable and in any event not binding precedent on this Court. In *Nichols*, the defendant claimed that a police officer's decision to run a warrant check on him was based

on his race, thus violating the Equal Protection Clause. *See id.* It appears that the only remedy sought by the defendant was exclusion—*i.e.*, suppression of evidence found by the police during a subsequent search of a vehicle that he was inside. The Sixth Circuit held that exclusion was not a remedy available for an equal protection violation. The Sixth Circuit also held that, in lieu of exclusion as a remedy, a person whose rights were allegedly violated could bring a civil lawsuit. *See id.* at 794–95. The relevant portion from *Nichols* is as follows:

While we, of course, agree with the general proposition that selective enforcement of the law based on a suspect's race may violate the Fourteenth Amendment, we do not agree that the proper remedy for such violations is necessarily suppression of evidence otherwise lawfully obtained. The exclusionary rule is typically applied as a remedy for Fourth Amendment violations, which Amendment does not apply to pre-contact investigatory steps like that presented here (the decision to run a warrant check). *See [United States v.] Avery*, 137 F.3d [343] at 353 [ (6th Cir.1997) ] ("[A]n officer's actions during the pre-contact stage cannot give rise to Fourth Amendment constitutional concerns because the citizen has not yet been 'seized.' "). Even if the Fourth Amendment were implicated, any challenge to a search or seizure based on legitimate probable cause, but in which it is alleged the officer's subjective motive was discriminatory, is doomed to fail. *See Whren* [*v. United States* ], 517 U.S. [806] at 813, 116 S.Ct. 1769 [135 L.Ed.2d 89 (1996) ] (unanimously rejecting such a challenge and holding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). Though

**10.** *See also United States v. Williams*, 431 F.3d 296, 299 (8th Cir.2005) (stating that, even if there were a due process violation based on racial profiling, "it is uncertain that dismissal is an appropriate remedy").

the Court left open the door to equal protection challenges in the same context, it gave no hint as to what the appropriate remedy would be. *See ibid.* Since we know from *Whren* that the evidence against Nichols would not be suppressed under the Fourth Amendment (even if the officers were improperly motivated by race), we are reluctant to graft that Amendment's traditional remedy into the equal protection context. Indeed, we are aware of no court that has ever applied the exclusionary rule for a violation of the Fourteenth Amendment's Equal Protection Clause and we decline Nichols's invitation to do so here. Rather, we believe the proper remedy for any alleged violation is a 42 U.S.C. § 1983 action against the offending officers. *See, e.g.*, *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir.2002) (rejecting officer's qualified immunity defense and affirming partial summary judgment in favor of Hispanic motorists who brought equal protection challenge under § 1983).

*Id.* at 794.

The Sixth Circuit's holding in *Nichols* is not persuasive. First, *Nichols* did not address the remedy of dismissal; but to the extent one could infer from *Nichols* that dismissal of an indictment, like exclusion, would not be an appropriate remedy for selective enforcement, such a result cannot be squared with *Yick Wo*, where as noted above, the Supreme Court ordered the remedy of discharge; notably, the fact that a § 1983 civil lawsuit was theoretically available was not a factor.[11]

Furthermore, in *Nichols*, the Sixth Circuit's decision was based on its reluctance to graft the remedy exclusion on to the Fourteenth Amendment because of that remedy's traditional association with the Fourth Amendment. Apart from the fact that the Fourteenth Amendment is a different constitutional source providing for different protections than the Fourth Amendment,[12] in *Nichols*, "there was no intrusion at all on Nichols's personal liberties by the initial actions of the officer [—] [t]here was no search, no seizure." *Id.* at 795. Under those circumstances, the Court appeared to view exclusion as an extreme remedy. Here, in contrast, Defendants were subject to seizure and then referred to federal authority for prosecution for charges which entailed an enhanced mandatory minimum sentence.[13] Unlike *Nichols*, the selective enforcement here did operate to inflict a substantial intrusion upon Defendants' personal liberties.

Moreover, while the Sixth Circuit grounded its analysis in terms of deterrence as the focus of the exclusionary rule,[14] the remedy for a Fourteenth Amendment violation encompasses more

---

**11.** Section 1983 was enacted prior to *Yick Wo*. *See Filarsky v. Delia*, 566 U.S. 377, 132 S.Ct. 1657, 1658, 182 L.Ed.2d 662 (2012) (noting that § 1983 was enacted in 1871).

**12.** It could also be argued that violation of the Fourteenth Amendment as a result of racially selective law enforcement is by definition more likely to be a systemic practice than an unlawful search.

