UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIFFANY CROSS, et al., | Case No. 18-cv-06097-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO STRIKE** |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | Docket No. 54 |

This civil action is related to the arrests and criminal prosecutions of 37 African American men and women as part of Operation Safe Schools ("OSS"), a program jointly undertaken by the United States Attorney's Office ("USAO"), the Drug Enforcement Agency ("DEA"), and the San Francisco Police Department ("SFPD"). During the criminal prosecutions, a number of these individuals moved to compel discovery on the theory that they were selectively targeted and then prosecuted on the basis of their race. The Court granted in part the motion to compel discovery, but the criminal prosecutions never went forward because, in January 2017, the USAO decided to dismiss the cases with prejudice. *See United States v. Mumphrey*, No. CR-14-0643 EMC (N.D. Cal.) (Docket No. 293) (order approving notice of dismissal with prejudice). Seven of those persons have now brought a civil action against the City and County of San Francisco ("City" or "San Francisco") as well as multiple SFPD officers. Currently pending before the Court is Defendants' motion to dismiss and strike the first amended complaint ("FAC").

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss and **DENIES** the motion to strike.

# I.    FACTUAL & PROCEDURAL BACKGROUND

In the operative FAC, Plaintiffs allege as follows.

OSS was a program run by the USAO, DEA, and the SFPD.  *See* FAC ¶ 59.  "The purported goal of the Operation was to target drug sales taking place near schools in the Tenderloin."  FAC ¶ 61.  "Some 46 members of law enforcement were involved in the Operation, including at least 34 officers, sergeants, and other members of the [SFPD]; 10 DEA officers; a United States Marshal; and a Daly City police officer."  FAC ¶ 60.

"The core actions involved in the Operation consisted of undercover law enforcement officers or confidential informants carrying out a series of 'buy-walk' transactions."  FAC ¶ 64.  "In those buy-walks, undercover law enforcement officers or confidential informants approached targeted individuals in the Tenderloin to buy small amounts of drugs from them."  FAC ¶ 65; *see also* FAC ¶ 74 (alleging that "[t]he alleged transactions at issue . . . involved small amounts of drugs sold, such as one 'rock' of crack").  "[SFPD] officers decided which individuals to target for buy-walks and surveillance before the enforcement operations took place."  FAC ¶ 67.  "The federal indictments that later issued rested almost exclusively on information obtained during these 'buy-walk' transactions, meaning that [SFPD] officers' decisions to select and target individuals for surveilled buy-walks resulted in federal prosecution of those individuals."  FAC ¶ 68.  "Certain [SFPD] officers were involved in the vast majority of buy-walks and arrests in the Operation."  FAC ¶ 69.

Two "waves" were conducted pursuant to OSS.

- The first wave "took place on various dates from August to November 2013" and "consisted of 20 buy-walks."  FAC ¶ 70.  Federal charges were brought against 14 out of the 20 individuals.  All 14 were African American.[1]  *See* FAC ¶ 70.  All 14 pled guilty.  *See* SAC ¶ 76.

- The second wave "took place on various dates from October to December 2014" and "consisted of 23 buy-walks."  FAC ¶ 71.  Federal charges were brought against

---

[1] At present, Plaintiffs have no knowledge regarding the race of the 6 individuals who were not prosecuted.

all 23 individuals.  All 23 individuals were African American.  *See* FAC ¶ 71.

Plaintiffs were all arrested in the second wave.  *See* SAC ¶ 71.

- In sum, 37 people were arrested and prosecuted under OSS, with all 37 people being African American.  All 37 faced the prospect of "at least a one-year mandatory minimum sentence pursuant to 21 U.S.C. § 860(a), (d),[2] though several faced greater exposure. . . . By contrast, there are no mandatory minimum sentences for drug-related offenses under California law."  FAC ¶ 75.

Although only African American individuals were arrested and charged pursuant to OSS, "[i]ndividuals of many different races engage in drug sales in the Tenderloin."  FAC ¶ 54.  In other words, "drug dealing in the Tenderloin is not limited to members of any one racial group or ethnicity.  One set of survey results suggests that approximately half of those persons who sell drugs within the Tenderloin are Black, while 20% are Latino and 17% are white."  FAC ¶ 56.

_____

[2] Section 860(a) provides:

> Any person who violates section 401(a)(1) or section 416 [21 U.S.C. § 841(a)(1) or 856] by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school . . . is (except as provided in subsection (b)) subject to (1) twice the maximum punishment authorized by section 401(b) [21 U.S.C. § 841(b)], and (2) at least twice any term of supervised release authorized by section 401(b) [21 U.S.C. § 841(b)] for a first offense.  A fine up to twice that authorized by section 401(b) [21 U.S.C. § 841(b)] may be imposed in addition to any term of imprisonment authorized by this subsection.  Except to the extent a greater minimum sentence is otherwise provided by section 401(b) [21 U.S.C. § 841(b)], a person shall be sentenced under this subsection to a term of imprisonment of not less than one year.  The mandatory minimum sentencing provisions of this paragraph shall not apply to offenses involving 5 grams or less of marihuana.

21 U.S.C.S. § 860(a).  Section 860(b) covers second offenders.  Section 860(d) provides that,

> [i]n the case of any mandatory minimum sentence imposed under subsection (b) [this section], imposition or execution of such sentence shall not be suspended and probation shall not be granted.  An individual convicted under this section shall not be eligible for parole until the individual has served the mandatory minimum term of imprisonment as provided by this section.

*Id.* § 860(d).

3

Moreover,

> [SFPD] members know the Tenderloin is racially diverse and that drug activity in the Tenderloin is not limited to one racial group or ethnicity. For example, multiple law enforcement reports demonstrate the [SFPD's] awareness of the presence of Hispanic or Latino dealers in the Tenderloin. There are also hundreds of San Francisco Superior Court cases that involve non-Black individuals arrested by the [SFPD] for drug-trafficking crimes in the Tenderloin between January 2013 and February 2015, a period that covers the events giving rise to this suit.

FAC ¶ 58.

Plaintiffs maintain that the 37 individuals – including themselves – were targeted for the buy-walks on the basis of their race. As evidence of discriminatory intent, Plaintiffs point to the following (all identified by this Court during the criminal proceedings – *i.e.*, in its order granting discovery into selective enforcement):

- "The fact that all 37 OSS Arrestees were Black even though the relevant population was not 100% Black." FAC ¶ 86(a).
- "[SFPD] incident reports that showed that the [SFPD] was aware of the presence of and locations frequented by Latino dealers in the Tenderloin." FAC ¶ 86(b).
- "Evidence that some of the [SFPD] officers who were part of the Operation were aware of the existence of non-Black persons engaged in drug sales in the Tenderloin, as those officers were personally involved with the arrests of more than 30 of the non-Black comparators identified by the Federal Defender." FAC ¶ 86(c).
- "A video from the investigation of Plaintiff McNeal, in which [Defendant] Officer Rosaia stated, 'fucking BMs,' – i.e., Black males – as the camera is focused on a group of Black men and women, and in response, [Defendant] Officer Crosby stated, 'shh, hey, I'm rolling.'" FAC ¶ 86(d).
- "A video from the investigation of a Black OSS Arrestee, Cassie Roberts, showing Officer Doe 1, who was acting in an undercover capacity as a buyer, declining an offer from an Asian dealer and instead purposefully waiting for Ms. Roberts to get off the phone so he could approach her." FAC ¶ 85(b)(iv); *see also* FAC ¶ 86(e).