**13.** In most cases, the quantity of drugs charged was small, but because the sales occurred within 1,000 feet of a school, charges if proven carried an enhanced sentence under

21 U.S.C. § 860. *See* 21 U.S.C. § 860(a) (providing that a violator is "subject to (1) twice the maximum punishment authorized by section 401(b) [21 U.S.C. § 841(b)], and (2) at least twice any term of supervised release authorized by section 401(b) for a first offense"). This enhancement applied even if the amount sold was only a fraction of a gram of crack cocaine, as occurred in OSS.

**14.** *See Lingo v. City of Salem*, No. 14-35344, 2016 WL 3525209 (9th Cir. June 27, 2016) (emphasizing deterrence rationale for exclusionary rule).

than deterrence. *Cf. Alcaraz–Arellano*, 441 F.3d at 1263 (stating that " '[r]acially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment' "). While dismissal of charges brought about as a result of a constitutional violation may serve in part as a deterrent to race-based law enforcement, it is also designed in part to redress that violation. *Cf. Davis v. United States*, 564 U.S. 229, 236–37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (stating that the exclusionary rule is a judicially created remedy the only purpose of which "is to deter future Fourth Amendment violations"; exclusion is not even "designed to '*redress*' the injury occasioned by an unconstitutional search") (emphasis added). It puts the victim where he or she could have been but for racially selective conduct of law enforcement.

*Nichols*'s assumption that a Fourteenth Amendment violation can adequately be addressed through a civil lawsuit is questionable. It is not clear a civil remedy for selective enforcement leading to a prosecution is available, particularly if the defendant is convicted. *See Heck v. Humphrey*, 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (stating that, if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated"); *Young v. City of Peoria*, No. 12–cv–1086, 2012 WL 5305336, at *5, 2012 U.S. Dist. LEXIS 153861, at *10 n. 5 (C.D.Cal. June 29, 2012)

(noting that "Young may not be able to bring a § 1983 claim for damages from an unlawful state conviction without first having the conviction overturned in some manner [under *Heck*]" and that "Young's selective prosecution claim, if successful, would necessarily mean that his conviction was unlawful").

Accordingly, the Court concludes, consistent with the holdings of the Seventh and Tenth Circuits, that dismissal of an indictment is a proper remedy for a selective enforcement claim if proven. Having so held, the Court must next address whether there is some evidence of discriminatory effect and then some evidence of discriminatory intent sufficient to warrant discovery.

B. Selective Enforcement—Discriminatory Effect

1. Similarly Situated Evidence Requirement

As an initial matter, the Court addresses Defendants' contention that discriminatory effect for selective enforcement purposes can be established based simply on the fact that all 37 OSS defendants are African American—*i.e.*, there is no need to do the *Armstrong* similarly situated analysis. This is the approach that the Seventh Circuit adopted in *Davis* (discussed above).

**[2]**  As noted above, *Davis* held that, as a general matter, in a selective enforcement case, a defendant need not necessarily provide some evidence as to preferential treatment of similarly situated persons outside the protected class in order to obtain discovery. Rather, the defendant can simply rely on statistics showing, *e.g.*, that a significant majority of persons targeted by law enforcement is made up of members of a protected class.[15] Under

---

**15.** At least one circuit court seems to have disagreed with the holding in *Davis* (although, admittedly, the case was decided before *Davis*). *See Alcaraz–Arellano*, 441 F.3d at 1264

(stating that "[s]imilar caution is required in reviewing a claim of selective law enforcement").

*Davis*, Defendants have established some evidence of discriminatory effect because all 37 of those targeted and arrested under the OSS program for whom the Court has information are all African American.[16] Defendants have submitted undisputable evidence that these numbers are highly significant as a statistical matter. The Court agrees with the approach in *Davis* and thus finds the statistical showing made by Defendants herein establishes discriminatory effect of selective enforcement.

### 2. Similarly Situated Evidence

[3] Assuming, however, a statistical showing alone is not sufficient to show discriminatory effect under *Armstrong*, and that the similarly situated requirement must be shown even in a selective enforcement (as opposed to selective prosecution) case, Defendants have satisfied that requirement. Defendants have shown some evidence that "similarly situated individuals of a different race were not [targeted]" by law enforcement. *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480.