4

- "Racially based conduct or comments made by other officers involved in the Operation, in other contexts." FAC ¶ 86(f); *see also United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1064 (N.D. Cal. 2016) (taking note of "race-based comments or conduct by at least some of the SFPD officers who worked on OSS, albeit in non-OSS situations (with many of these officers working on multiple OSS cases)").

As indicated above, the two OSS waves took place in late 2013 and 2014. Criminal proceedings in this District were largely initiated in 2014 and 2015.

> On March 31, 2015, the Federal Public Defender filed a notice of related cases for eight of the OSS Arrestees – including the Plaintiffs in this case – noting [a] pattern of racially selective enforcement and prosecution, and the intent to file a motion to dismiss the criminal indictments based on violations of the Equal Protection Clause's prohibition against racially selective enforcement of the laws.

FAC ¶ 78.

On April 27, 2015, the Executive Committee for the District assigned all of the criminal cases to this Court "in light of the stated intent of the Federal Public Defender and CJA counsel to file motions to dismiss for selective prosecution based on the same evidentiary record in each of the . . . cases." *United States v. Mumphrey*, No. CR-14-0643 EMC (N.D. Cal.) (Docket No. 30) (order).

On July 16, 2015, the federal government filed a motion seeking a ruling on the claim that the government had engaged in selective enforcement and selective prosecution. *See United States v. Mumphrey*, No. CR-14-0643 EMC (N.D. Cal.) (Docket No. 51) (Mot. at 1) (asking for "a ruling that the defendants are not entitled to relief in these criminal cases on any claim that law enforcement officers and prosecutors engaged in racial discrimination in [OSS]"). On December 2, 2015, the criminal defendants moved to compel discovery – more specifically, discovery targeted to support a theory of selective enforcement and/or prosecution pursuant to the Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456 (1996). *See United States v. Mumphrey*, No. CR-14-0643 EMC (N.D. Cal.) (Docket No. 119) (motion).

On June 30, 2016, this Court granted in part and denied in part the motion to compel discovery. *See United States v. Mumphrey*, No. CR-14-0643 EMC (N.D. Cal.) (Docket No. 190)

(order). More specifically, the Court allowed discovery on the selective enforcement theory, but not the selective prosecution theory.

On January 24, 2017, the federal prosecution filed a notice that it was dismissing the indictments in all of the criminal cases. The next day, the Court approved the dismissal with prejudice. *See United States v. Mumphrey*, No. CR-14-0643 EMC (N.D. Cal.) (Docket Nos. 289, 293) (notice and order, filed on January 24 and 25, 2017, respectively).

On October 3, 2018, several of the persons whose indictments had been dismissed filed the instant lawsuit asserting that their civil rights had been violated.

Under the operative FAC, Plaintiffs are as follows:

(1) Tiffany Cross;

(2) Shalonda Adams;

(3) Crystal Anthony;

(4) Arron Lee Matthews;

(5) Acacia McNeal;

(6) Tiana Reddic; and

(7) Darlene Francine Rouse.

In turn, the following persons and entities have been named as Defendants:

(1) San Francisco;

(2) SFPD Deputy Chief Mike Redmond;

(3) SFPD Captain Jason Cherniss;

(4) SFPD Sgt. Francis J. Hagan;

(5) SFPD Sgt. Ronald T. Liberta;

(6) SFPD Sgt. Darren Nocetti;

(7) SFPD Officer Ryan R. Crosby;

(8) SFPD Officer John Patrick Cunnie;

(9) SFPD Officer Murray P. Daggs;

(10) SFPD Officer Britt D. Elmore;

(11) SFPD Officer David A. Goff;

(12)    SFPD Officer Thomas J. Lee;

(13)    SFPD Officer Kenneth R. MacDonald;

(14)    SFPD Officer Brenton Thomas Reeder;

(15)    SFPD Officer Daniel P. Rosaia;

(16)    SFPD Officer Anthony M. Scafani;

(17)    SFPD Officer Daniel C. Solorzano; and

(18)    SFPD Officer John Doe.

Plaintiffs have asserted the following claims for relief:

(1) Violation of equal protection based on selective enforcement. *See* 42 U.S.C. § 1983.

This claim is brought against all non-supervisory SFPD officers, plus Sgt. Nocetti.

(2) Violation of equal protection based on selective enforcement. *See id.* § 1983.  This

claim is brought against all supervisory SFPD officers (including Sgt. Nocetti).

(3) Violation of equal protection based on selective enforcement. *See id.* § 1983.  This

claim is brought against the City.

(4) Violation of Title VI of the 1964 Civil Rights Act.  *See id.* § 2000d (providing that

"[n]o person in the United States shall, on the ground of race, color, or national origin, .

. . be subjected to discrimination under any program or activity receiving Federal

financial assistance"); 28 C.F.R. §§ 42.101-42.112.  This claim is brought against the

City.

## II.      DISCUSSION

A.    Motion to Dismiss

1.    Legal Standard

> To survive a [12(b)(6)] motion to dismiss for failure to state a claim
> after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S.
> 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544
> (2007), [a plaintiff's] factual allegations [in the complaint] "must . . .
> suggest that the claim has at least a plausible chance of success."  In
> other words, [the] complaint "must allege 'factual content that
> allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged.'"
>
> . . . . [The Ninth Circuit has] settled on a two-step process for

7

evaluating pleadings:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014).

Notably,

> [t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'"

*Iqbal*, 556 U.S. at 678.

### 2. All Claims – Statute of Limitations

Defendants move to dismiss the equal protection and Title VI claims on the basis that they are time barred. A contention that a claim is barred by the statute of limitations is an affirmative defense. Nevertheless, "a defendant may still raise a motion to dismissed based on [this] defense if the running of the limitations period is apparent on the face of the complaint." *Martinez v. Kaiser Found. Hosps.*, No. C-12-1824 EMC, 2012 U.S. Dist. LEXIS 93091, at *37 (N.D. Cal. July 5, 2012); *see also Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) (stating that "plaintiffs ordinarily need not 'plead on the subject of an anticipated affirmative defense'" but, "[w]hen an affirmative defense is obvious on the face of a complaint, . . . a defendant can raise that defense in a motion to dismiss").