To be sure, there is a threshold question of what the *Armstrong* Court meant by "similarly situated." In their motion, Defendants have provided examples of how various circuit courts have defined the term. *See* Mot. at 72-75. *See, e.g.*, *United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008) (stating that "[a] similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced"); *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir.1996) (stating that "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them"). The

Ninth Circuit has not defined "similarly situated" since *Armstrong* was decided. However, in a pre-*Armstrong* decision, the Ninth Circuit noted as follows:

> The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group. The control group and defendant are the same *in all relevant respects*, except that defendant was, for instance, exercising his first amendment rights. If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination. But where the comparison group has less in common with defendant, then factors other than the protected expression may very well play a part in the prosecution.

*United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir.1989) (emphasis added), *superseded by statute on other grounds as stated in United States v. Gonzalez-Torres*, 273 F.3d 1181, 1187 (9th Cir. 2001).

This approach makes sense and it consistent with how the term "similarly situated" is understood in civil discrimination cases. *See United States v. Brantley*, 803 F.3d 1265, 1271–72 (11th Cir.2015) (in a selective prosecution case, noting that, "[i]n a different context—when a Title VII plaintiff complains she was treated differently than a similarly situated co-worker— we have required the plaintiff and the employee to be similarly situated 'in all relevant respects' " in order "to prevent courts from second-guessing a reasonable decision by the employer"; "[t]he same considerations apply in a challenge based upon selective prosecution"—*i.e.*, "a court is not free to second-guess the prosecutor's exercise of a charging discretion").

---

16. As noted above, 6 out of the 43 persons arrested under OSS were ultimately not prosecuted. There is no evidence as to what the racial identities of those 6 persons are.

But, importantly, there is no magic formula for determining who is similarly situated. "Different factors will be relevant for different types of inquiries—it would be imprudent to turn a common-sense inquiry into a complicated legal one." *Chavez v. Ill. St. Police*, 251 F.3d 612, 635 (7th Cir.2001) (§ 1983 selective enforcement case). A court should take "care[ ] not to define the [similarly situated] requirement too narrowly." *Id.* Here, similarly situated should include consideration of the goals of the program. As discussed below, even under the government's purported criteria for prosecution under OSS (*e.g.*, history of drug dealing, strength of the evidence), Defendants have demonstrated there were similarly situated non-African Americans who were not arrested and subject to prosecution under OSS.

Defendants' evidence on this point includes:

- 100% of the OSS defendants are African American, which contrasts with the San Francisco Superior Court charging data obtained by Defendants (61.4% of those arrested and charged for drug-trafficking crimes in the Tenderloin were African American, **24.7% were Latino, and 10.7% were white** and the survey information obtained by Defendants (56% of the Tenderloin drug transactions involved African American drug sellers, **20% involved Latino drug sellers, and 16.8% involved white drug sellers**). *See* Mot. at 14, 21, 76; *cf. Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480 (noting that "respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court").
- The San Francisco Superior Court charging data includes **hundreds of cases involving non-African Americans** that could have been charged with

a violation of § 860 specifically because "[a]lmost every area of the Tenderloin falls within 1,000 feet of a playground or educational institutional." Mot. at 76.

- Defendants have identified approximately **sixty specific instances in which non-African American drug dealers** were arrested for committing drug-trafficking crimes in the Tenderloin in recent years but were not federally charged under OSS.
- Video from one of the OSS cases (now resolved) (*United States v. Roberts*, No. CR-13-0760 CRB) where the undercover informant **declines to buy drugs from an Asian woman and waits to buy drugs from the defendant, an African American woman**. *See* Mot. at 60-61; *see also United States v. Anthony*, No. CR-15-0005 EMC (Docket No. 11-2) (Phillips (FPD) Decl., Ex. G) (video in *Roberts* case).

The Court agrees with Defendants that this is enough to satisfy the similarly situated evidence requirement for discovery purposes. The evidence shows there are substantial numbers (and a substantial proportion) of drug dealers in the Tenderloin who are *not* African American; yet they were not stopped or arrested under OSS. Defendants have proffered specific examples of similar situated non-African Americans not arrested and charged in OSS.

In its papers, the government protests that nonetheless the similarly situated requirement has not been met. For example, the government asserts that the OSS cases are different from the comparator cases cited by Defendants because the OSS cases had strong evidence—*i.e.*, the drug transactions were videotaped. *See* Opp'n at 17 (stating that "the defendants do not cite to a videotaped drug sale in any of the 42 John and Jane Doe cases set forth in their motion for discovery"). But as Defendants

point out, that fact should have no impact on their selective enforcement theory. The question for selective enforcement is whether law enforcement was improperly targeting African Americans in the first place. That law enforcement, *after* making the targeting decision, videotaped the transaction is irrelevant to the initial selection of the target. *See* Mot. at 87. Videotape evidence simply begs the question of *whom* was targeted for an OSS "buy" in the first place.