According to Defendants, all claims are time barred based on the face of the complaint because, at the very least, Plaintiffs knew about potential selective enforcement as of March 31, 2015, *i.e.*, when the Federal Public Defender filed a notice indicating that a motion to dismiss

based on selective enforcement would be brought.[3]  *See* FAC ¶ 78.  However, Plaintiffs ultimately

did not file the instant lawsuit until October 3, 2018, *i.e.*, more than three years later.  Defendants

argue that this is outside the two-year limitations period applicable to § 1983 and Title VI claims.

*See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) (noting that, "[b]ecause §

1983 has no specific statute of limitations, federal courts borrow state statute of limitations for

personal injury actions," and "California's statute of limitations for personal injury actions is two

years"); *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993) ("hold[ing] that

claims brought under 42 U.S.C. § 2000d are governed by the same state limitations period

applicable to claims brought under § 1983").

      In response, Plaintiffs argue that their claims are not time barred because a tolling doctrine

applies.  "Whether the statute [of limitations] is tolled in section 1983 cases is determined by state

law not inconsistent with federal policy."  *Bacon v. City of Los Angeles*, 843 F.2d 372, 374 (9th

Cir. 1988); *see also Lucchesi v. Bar-O Boys Ranch*, 353 F.3d 691, 694 (9th Cir. 2003) (stating that

"[s]tate law governs the statutes of limitations for section 1983 actions as well as questions

regarding the tolling of such limitations periods").  The same is true for Title VI claims.  *See, e.g.*,

*Lee v. Bd. of Trs. of the Cal. State Univ.*, No. 2:15-cv-01713-CAS(PLAx), 2015 U.S. Dist. LEXIS

91463, at *16 (C.D. Cal. July 14, 2015) (stating that "California's equitable tolling rules apply to

plaintiff's Title VI claim").  In the instant case, Plaintiffs assert that there is both (1) statutory and

(2) equitable tolling.

          a.   <u>Statutory Tolling</u>

      Plaintiffs contend first that there is statutory tolling pursuant to California Government

Code § 945.3.  That statute, which is part of the California Tort Claims Act ("CTCA"), provides in

relevant part as follows:

---

[3] Defendants actually take the position that "the statute of limitations began to run at the time of the arrest[s] in early 2014."  Reply at 3.  But this argument lacks merit because there is no indication that, at the time of the arrests, Plaintiffs should have known that they were (allegedly) being targeted on the basis of their race.  *See Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 581 (9th Cir. 2012) (noting that federal law "determines when a federal cause of action accrues" and, under federal common law, "a claim accrues not just when the plaintiff experiences the injury, but when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and the cause of the injury") (internal quotation marks omitted).

9

> No person charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense may bring a civil action for money or damages against a peace officer or the public entity employing a peace officer based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating or reporting the offense or arresting or detaining the accused, while the charges against the accused are pending before a superior court.
>
> *Any applicable statute of limitations for filing and prosecuting these actions shall be tolled during the period that the charges are pending before a superior court.*
>
> For the purposes of this section, charges pending before a superior court do not include appeals or criminal proceedings diverted pursuant to Chapter 2.5 (commencing with Section 1000), Chapter 2.6 (commencing with Section 1000.6), Chapter 2.7 (commencing with Section 1001), Chapter 2.8 (commencing with Section 1001.20), or Chapter 2.9 (commencing with Section 1001.50) of Title 6 of Part 2 of the Penal Code.
>
> Nothing in this section shall prohibit the filing of a claim with the board of a public entity, and this section shall not extend the time within which a claim is required to be presented pursuant to Section 911.2.

Cal. Gov't Code § 945.3 (emphasis added). Plaintiffs maintain that, pursuant to § 945.3, the time from March 31, 2015 (when they stated an intent to challenge the criminal charges based on selective enforcement), to January 25, 2017 (when the criminal charges were dismissed), does not count – and therefore, their initiation of suit on October 3, 2018 (less than two years after dismissal), was timely.

As an initial matter, Defendants assert that § 945.3 is "not a general tolling provision" but rather "is part of the California Government Tort Claims Act" and "must be read in that context." Mot. at 7. To the extent Defendants mean that § 945.3 cannot be used to toll the limitations period in a § 1983 case, that argument has no merit. In *Harding v. Galceran*, 889 F.2d 906 (9th Cir. 1989), a § 1983 case, the Ninth Circuit stated that the tolling provision in § 945.3 "is consistent with the objectives behind section 1983 actions," and therefore concluded that "the statute of limitations on [the plaintiff's] section 1983 claims was tolled while criminal charges were pending against him."[4] *Id.* at 908-09; *see also Deocampo v. Potts*, 836 F.3d 1134, 1136-37 & n.1 (9th Cir.

---

[4] The Ninth Circuit addressed not only the tolling provision in § 945.3 but also a separate provision in the statute that "*absolutely prohibits* a party from bringing a civil action against a

10

2016) (in § 1983 case, noting that, pursuant to § 945.3 statute of limitations "was tolled while the criminal charges against Plaintiffs were pending"). To the extent Defendants argue that *Harding* and *Deocampo* do not address what application § 945.3 has to Title VI claims, that is true. *See* Reply at 3, 7. However, Defendants fail to explain why Title VI claims should be treated differently from § 1983 claims in this regard, and therefore the Court holds that § 945.3 has equal applicability to Title VI claims. *See Lee*, 2015 U.S. Dist. LEXIS 91463, at \*16 (stating that California equitable tolling law applies to a Title VI claim).

Defendants protest that § 945.3 is nonetheless inapplicable in the instant case because it provides for equitable tolling only when "charges are pending before a *superior court*." Cal. Gov't Code § 945.3 (emphasis added). In the case at bar, charges against Plaintiffs were pending before a federal district court, not a California superior court.[5] In short, Defendants argue that the literal language of § 945.3 precludes application of the statute to the instant case.

The Court is not persuaded. Under California law, "'[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of the statute if reliance on that language would defeat the plain purpose of the statute . . . .'" *Florez v. Linens 'N Things, Inc.*, 108 Cal. App. 4th 447, 452 (2003) (quoting *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983)); *see also Lungren v. Deukmejian*, 45 Cal. 3d 727, 735 (1988) (stating that the "plain meaning" rule "does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose"; "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute" – *i.e.*, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act"); *cf. Bond v. United States*, 572 U.S. 844, 856-57 (2014) (under federal law, finding statutory interpretation supported by government problematic, in spite of language of statute, because it would dramatically intrude

---

peace officer while state criminal charges are pending against that party." *Harding*, 889 F.2d at 908 (emphasis added). The court held that the latter provision that "absolutely prohibits a party from bringing a civil action against a peace officer while state criminal charges are pending against that party, is contrary to the purposes of section 1983" and therefore "must fall under the Supremacy Clause." *Id.*

[5] Both *Harding* and *Deocampo* involved charges pending before a state court.