The government also challenges Defendants' similarly situated evidence on the ground that the examples cited by Defendants did not involve " 'the same basic crime' " being committed " 'in substantially the same manner.' " Opp'n at 18-19 (quoting *Smith*, 231 F.3d at 810 (Eleventh Circuit decision)).[17] But there should be no real dispute here that the same basic crime was involved—drug trafficking in the Tenderloin and near a school.

The government's real beef, therefore, seems to be about how the crimes were committed. More specifically, for the non-OSS examples provided by Defendants, not all crimes involved hand-to-hand drug deals. For example, some Does were investigated based on informant tips; searches were executed in other Doe cases. *See* Opp'n at 18-20. But the government does not seem to dispute at least some of the non-OSS cases did involve hand-to-hand drug deals. Indeed, Defendants provided additional examples in their reply brief that involved such deals. One similarly situated example is arguably all Defendants need to show discriminatory effect. *See United States v. Alabi*, 597 Fed.Appx. 991,

996 (10th Cir.2015) (stating that "[w]e have recognized three possible methods of providing discriminatory effect in a selective-enforcement case: statistical evidence; *the identification of a similarly situated individual who could have been, but was not, stopped or arrested*; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similarly discriminatory behavior") (emphasis added). Moreover, even for the non-OSS examples that did not involve hand-to-hand deals, the question is whether that difference was material for the similarly situated analysis. Why did the manner of sales make a difference from the viewpoint of the objective of the OSS program? *Cf. Lewis*, 517 F.3d at 25 ("The focus of an inquiring court must be on factors that are at least arguably material to the decision as to whether or not to prosecute. Material prosecutorial factors are those that are relevant—that is, that have some meaningful relationship either to the charges at issue or to the accused— and that might be considered by a reasonable prosecutor."). The government has failed to provide an explanation as to how those differences were material. Indeed, as Defendants argue, because the OSS defendants were charged with violating § 841(a), *i.e.*, possession with mere intent to distribute, it should not matter whether there was a hand-to-hand deal. *See* Reply at 39-41 (also arguing that the government has improperly focused on how the officers investigated or discovered the crime).

Finally, the government suggests that any discriminatory effects are exaggerated because Defendants are assuming that

---

17.   In *Smith,* the Eleventh Circuit stated:
[W]e define a *"similarly situated"* person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would

have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.

*Smith,* 231 F.3d at 810.

"[OSS] selected 37 individuals for prosecution on 37 independent occasions," but that was not in fact the case: "[T]he [OSS] arrests were concentrated in a relatively small number of areas on a limited number of days . . . . [T]here was clear temporal and geographic clustering, which undermines the assumption of independence across the 37 arrests." Opp'n at 26. But Defendants' expert addresses this in her supplemental report.

> In any given data set, some arrests are potentially "clustered" by time and space. For example, arrests involving parties involved in the same criminal event are not temporally or spatially independent of each other. Yet this fact has not prevented well-respected, peer-reviewed social science journals from publishing research that uses the Z-score test to assess the likelihood that any racial disparities between the arrested population and other benchmarks are the result of chance.

Amram (FPD) Reply Decl., Att. A (Supp. Beckett Rpt. at Ex. 05248). The government did not provide any expert report in support of its position.

Furthermore, the government's claim of temporal and geographic clustering appears overstated. For the first OSS sweep, 14 OSS defendants were arrested on 8 different days in 10 different locations; for the second OSS sweep, 23 defendants were arrested on 8 different days in 10 different locations. *See* Cruz-Laucirica (FPD) Decl., Att. A (chart providing, *inter alia*, dates and locations of arrests). As reflected by maps prepared by Defendants, some of the locations are in relatively close proximity to one another but a fair number of the locations are also dispersed in different parts of the Tenderloin. *See* Sommerfeld (FPD) Decl., Atts. E-F (maps showing locations of arrests). This is not a situation where, *e.g.*, a majority of the arrests took place in just a few locations within the Tenderloin. In any event, the government

failed to produce *any* evidence as to how any clustering could have resulted in 37 out of 37 defendants being African American.

Accordingly, even if there were a similarly situated requirement for discriminatory effect in a selective enforcement case, the Court concludes that Defendants have made the required showing of some evidence in support.