1    upon traditional state criminal jurisdiction.[6]

2           Defendants assert that the Ninth Circuit requires a lower court to follow the literal

3    language of a statute when it comes to statutory tolling, but the case that they cite, *Jones v. Blanas*,

4    393 F.3d 918 (9th Cir. 2004), does not support that proposition.  In *Jones*, the Ninth Circuit simply

5    held that a statute providing for tolling did not apply given its literal language and then went on to

6    consider equitable tolling.  *See id.* at 927 (noting that "California law provides for the tolling of a

7    statute of limitations . . . based on the disability of imprisonment" but "the language of the tolling

8    provision applies only to plaintiffs 'imprisoned on a criminal charge'"; "[t]he literal language of

9    the statute does not cover . . . a civil detainee").  The Ninth Circuit did not foreclose the possibility

10   that statutory tolling could apply, in spite of the literal language of the statute, if application of that

11   language would defeat the purpose of the statute.

12          Here, § 945.3, on its face, provides for tolling of the statute of limitations in a civil action

13   while criminal charges are pending before a "superior court."  Cal. Gov't Code § 945.3.  The

14   purpose of § 945.3 is clear.  The statute has three objectives: (1) civil damage complaints should

15   not be used as plea bargaining levers in the pending criminal proceeding; (2) civil actions should

16   not be used as a discovery device in the pending criminal proceeding; and (3) criminal defendants

17   should be encouraged to await the outcome of the criminal action before bringing a § 1983 case.

18   *See Harding*, 889 F.2d at 908-09 (citing *McMartin v. Los Angeles County*, 202 Cal. App. 3d 848

19   (1988)).  As to these objectives, it does not matter whether criminal charges are pending in a state

20   superior court or in a federal district court.  That is, if criminal charges are pending before a

21   federal district court, the same three objectives would still be served by applying tolling.

22          Moreover, the legislative history of § 945.3 reflects that the state legislature was concerned

23   about charges pending before a *trial* court.  *See* Pls.' RJN, Exs. A, C-E (legislative history

24   documents all referring to criminal charges pending before a "trial court").  Both the state superior

25   court and the federal district court are, of course, "trial courts."  Although the legislature

26   _____

27   [6] *See also Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004) (in discussing contract
     law, noting that, "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be
28   exposed by extrinsic evidence which reveals more than one possible meaning to which the
     language of the contract is yet reasonably susceptible").

                                                       12

ultimately used the phrase "superior court," it appears that the legislature used that term to distinguish trial courts from appellate courts, not state trial courts from federal trial courts. This is suggested by the language in the statute: "charges pending before a superior court *do not include appeals*." Cal. Gov't Code § 945.3 (emphasis added); *cf. Rancho Viejo v. Tres Amigos Viejos*, 100 Cal. App. 4th 550, 562 (2002) (noting that, "read literally, the statute immunizes specified agricultural enterprises only as against claims based upon a theory of public or private nuisance and not against claims based on other liability theories, such as trespass[,] [b]ut we cannot accept appellant's position that the Legislature intended by this reference to focus strictly upon the pleaded theory of liability and reject immunity for an accepted and established farming activity amounting to a nuisance, simply because it is pleaded as a trespass" – "*[o]ur review of the legislative history provided by appellant demonstrates no such intent*") (emphasis added). Even Defendants conceded at the hearing herein that the legislature likely did not even consider federal trial court proceedings at the time it enacted § 945.3.

Finally, the case law cited by the parties also weighs in favor of Plaintiffs. Only two other courts appear to have considered whether § 945.3 could be applied where criminal charges are pending in a federal trial court, instead of a state superior court. *See Harned*, 88 F. Supp. 2d at 1118; *Rogers v. Cal. Highway Patrol*, No. 2:17-cv-000149 JAM GGH, 2017 U.S. Dist. LEXIS 167377, at *7 (E.D. Cal. Oct. 9, 2017). Both held that statutory tolling should apply. *See, e.g.*, *Harned*, 88 F. Supp. 2d at 1122 (noting that the objectives of § 945.3 are served by application; also indicating that the literal language should not take precedence given that state law tolling was applied as a matter of federal law).

The cases on which Defendants rely are materially distinguishable. For example, Defendants cite *Matthews v. Macanas*, 990 F.2d 467 (9th Cir. 1993). There, the plaintiff filed a *Bivens* claim, asserting that federal officers violated his constitutional rights in connection with a search and arrest. (The plaintiff filed a *Bivens* claim, and not a § 1983 claim, because the defendants were federal officers, and not state officers.) The district court dismissed based on the statute of limitations, but the plaintiff argued in favor of equitable tolling based on § 945.3,

which provides that the applicable statute of limitations shall be

13

> tolled in a related civil damage action against a "peace officer"
> during the time the plaintiff's criminal charges are pending.  Under
> California law, "federal criminal investigators and law enforcement
> officers are not California peace officers," although they may
> exercise powers of arrest provided that they are engaged in the
> enforcement of federal criminal law.  Cal. Penal Code § 830.8(a).
> Because federal officers are not "peace officer," section 945.3's
> tolling provision does not apply to federal officials.

*Matthews*, 990 F.2d at 469; *see also Mitchell v. Culver*, No. 2:15-CV-00058-GEB-CMK, 2015

U.S. Dist. LEXIS 112827, at *4-5 (E.D. Cal. Aug. 25, 2015) (in a *Bivens* case, holding – in

accordance with *Matthews* – that § 945.3 did not provide a basis for equitable tolling; noting that

"[t]he California Penal Code contains provisions that define 'peace officer'" and California Penal

Code § 830.8(c) specifically provides that "'[n]ational park rangers are not California peace

officers'").

Defendants characterize *Matthews* as a case holding that a court must adhere to the literal

language of an equitable tolling statute.  But as Plaintiffs argue, *Matthews* is distinguishable

because, there,

> no state interests were affected by an outcome releasing *federal*
> officers from potential liability for alleged constitutional violations,
> so there was no obligation to construe the term broadly to effectuate
> state legislative intent.  By contrast, this case . . . implicates critical
> state interests in the accountability of California peace officers and
> the City for [alleged] racial targeting of California citizens . . . .

Opp'n at 10 (emphasis in original).  Hence, a literal reading of the statute was perfectly aligned

with its objectives.

Defendants also cite *Gregory v. Fresno*, No. 1:18-cv-00524-LJO-SAB, 2018 U.S. Dist.

LEXIS 152327 (E.D. Cal. Sept. 6, 2018) (report and recommendation), *adopted in part*, 2018 U.S.

Dist. LEXIS 210562 (E.D. Cal. Dec. 13, 2018).  In *Gregory*, the court addressed not § 945.3 but

rather § 946.6.  Section 946.6 provides in relevant part as follows:

> If an application for leave to present a claim is denied or deemed to
> be denied pursuant to Section 911.6, a petition may be made to the
> court for an order relieving the petitioner from Section 945.4. The
> proper court for filing the petition is a *superior court* that would be a
> proper court for the trial of an action on the cause of action to which
> the claim relates.