C. Selective Enforcement—Discriminatory Intent

[4] Regarding discriminatory intent, the Ninth Circuit has noted that " '[a]wareness of consequences' is not the same as intent to discriminate. The kind of intent to be proved is that the government undertook a particular course of action 'at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group.' " *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir.1997); *see also Wayte v. United States*, 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (stating that "[d]iscriminatory purpose . . . implies more than . . . intent as awareness of consequences") (internal quotation marks omitted). Of course, discriminatory intent in the instant case is somewhat of a complicated matter—both for purposes of selective enforcement and selective prosecution—because the Court is being asked to consider the discriminatory intent of many different individuals. But notwithstanding this difficulty, the Court concludes that Defendants have adequately shown some evidence of discriminatory intent, in particular, within the SFPD.

[5] As an initial matter, the fact that 100% of all the OSS defendants are African American is probative of discriminatory intent, particularly when the relevant population is not 100% African American. *See* Mot. at 82 (arguing that "[t]he statistical disparity present here is so dramatic

that it alone should suffice for making a prima facie case of discriminatory intent"); *Belmontes v. Brown*, 414 F.3d 1094, 1127 (9th Cir.2005) (stating that habeas petitioner's statistics "may support a prima facie showing of unlawful charging discrimination" because they focused on the decisionmaker at the local level), *rev'd on other grounds by Ayers v. Belmontes*, 549 U.S. 7, 127 S.Ct. 469, 166 L.Ed.2d 334 (2006); *Tuitt*, 68 F.Supp.2d at 10 (in making an *Armstrong* evaluation, stating that "[a] discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose"; citing, *inter alia*, *Yick Wo*). As Defendants argue, this is comparable to the "inexorable zero" in the civil employment context. *See Woodson v. Pfizer*, 34 Fed.Appx. 490, 493 (7th Cir. 2002) (stating that, "[u]nder the 'inexorable zero' test, we held that when an employer with a statistically large enough workforce employs no African Americans, we can infer that the employer intentionally discriminates against African Americans in its hiring decisions"); *NAACP v. Town of E. Haven*, 70 F.3d 219, 225 (2d Cir. 1995) (stating that "evidence that an employer in an area with a sizeable black population has never hired a single black employee . . . , by itself, supports an inference of discrimination"; *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (stating that a "company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero' "). *But see Chavez*, 251 F.3d at 647–48 (Seventh Circuit decision noting that "[o]nly in 'rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation [*e.g.*, jury venire]' "; also stating that, "in his context, statistics may not be the sole proof of a constitutional violation and neither Chavez nor Lee have presented sufficient non-statistical evidence to demonstrate discriminatory in-

tent"); *cf. Olvis*, 97 F.3d at 745–46 (stating that, "in cases involving discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer that *prosecutors* in a particular case acted with a discriminatory purpose") (emphasis added).

Moreover, aside from the inexorable zero, Defendants have offered additional evidence of discriminatory intent. For example:

- Evidence that the SFPD generally was "aware[ ] of the presence, behavior, and specific geographic locations frequented by Hispanic/Latino dealers" in the Tenderloin, as reflected in several SFPD incident reports. Mot. at 22 (giving six SFPD incident reports as examples).

- Evidence that some of the SFPD officers who were a part of OSS knew about the existence of non-African American drug dealers in the Tenderloin, as they were personally involved with the arrests of more than 30 non-African American comparators identified in Defendants' opening and reply briefs. *See* Reply at 37-38.

Evidence of such knowledge combined with the failure to arrest any non-African American drug dealers as part of OSS gives rise to an inference of discrimination.

Finally, there is further evidence of discriminatory intent based on (1) the OSS case where a SFPD officer made the "fucking BMs" comment; (2) the OSS case where an informant avoided a non-African American drug dealer and waited instead for an African American drug dealer; and (3) race-based comments or conduct by at least some of the SFPD officers who worked on OSS, albeit in non-OSS situations (with many of these officers working on multiple OSS cases).

The totality of the above evidence constitutes some evidence of discriminatory intent.

Contrary to what the government suggests, the declarations from the supervisory DEA agents and the federal prosecutors do not dispel the inference of discriminatory intent. Notably, as previously noted, the supervisory DEA agents do not describe how targeting decisions were actually made in the field, and there are no declarations from any "line" DEA agents or any SFPD officer. Furthermore, just because a supervisory DEA agent was not aware of any racism, *see* Opp'n at 12, is hardly enough to say that there was no race-based selectivity by officers in the field.

### D. Summary

For the foregoing reasons, the Court concludes that dismissal is a remedy for a selective enforcement claim and that Defendants have submitted sufficient evidence of both discriminatory effect and discriminatory intent such that they are entitled to discovery in support of their selective enforcement claim.

## V. SELECTIVE PROSECUTION

### A. Selective Prosecution

While there is some evidence of discriminatory effect and discriminatory intent in selective enforcement, the evidence as to selective prosecution is more complicated.