Cal. Gov't Code § 946.6(a) (emphasis added); *see also id.* § 945.4 (providing that, with certain

14

exceptions, "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board"). The *Gregory* court noted: "[A] federal court is not the proper court to hear [a] section 946.6 petition[]. . . . [M]ost California District Courts interpret § 946.6(a) as meaning that only state superior courts, and not federal district courts, may grant relief from Government Code § 945.4.'" *Gregory*, 2018 U.S. Dist. LEXIS 152327, at *143-44; *see also Hill v. City of Clovis*, No. 1:11-cv-1391 AWI SMS, 2012 U.S. Dist. LEXIS 32001, at *37 (E.D. Cal. Mar. 8, 2012) (noting that § 946.6(a) once referred to "a court" but, "since 2002, the language of § 946.6(a) has become more specific" and now refers to "a superior court"). At the hearing, Plaintiffs persuasively explained why *Gregory* is distinguishable – *i.e.*, because of federalism concerns, only a state court (and not a federal court) should be allowed to waive the sovereign immunity of the state. Again, the literal wording of § 946.6(a) was perfectly aligned with its intended purpose. Not so in the case of § 945.3.

Accordingly, the Court holds that statutory tolling is applicable in the instant case and thus there is no time bar to Plaintiffs' claims.

### b. Equitable Tolling

Even if Plaintiffs could not rely on statutory tolling, their claims still would not be time barred because equitable tolling also applies. *See Jones*, 393 F.3d at 928 (noting that equitable tolling operates independently of statutory tolling "to suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness[;] [t]he purpose of California's equitable tolling doctrine is to soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court") (internal quotation marks omitted); *see also Hopkins v. Kedzierski*, 225 Cal. App. 4th 736, 746 (2014) (stating that "[t]he equitable tolling of statutes of limitations is a judicially created, nonstatutory doctrine . . . 'designed to prevent unjust and technical forfeitures of the right to a trial on the merits when the purpose of the statute of

limitations – timely notice to the defendant of the plaintiff's claims – has been satisfied'").[7]

An equitable tolling determination generally requires a balancing by the court, in particular, (1) the reasons for the plaintiff's delay in filing suit and (2) prejudice to the defendant if the case were to go forward. *See Jones*, 393 F.3d at 928 (stating that "California courts apply equitable tolling to prevent the unjust technical forfeiture of causes of action, where the defendant would suffer no prejudice"). *See, e.g.*, *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 102 (2008) (addressing "the strand of equitable tolling arising from pursuit of an alternate administrative remedy"; stating that equitable tolling in this situation "require[s] a showing of three elements: 'timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff'"). In the instant case, this balancing weighs in favor of applying equitable tolling.

As an initial matter, the Court notes that, contrary to what Defendants suggest, it is not clear that equitable tolling is applicable only where there are "extraordinary circumstances" underlying the plaintiff's delay in filing suit. Although some cases refer to extraordinary circumstances, *see, e.g.*, *Kendrick v. City of Eureka*, 82 Cal. App. 4th 364, 369 n.2 (2000) (stating that "California decisional law does provide for equitable tolling, which, in extraordinary circumstances, might arguably be used to extend the tolling period"), not all do. *See, e.g.*, *McDonald*, 45 Cal. 4th at 102 (evaluating whether there has been "reasonable and good faith conduct on the part of the plaintiff").

Even assuming that extraordinary circumstances are required, that threshold has been met in the case at bar. As the Court noted at the hearing, Plaintiffs' decision to wait for the federal criminal proceedings to be completed before proceeding with their civil action was justified given that (1) more likely than not, the court in the civil action would stay the case until the federal criminal proceedings were completed and that (2) Plaintiffs could not realistically litigate their

United States District Court
Northern District of California

---

[7] As Plaintiffs note, *Wallace v. Kato*, 549 U.S. 384 (2007), is no bar to equitable tolling in the instant case. In *Wallace*, the Supreme Court simply declined to apply a federal tolling rule and indicated that there was no tolling rule applicable under Illinois law; here, the Court is addressing tolling under California law. *See id.* at 394 (stating that "we [are not] aware of [any] Illinois cases providing tolling in even remotely comparable circumstances[;] . . . [n]or would we be inclined to adopt a federal tolling rule to this effect").

civil action while federal criminal proceedings were still ongoing without putting their Fifth Amendment rights in the criminal proceedings in jeopardy. *See Ebay, Inc. v. Dig. Point Sols., Inc.*, No. C 08-4052 JF (PVT), 2010 U.S. Dist. LEXIS 23253, at *8 (N.D. Cal. Feb. 25, 2010) (noting that, "[w]hen simultaneous civil and criminal proceedings involve 'the same or closely related facts,' the Fifth Amendment concerns may be sufficient to warrant a stay"). The Court also notes that the facts in the case at bar also bear some similarity to facts in those cases that have allowed for equitable tolling because the plaintiff has been pursuing an alternate remedy before initiating suit. *See McDonald*, 45 Cal. 4th at 101. Here, Plaintiffs were litigating the issue of selective enforcement in an alternate forum, *i.e.*, the criminal proceedings, before moving on to file a civil action.

Defendants argue still that equitable tolling should not be permitted here because they would suffer prejudice if the Court were to allow this civil case to proceed. More specifically, they argue prejudice because "the records retention policy for Department of Emergency Management records is three years, and those records have now disappeared. [Also], [m]emories have faded, and because the USAO and DEA created the paperwork and prosecuted these matters, the SFPD lacks their normal investigatory records to refresh recollection." Mot. at 8. But none of these arguments is particularly compelling, at least at this juncture of the proceedings.

First, although Defendants claim records have now disappeared, there is no concrete evidence to support such. All that Defendants have presented to the Court is the records retention *schedule*, *see* RJN, Ex. F (records retention schedule); whether documents were actually destroyed is not known. In fact, as Plaintiffs note in their opposition, when documents could be destroyed depends on the triggering date for the three-year retention period. *See* Opp'n at 11 n.11 (arguing that records should have been retained for three years after the criminal proceedings were dismissed in January 2017). And if Defendants destroyed documents while knowing the Plaintiffs were claiming selective enforcement, that would clearly be problematic.

Second, while memories may have faded, as indicated by the above, Defendants have known about the charge of selective enforcement for quite some time – at the very least, as of June 2016, when the Court granted discovery on selective enforcement in the criminal proceedings. If

17

Defendants were concerned with fading memories while the criminal case was ongoing, presumably they took steps to preserve those memories.

Finally, the fact that the USAO and DEA created the paperwork and prosecuted the matters actually benefits Defendants because there is another source for documents relevant to the case, and nothing indicates that the USAO and DEA would not make information available as part of the civil proceedings.