The government points out that *Armstrong* assumed there has to be a selection in order for there to be a selective prosecution case. This position has merit. *See Armstrong*, 517 U.S. at 469, 116 S.Ct. 1480 (stating that "selective prosecution implies that a selection has taken place") (internal quotation marks omitted). Thus, as to the claim of selective prosecution, the focus should be on whether the prosecutors who made the charging decisions (in contrast to police officers in the field) engaged in race-based selectivity in deciding whether to prosecute Defendants.

[6] In this case, the record does not establish that federal prosecutors who made prosecutorial decisions were aware (either individually or collectively) of similarly situated non-African Americans that could have been presented for prosecution but were not. The only evidence on this point is the declarations of prosecutors that they had no such awareness. To be sure, this fact may inform discriminatory intent more so than discriminatory effect; the effect prong arguably should be measured by the pool of potential defendants known to all in the law enforcement chain, not just those presented to prosecutors.[18] *See Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480 (stating that "respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California *and were known to federal law enforcement officers*, but were not prosecuted in federal court") (emphasis added). Regardless, the lack of knowledge

---

**18.** The government contends that the similarly situated evidence provided by Defendants is not a proper comparator because the OSS cases had strong evidence—*i.e.*, videotape—to support prosecution and there is no indication that the non-OSS cases had such videotape evidence. However, Defendants have made a fair case that the videotape evidence is not as strong as the government asserts. *See, e.g.*, Piper (FPD) Reply ¶ 3 (stating that, in 11 OSS cases, after viewing the body-camera video evidence, she was not able "to see any money and/or substance exchanged between a defendant and an alleged purchaser"; that, in 6 OSS cases, after viewing the rooftop/building surveillance video, she was not able "to see actual substance allegedly exchanged between individuals on the street"; and that, in 3 OSS cases, after viewing the rooftop/building surveillance video, she was not able "to clearly see the interaction due to blurred image, camera zoom, or lack of lighting"). Moreover, the government fails to address the fact that non-OSS cases often had strong evidence in other forms such as the sale of drugs to an undercover officer. *See* Reply at 35.

and hence race-based selection by prosecutors is critical to the equal protection claim of selective prosecution.

As to discriminatory intent, Defendants argue that at the very least, the prosecutors knew at some point that all those prosecuted under the OSS were African American, and that this should satisfy *Armstrong*. However, " '[a]wareness of consequences' is not the same as intent to discriminate. The kind of intent to be proved is that the government undertook a particular course of action 'at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group.' " *Turner*, 104 F.3d at 1184; *see also Wayte*, 470 U.S. at 610, 105 S.Ct. 1524 (stating that "[d]iscriminatory purpose . . . implies more than . . . intent as awareness of consequences") (internal quotation marks omitted).

Defendants have offered several theories regarding discriminatory intent:

(1) Discriminatory intent can be inferred from the inexorable zero (*i.e.*, that none of the defendants prosecuted pursuant to OSS are not African American);

(2) Discriminatory intent can be inferred because not all OSS defendants met the charging criteria (*e.g.*, not all OSS defendants had a high-level criminal history);

(3) Discriminatory intent can be inferred because the prosecutors did not in place any policy to ensure against SFPD discriminatory animus; and

But these theories are problematic, whether taken individually or collectively. For example, the inexorable zero theory while viable in some contexts of discrimi-

nation jurisprudence, has yet to be applied to selective prosecution claims. *See Olvis*, 97 F.3d at 745–46 (stating that, "in cases involving discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose"; adding that, "[b]y ruling that defendants can meet these demanding burdens by presenting a study of the type they presented in this case [*i.e.*, that more than 90% of those who had been tried since 1992 for crack cocaine offenses in certain divisions are black] and thereby shifting to the government the onus of dispelling a presumption of discrimination would open virtually every prosecution to a claim for selective prosecution"). At the very least, the Court in *Armstrong* did not recognize its application in this context.

Defendants' assertion that discriminatory intent can be inferred because not all OSS defendants met the charging criteria (*e.g.*, not all OSS defendants were persistent, recidivist, and repeat offenders) is problematic given that they have identified only about 1/4 of the OSS defendants who did not meet the charging criteria.[19] *See* Mot. at 84-85 (identifying 9 OSS defendants). This factual showing is not compelling evidence of discriminatory intent.