### 3. All Claims – Causation

Defendants argue that, even if there is no time bar to Plaintiffs' claims, dismissal of all claims is still justified because "[a] prosecutor's independent decision to charge and prosecute a suspect breaks the chain of causation between an officer's allegedly unconstitutional act and a criminal prosecution." Mot. at 10. But the cases on which Defendants rely do not discuss independent prosecutorial decisions in the context of claims for *equal protection* (as here); rather, the cases discuss independent prosecutorial decisions in the context of, *e.g.*, *false arrest and malicious prosecution* claims, both of "which require a showing of lack of probable cause." Opp'n at 16. *See, e.g.*, *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) (addressing prosecutorial independence in addressing plaintiff's claims that he was arrested and imprisoned without probable cause for his protected speech); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066-67 (9th Cir. 2004) (addressing prosecutorial independence in addressing plaintiff's malicious prosecution claim).[8]

Here, it does not really matter whether Plaintiffs engaged in conduct that supported probable cause. Even if their conduct supported probable cause, Plaintiffs' equal protection rights were still violated if the police targeted Plaintiffs for the buy-walk transactions because of their race. *See Nickerson v. Portland Police Bureau*, No. CV-08-217-HU, 2008 U.S. Dist. LEXIS

---

[8] Defendants correctly note that *Awabdy* was not just a malicious prosecution case but also an equal protection case. *See Awabdy*, 368 F.3d at 1070-72 (noting that plaintiff brought not only a malicious prosecution claim but also claims for "direct constitutional violations under the First and Fourteenth Amendment[s]" – *e.g.*, defendants allegedly took action against plaintiff because of his political activity and because of his Arab ethnicity; adding that "nothing prevents [plaintiff] from bringing *both* malicious prosecution and direct First and Fourteenth Amendment claims in the same § 1983 action"). However, the Ninth Circuit addressed prosecutorial independence in discussing the malicious prosecution claim, and not the equal protection claim.

125016, at *20 (D. Or. Aug. 22, 2008) (noting that, in *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court "made clear that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment[;] [t]he Court noted that 'the Constitution prohibits selective enforcement of the law based on considerations such as race [b]ut the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment'"); *see also Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety-Division of State Police*, 411 F.3d 427, 440-41 (3d Cir. 2005) (stating that "'the fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for enforcement of a law[;] Plaintiffs' equal protection claims under the Fourteenth Amendment require a wholly separate analysis from their claims under the Fourth Amendment'"). That prosecutors may have independently found probable cause does not mean that they thereby endorsed the police officers' alleged racial discrimination – and even if the prosecutors did endorse the alleged discrimination (*e.g.*, continuing the prosecution of OSS arrestees even after claims of selective enforcement were made), that would at most provide a reason to hold the prosecutors accountable for discrimination as well. It would not be a reason to immunize the officers from liability for their discriminatory actions.

4.      Claims Against Nonsupervisory Defendants

Defendants argue next that, at the very least, the claims against the nonsupervisory defendants should be dismissed because Plaintiffs have failed to state a claim for relief.[9] Defendants present two main arguments:

(1) "[P]laintiffs' own allegations contradict any inference of [discriminatory] intent" because Plaintiffs "affirmatively allege that the SFPD enforces drug laws against all races, which it does. Specifically, plaintiffs allege that the Superior Court has 'hundreds of . . . cases that involve non-Black individuals arrested by the [SFPD] for drug trafficking crimes in the Tenderloin' during the two-year period that included the

_____

[9] It is not clear from their papers whether Defendants are also arguing that, without predicate constitutional violations by the nonsupervisory defendants, the City cannot be held liable (*e.g.*, on a ratification, deliberate indifference, or failure-to-train theory).

federal government's selection of persons to prosecute under OSS." Mot. at 10.

(2) "Plaintiffs cite to no facts regarding the specific intent of each of the individual defendants . . . ." Mot. at 10.

The Court rejects the first argument because Plaintiffs have alleged that they, along with others, were singled out for federal charges which carry a mandatory minimum of one year – something that persons charged under state law would not face. A discriminatory intent may thus be reasonably inferred as to this operation irrespective of whether other operations may not have been so affected.

The second argument, however, has some merit. As the FAC currently stands, Plaintiffs have not clearly explained (with one exception) why it is reasonable to infer that *each* nonsupervisory defendant harbored a discriminatory animus.[10] For example, was the defendant involved in multiple OSS arrests? Did the defendant make a racist comment? This deficiency, however, can likely be cured through an amendment. Indeed, at the hearing, Plaintiffs represented that some of the nonsupervisory defendants were involved in more than ten OSS arrests; one defendant was actually involved in almost 30 OSS arrests.

The Court therefore grants the motion to dismiss the claims against the nonsupervisory defendants (except for Officer Rosaia) but with leave to amend.

5. Claims Against Deputy Chief Redmond and Captain Cherniss

Finally, Defendants challenge the claims against two (not all) of the supervisory defendants – namely, Deputy Chief Redmond and Captain Cherniss. Defendants assert that there are insufficient allegations that the two engaged in any wrongdoing:

> Plaintiffs do not allege, nor can they, that Captain Cherniss or Deputy Chief Redmond personally participated in any of the arrests or prosecutions, or was even aware of plaintiffs' arrests or the USAO's prosecutions of plaintiffs. In other words, plaintiffs are seeking to hold them responsible for the actions of their employees, and no such respondeat superior liability exists.

---

[10] The FAC contains an allegation that one of the nonsupervisory defendants did make a racist statement and thus a discriminatory intent may fairly be inferred as to him. *See* FAC ¶ 86(d) (addressing "[a] video from the investigation of Plaintiff McNeal, in which [Defendant] Officer Rosaia stated, 'fucking BMs,' – i.e., Black males – as the camera is focused on a group of Black men and women, and in response, [Defendant] Officer Crosby stated, 'shh, hey, I'm rolling'").)

20

Mot. at 12-13.  Plaintiffs' main argument in response is that their supervisory claim is adequately

pled because they have alleged that Deputy Chief Redmond and Capt. Cherniss knew *or should

have known* of the targeting but failed to take corrective action; thus, the two defendants were

deliberately indifferent to Plaintiffs' constitutional rights.  At the hearing, Plaintiffs noted that they

did not sue all of the supervisors in the SFPD but rather focused on who they believed had some

kind of role in OSS.  Plaintiffs maintained that Deputy Chief Redmond likely had some kind of

role in OSS because he approved the assignment of Sgt. Nocetti to liaison with the federal

government and because he was the supervisor of at least some of officers involved in OSS.  *See*

FAC ¶¶ 26-27.  As for Captain Cherniss, Plaintiffs noted that he was the captain of the Tenderloin

station – "the smallest of the 10 district station areas that together cover the City and County of

San Francisco" – and that he was the supervisor of at least some of the officers involved in OSS.

FAC ¶ 28.