Defendants contend that discriminatory intent can be inferred because the prosecutors did not put in place any policy to ensure against SFPD discriminatory animus. *See, e.g.*, Mot. at 90. This fact perhaps establishes negligence in management or maybe even deliberate indifference to the disparate consequences of its prosecutorial decisions.[20] But this

---

**19.** The government quibbles that a person with high-level criminal history is not the same thing as a repeat offender, *see* Opp'n at 32, but that seems to be elevating form over substance.

**20.** Defendants have a fair argument for deliberate indifference, especially by the time of the 2014 sweep because, by that time, the prosecutors should have known because, "[o]nce the first fourteen people were arrest-

would not establish the requisite intentionality currently required under *Armstrong* to support a claim of selective prosecution. Defendants cite *Wayte* to support their argument, but the language they cite is from the *dissent*. *See* Reply at 41 n.27 (noting that opening brief failed to identify language from *Wayte* as coming from the dissent). More specifically, Justice Marshall, in dissenting, stated that, to make out a prima facie case of selective prosecution, a person must show (1) "that he is a member of a recognizable, distinct class"; (2) "that a disproportionate number of this case was selected for investigation and possible prosecution"; and (3) "*that this selection procedure was subject to abuse* or otherwise not neutral." *Wayte,* 470 U.S. at 626, 105 S.Ct. 1524 (Marshall, J. dissenting) (emphasis added). Justice Marshall, in turn, cited *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), for this proposition, but *Castaneda* is arguably distinguishable because it was a case involving an equal protection claim in a very specific context—*i.e.,* the grand jury context. *See id.* at 494, 97 S.Ct. 1272; *see also Batson v. Kentucky,* 476 U.S. 79, 95, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (stating that, "[i]n cases involving the venire, this Court has found a prima facie case [of discrimination] on proof that members of the defendant's race were substantially underrepresented on the venire from which his jury was drawn, and that the venire was selected under a practice providing 'the opportunity for discrimination' "; adding that "[t]his combination of factors

raises the necessary inference of purposeful discrimination because the Court has declined to attribute to chance the absence of black citizens on a particular jury array where the selection mechanism is subject to abuse"). No court, however, has applied *Castaneda* or *Batson* to the specific context of *Armstrong.*

The Court therefore cannot say at this juncture that there is some evidence showing that the prosecutors selected the OSS for defendants because of their race. This conclusion is consistent with the Ninth Circuit's decision in *Turner,* 104 F.3d at 1180.

In *Turner,* the defendants—five African American men—asserted that "they had been selected for prosecution on crack cocaine charges on racial grounds." *Id.* at 1181. The defendants sought discovery on their selective prosecution claim. "In support of their motions, they submitted an affidavit of a paralegal in the Federal Public Defender's Office for the Central District of California stating that an inspection of closed cases of crack cocaine prosecutions defended by that public defender in 1991, 1992, and 1993 showed 47 African Americans, 5 Latino, and no white defendants had been charged with crack offenses." *Id.* at 1182. The defendants also submitted newspapers articles and a NPR report "commenting on 'the racial divide' in crack cocaine prosecutions" and a study showing that "3% of 8,250 persons charged with the sale of crack by the Los Angeles District Attorney to be Anglo, 53% to be African American, 43% to be Latino, and 1% to be 'other,' " while "[t]he comparable federal breakdown of 43 persons similarly charged was 0% Anglo, 83%

ed and arraigned in the 2013 sweep, the government must have been aware that they all appeared to be Black." Mot. at 89. The statements of the individual prosecutors that they were unaware of any pattern developing in the OSS prosecutions raises troubling questions. One would hope and expect the U.S.

Attorney's Office would have a systematic way of overseeing and discerning patterns of potential bias in respect to its prosecutorial decisions, and not have to await a defense motion before becoming aware of such pattern (as was represented at the hearing).

African American, 16% Latino, and 0% Other."[21] *Id.*

In turn, the government submitted affidavits from both FBI agents and prosecutors. One of the FBI agents explained, *inter alia*, that "much of the violent crime committed by street gangs . . . was connected to illegal drug trafficking," particularly with respect to cocaine base, with the Bloods and the Crips being the most notorious of those gangs. *Id.* at 1182–83. " '[E]nforcement of the federal laws regarding crack cocaine was one weapon in addressing the problem of gang-related violent crimes . . . .' " *Id.* at 1183. The prosecutors all stated that "race and ethnicity had not influenced their decisions to prosecute." *Id.* The government also provided a copy of the USAO's written prosecutive guidelines regarding drug offenses and an updated report of the ethnic composition of its crack cocaine prosecutions in Los Angeles—out of 149 defendants, 109 were African American, 28 were Hispanic, 8 were Asian, 1 was white, and 3 were unclassified. *See id.* at 1183–34.