Because Plaintiffs are asserting a supervisory claim, the Court looks first to the Supreme

Court's decision in *Iqbal*.  In *Iqbal*, the Supreme Court noted that, in a *Bivens* case (and thus in a §

1983 case as well[11]), a supervisor "may not be held liable for the unconstitutional conduct of [a]

subordinate[] under a theory of *respondeat superior*."  *Iqbal*, 556 U.S. at 676.  A supervisor can be

held liable only for his or her "own individual actions."  *Id.*

The Supreme Court then addressed the specific *Bivens* claim being asserted in the case

under consideration: "invidious discrimination in contravention of the First and Fifth

Amendments."  *Id.*  A supervisor could not be held liable for invidious discrimination simply

because the supervisor knew of a subordinate's discriminatory purpose.  *See id.*; *see also OSU

Stud. All. v. Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012) (stating that *Iqbal* "holds that a plaintiff

does not state invidious racial discrimination claims against supervisory defendants by pleading

that the supervisors *knowingly acquiesced* in discrimination perpetrated by subordinates")

(emphasis added).  "[P]urpose rather than knowledge is required to impose *Bivens* liability on the

---

[11] *See Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (stating that, "[u]nder Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability") (internal quotation marks omitted).

1    subordinate for unconstitutional discrimination; the same holds true for an official charged with

2    violations arising from his or her superintendent responsibilities." *Iqbal*, 556 U.S. at 677; *see also*

3    *id.* at 676 (noting that "purposeful discrimination requires more than 'intent as volition or intent as

4    awareness of consequences'").

5        *Iqbal*, however, did not hold that any given *Bivens* or § 1983 claim against a supervisor

6    requires purposeful conduct on the part of the supervisor.  If the intent requirement for a claim is

7    something less – *e.g.*, deliberate difference – then a plaintiff need only show that the defendant

8    acted with that intent, whether the defendant was a subordinate or a supervisor.  *See, e.g.*, *Perez v.*

9    *United States*, 103 F. Supp. 3d 1180, 1211 (S.D. Cal. 2015) (noting that "*Iqbal* does not

10   necessarily impose a 'purpose' requirement in all constitutional contexts, but instead required that

11   the same requirements for holding a subordinate liable for a *Bivens* violation are equally

12   applicable to 'an official charged with violations arising from his or her superintendent

13   responsibilities'").  Thus, in *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), the Ninth Circuit noted

14   that liability for a claim of unconstitutional condition of confinement can be established through

15   deliberate indifference.  *See id.* at 1206 ("A claim of unconstitutional conditions of confinement,

16   unlike a claim of unconstitutional discrimination, may be based on a theory of deliberate

17   indifference.").  Therefore, a supervisor could be held liable for a claim of unconstitutional

18   condition of confinement if the plaintiff could prove deliberate indifference on the part of the

19   supervisor.  *See id.* at 1206-07 ("A showing that a supervisor acted, or failed to act, in a manner

20   that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to

21   demonstrate the involvement – and the liability – of that supervisor.  Thus, when a supervisor is

22   found liable based on deliberate indifference, the supervisor is being held liable for his or her own

23   culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or

24   her subordinates.").

25       *Starr*, however, does not hold that any given *Bivens* or § 1983 claim against a supervisor is

26   viable on a deliberate indifference theory.  Rather, supervisory liability turns on the substantive

27   scienter requirements of the constitutional claim at issue.  As the Ninth Circuit explained in *OSU*

28   *Student Alliance*: "*Iqbal* makes crystal clear that constitutional tort claims against supervisory

defendants turn on the requirements of the particular claim – and, more specifically, on the state of mind required by the particular claim – not on a generally applicable concept of supervisory liability." *OSU Stud. All.*, 699 F.3d at 1071. The Ninth Circuit continued: "courts before *Iqbal* generally did not have to determine the required mental state for constitutional violations, particularly not free speech violations" and, instead, "[a] uniform mental state requirement applied to supervisors: so long as they acted with deliberate indifference, they were liable, regardless of the specific constitutional right at issue. *See Preschooler II v. Clark Cnty. Sch. Bd. Of Trs.*, 479 F.3d 1175, 1182 (9th Cir. 2007) ('[A] supervisor is liable for the acts of his subordinates if the supervisor . . . knew of the violations of his subordinates and failed to act to prevent them.')." *Id.* at 1072. In other words, "[t]he line officers generally satisfied every mental state because they acted intentionally, and supervisors were subject to a uniform mental state requirement divorced from the underlying claim." *Id.* at 1073. But *Iqbal* "abrogat[ed] the second half of this framework" and "place[d] new weight on the state of mind requirement for constitutional torts. Now claims against supervisors present problems that claims against subordinates typically do not: must the supervisor have harbored the specific intent to subject the plaintiff to the injury-causing act, or does knowledge or some lesser mental state suffice?" *Id.*; *see also id.* at 1073 n.15 ("We understand *Iqbal*'s language eliminating the doctrine of 'supervisory liability' to overrule circuit case law that, following *City of Canton v. Harris*, had applied a uniform test for supervisory liability across the spectrum of constitutional claims.").

Given the above legal framework for supervisory claims, the first question in the instant case is what kind of claim has been brought by Plaintiffs. Based on the allegations in the FAC, Plaintiffs seem to be asserting both a claim for invidious discrimination (as in *Iqbal*) *and* a claim for failure to train.

For the invidious discrimination claim, Plaintiffs must allege purposeful discrimination by the supervisory defendants, and not just knowing acquiescence or deliberate indifference. *See id.* at 1071-72 (stating that *Iqbal* "holds that a plaintiff does not state invidious racial discrimination claims against supervisory defendants by pleading that the supervisors knowingly acquiesced in discrimination perpetrated by subordinates"); *see also Sandra T.E. v. Grindle*, 599 F.3d 583, 588

23

(7th Cir. 2010) (stating that, "[w]hile it appears that our precedent would have previously allowed a plaintiff to recover from a supervisor based on that supervisor's 'deliberate indifference' toward a subordinate's purposeful discrimination, after *Iqbal* a plaintiff must also show that the supervisor possessed the requisite discriminatory intent"). *Iqbal* indicates, however, that an inference of purposeful discrimination may be made where the supervisor condones the subordinate's misconduct. *See Iqbal*, 556 U.S. at 683 (noting that "the complaint alleges discrete wrongs – for instance, beatings – by lower level Government actors" and these allegations, "if true, and if condoned by [the supervisors], could be the basis for some inference of wrongful intent on [the supervisors'] part"); *see also Locke v. Haessig*, 788 F.3d 662, 671 (7th Cir. 2015) (stating that "[s]hort perhaps only of a confession of intentional discrimination, selective inaction can be strong evidence of discriminatory intent").