With respect to the issue of discriminatory intent, the Ninth Circuit held that there was not enough to show that the defendants had been targeted based on their race. The government had provided a race neutral basis for the prosecution: Gangs were being targeted, not African Americans, and "the distribution of cocaine by gang members inclined to violence makes the distribution more heinous and more dangerous than the single sale of cocaine by individuals." *Id.* at 1185. The court added:

The [defendants] have offered no evidence whatsoever of a intent on the part of the prosecutors to prosecute them on account of their race, and the prosecutors and the FBI investigators have under oath denied such motivation. No reason was given by the district court to doubt the 'background presumption'] that United States Attorneys are properly discharging their duties, no reason given to doubt the integrity of prosecutors and investigators whose honesty, good faith, and absence of racial bias are unimpaired by anything in evidence before the court. The district court seems to have neither given credence to the affidavits that the government placed before it nor explained why the affidavits were not credible.

*Id.*

Here, as in *Turner*, Defendants have not presented reason to doubt the veracity of the government's declarations or the presumption of regularity that applies to prosecutors.[22] Should such evidence arise, however, this issue may be revisited. At this juncture, the Court shall not permit discovery on Defendants' selective prosecution claim.

In so ruling, the Court acknowledges Defendants' alternative theory that discriminatory intent can be inferred because the discriminatory intent of the law enforcement officers can be, in essence, attributed to the prosecutors because the prosecutors essentially delegated the decisionmaking to law enforcement officers. *See United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir.1996) (in discussing

**21.** The Ninth Circuit concluded that the defendants had failed to provide some evidence of discriminatory effect because the study was "based on a statistically unimpressive number of federal defendants" and failed to show that the small number of white persons who had been prosecuted in state court were similarly situated. *Turner*, 104 F.3d at 1885.

**22.** As noted above, in the first OSS sweep, the U.S. Attorney's Office decided not to prosecute 6 of the 20 arrestees. At this juncture, there is no evidence, for instance, that all 6 (in contrast to the 14 who were prosecuted) were non-African Americans.

vindictive prosecution claim, stating that, "to connect the animus of a referring agency to a federal prosecutor, a defendant must establish that the agency in some way prevailed upon the prosecutor in making the decision to seek an indictment"). While this may be a viable theory, in the instant case, there is insufficient evidence to support the theory. Notably, for the first sweep, 6 out of the 20 persons presented to prosecution by law enforcement were not prosecuted. This is strong evidence that independent prosecutorial judgment was exercised. For the second sweep, it is true that all 23 persons presented were actually prosecuted. But here the line AUSA declarations (from Ms. Hawkins and Mr. Farnham, who each worked independently from one another) indicate that independent prosecutorial judgment was exercised—*i.e.*, this was not just rubber stamping of law enforcement decisions. *Cf. Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir.2008) (noting that "[a] prosecutor's independent judgment may break the chain of causation between the unconstitutional actions of other officials and the harm suffered by a constitutional tort plaintiff[;] [p]ut in traditional tort terms, the prosecutor's independent decision can be a superseding or intervening cause of a constitutional tort plaintiff's injury, precluding suit against the officials who made an arrest or procured a prosecution").

The request for discovery into selective prosecution is therefore denied without prejudice to a further and future showing should additional evidence be revealed which meets the *Armstrong* standard.

## VI. DISCOVERY

For the reasons stated above, the Court shall permit discovery on the selective enforcement theory, but not the selective prosecution theory. In so ruling, however, the Court does not automatically authorize the breadth of the discovery sought by Defendants. Rather, the Court directs the

parties to meet and confer and agree upon "a more measured, perhaps phased, approach. *See, e.g., Davis*, 793 F.3d at 722–23.

The parties shall report within two (2) weeks from the date of this order to this Court by joint letter whether they can agree on a discovery plan. If not, the parties shall set forth their respective positions in said letter. A Status Conference shall be scheduled for 2:30 p.m., July 20, 2016.

This order disposes of Docket No. 119.

**IT IS SO ORDERED**.



**PAPST LICENSING GMBH & CO. KG, Plaintiff,**

v.

**XILINX INC., Defendant.**

**Papst Licensing GmbH & Co. KG, Plaintiff,**

v.

**Altera Corporation, Defendant.**

**Case No. 16-CV-00925-LHK, Case No. 16-CV-00926-LHK**

United States District Court, N.D. California, San Jose Division.

Signed June 9, 2016

**Background:** Assignee of patents related to methods for creating and verifying sets of instructions or operations used to test memory devices brought infringement action. Defendants moved for judgment on the pleadings based on claim that patents