For a failure-to-train claim, the intent requirement is not as high as it is for an invidious discrimination claim. For a failure to train, deliberate indifference is the requisite intent. *See Neil v. Modesto City Sch. Dist.*, No. 1:17-cv-0256-LJO-SKO, 2017 U.S. Dist. LEXIS 171904, at *26 n.22 (E.D. Cal. Oct. 17, 2017) (in a post-*Iqbal* case, indicating that, where a claim is brought against a supervisor based on failure to train, "the requisite state of mind is 'deliberate indifference'"); *see also Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (in a pre-*Iqbal* case, indicating that a claim could be brought against supervisory officials for failure to institute adequate policies based on a deliberate indifference theory). Deliberate indifference may be shown by knowledge and acquiescence on the part of the supervisor. *Cf. Starr*, 652 F.3d at 1207 (noting that, in a claim for unconstitutional condition of confinement, "a plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates").

In the instant case, Plaintiffs claim invidious discrimination because Deputy Chief Redmond and Captain Cherniss knew about the racial targeting in OSS but failed to intervene. For failure to train, Plaintiffs assert that, at the very least, Deputy Chief Redmond and Capt. Cherniss should have known about the racial targeting in OSS but failed to act. If these allegations are credited, then both causes of action would survive the motion to dismiss. The

problem for Plaintiffs is that, as the FAC is currently pled, there is an insufficient factual basis for the allegations that the supervisors had the requisite intent under either theory. If the two supervisors were actually involved in some concrete way with OSS, that would be a basis for knowledge; however, at the hearing, Plaintiffs essentially conceded that they did not know if either supervisor did have a role in OSS and that they were simply presuming such because Deputy Chief Redmond and Captain Cherniss are, as a general matter, supervisors over police officers who were actually involved in OSS.

The Court therefore grants the motion to dismiss the claims against Deputy Chief Redmond and Captain Cherniss. The dismiss, however, is without prejudice. If, during discovery, Plaintiffs uncover evidence indicating that one or both did have a role in OSS, then they may move for leave to amend to add the supervisor(s) back to the case.

B.     Motion to Strike

Finally, independent of the motion to dismiss, Defendants have moved to strike extensive parts of the FAC. The exact parts – *e.g.*, paragraphs, headers, footnotes, and/or portions thereof – are identified in Exhibit A to the motion. *See* Mot., Ex. A (identifying the following paragraphs or portions thereof: ¶¶ 4-5, 8, 63, "B," 78-91, 205, 207, 95-99, 2, 100, "a," 101-17, "c," 125-31, "d," 132-34, nn.21-22, 135-36, 139-40, n.25, 141-162, 165-77, n.34, 179-81, n.35, 182-87, 189-201, 206, and 325). Basically, the parts fall into one of the following three categories:

(1) The parts refer to or quote from the Court's order granting discovery on selective enforcement in the criminal proceedings. (The order shall hereinafter be referred to as "*Mumphrey*.")

(2) The parts refer to racist incidents not directly related to OSS.

(3) The parts refer to one or more of seven reports related to racially motivated policing in San Francisco.

Pursuant to Federal Rule of Civil Procedure 12(f), a court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed .R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir.

> 2010).  Motions to strike are generally disfavored.  *See Barnes v. AT & T Pension Ben. Plan – Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010); *see also Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (stating that, "*[i]f there is any doubt* whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion"); *McRee v. Goldman*, No. 11-CV-00991-LHK, 2012 U.S. Dist. LEXIS 36793 (N.D. Cal. Mar. 19, 2012) (explaining that motions to strike are disfavored because the motions may be used as delaying tactics and because there is a strong policy favoring resolution on the merits).

*Menzel v. Scholastic, Inc.*, No. 17-cv-05499-EMC, 2019 U.S. Dist. LEXIS 1887, at *17-18 (N.D. Cal. Jan. 4, 2019) (emphasis added).

Given the above standard, the Court denies the motion to strike.

(1) The references to the *Mumphrey* decision are not irrelevant.  The Court determined that there was sufficient evidence in support of selective enforcement to move forward with discovery.  Selective enforcement is the same issue in this civil proceeding.  The fact that *Mumphrey* was "issued without . . . input from the SFPD," Mot. at 14, does not thereby make references to the decision damning.  In responding to these parts of the FAC, Defendants can simply admit that the decision was issued but otherwise make a substantive denial.  Contrary to what Defendants suggest, Plaintiffs are not arguing that *Mumphrey* can "be used for issue or claim preclusion."  Reply at 7.

(2) Racist incidents that not directly related to OSS are not irrelevant.  One of Plaintiffs' theories – against both the City and the supervisory defendants – is a failure to train.  A failure to train can relate to officers who are not named defendants.  Although Defendants take the position that other officers' conduct is tangential, such conduct is not altogether immaterial.

(3) The seven reports are not irrelevant.  As noted above, one of Plaintiffs' theories is a failure to train.  Defendants argue that superfluous historical allegations are properly stricken, *see* Reply at 14, but they have not adequately shown that the allegations here about the reports are superfluous.  *See* https://www.merriam-webster.com/dictionary/superfluous (last visited March 22, 2019) (defining "superfluous" as "exceeding what is sufficient or necessary: extra").  Even if, as

1   Defendants claim, they have taken "extensive reform efforts," Reply at 14, Plaintiffs'
2   position is that Defendants still did not do enough.

3   To the extent Defendants assert that any or all of the above is prejudicial to them, Rule
4   12(f) allows a court to strike where a matter is scandalous, which is not the same thing as being
5   prejudicial. *But see* Reply at 12 (arguing for the first time that the *Mumphrey* allegations are
6   scandalous because "plaintiffs imply that the Police Department did not consider the allegations of
7   racism worthy of a response"). And in any event, allegations in the complaint are not subject to
8   rules of evidence. What may ultimately come in as evidence, *see* Fed. R. Evid. 403 (allowing for
9   evidence to be excluded where "its probative value is *substantially* outweighed by [*e.g.*] unfair
10  prejudice"), can be decided at a later point in time. Finally, the Court notes that the sheer breadth
11  of the motion to strike (as reflected in Exhibit A to the motion) weighs against granting the
12  motion. It is difficult to imagine what kind of pleading would remain if the Court were to strike
13  all parts identified by Defendants.

### III.    CONCLUSION

15  For the foregoing reasons, the Court rules as follows. The motion to dismiss is granted
16  with respect to the claims against the nonsupervisory defendants (except Officer Rosaia) and the
17  claims against Deputy Chief Redmond and Captain Cherniss. In all other respects, the motion to
18  dismiss is denied. Plaintiffs have leave to amend their claims against the nonsupervisory
19  defendants. The amended complaint shall be filed by **June 3, 2019**. Plaintiffs do not, at this time,
20  have leave to amend their claims against Deputy Chief Redmond and Captain Cherniss but are not
21  precluded from moving to add these individuals back to the case (or to add other supervisory
22  individuals) if discovery supports a basis for such an amendment.

23  This order disposes of Docket No. 54.

24  **IT IS SO ORDERED**.

26  Dated: May 2, 2019

_____

EDWARD M. CHEN
United States District Judge